BC

FILED
12/1/2025
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

AXM

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**IN RE CIVIL MATTER OF:** *Plaintiff,*
**GREGORY J. HALPERN** **vs.**

Hunter Biden; Paul Pelosi; Governor Gavin Newsom; Mayor Zohran Mamdani; Mayor Muriel Bowser; Governor Tim Walz; Governor Kathy Hochul; Harvard University; Columbia University; Wikipedia/Wikimedia Foundation; Planned Parenthood; Mark Zuckerberg META Facebook; Sundar Pichai, Larry Page, Sergey Brin, Alphabet Inc., Google Inc., YouTube, Jake Tapper; Rachel Maddow; Lawrence O'Donnell; Joe Scarborough; Robert De Niro; Musician Bono; Actor John Cusack; Celebrity Snoop Dogg; Musician Bruce Springsteen; Celebrity Taylor Swift; The View Whoopi Goldberg & Joy Behar; Nighttime Hosts Stephen Colbert& Jimmy Kimmel; Musician Beyoncé; Kenneth Gertz; The Gates Foundation; News Corp; Open Society Foundation; Black Rock; New York Stock Exchange (NYSE); CNN; NBC; ABC; CBS; NPR; PBS; USA Today; The Atlantic; Factcheck.Org; ProPublica; Snopes

*Defendants.*

**CIVIL NO. 25-50461**

**CAUSES OF ACTION (ILLINOIS-ONLY)**

COUNT I – FRAUD (COMMON LAW)
COUNT II – ILLINOIS CONSUMER FRAUD ACT (815 ILCS 505/2)
COUNT III – CIVIL CONSPIRACY (COMMON LAW)
COUNT IV – DEFAMATION (COMMON LAW)
COUNT V – FALSE LIGHT (COMMON LAW)
COUNT VI – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
COUNT VII – TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
COUNT VIII – ILLINOIS RICO (720 ILCS 5/33G)
COUNT IX – DECLARATORY JUDGMENT (735 ILCS 5/2-701)

# FIRST AMENDED COMPLAINT

(FRAUD, ILLINOIS CONSUMER FRAUD, DEFAMATION, FALSE LIGHT, IIED, TORTIOUS INTERFERENCE, CIVIL CONSPIRACY, ILLINOIS RICO, AND DECLARATORY RELIEF)

## JURY TRIAL DEMANDED

**(Illinois Constitution, Art. I, §13)**

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ........................................ 5

**PRELIMINARY STATEMENT** ........................................ 6

**I. PARTIES** ........................................ 7

A. Plaintiff ........................................ 7

B. Defendants ........................................ 7

**II. JURISDICTION AND VENUE (ILLINOIS-ONLY)** ........................................ 9

**III. FACTUAL BACKGROUND** ........................................ 10

A. Plaintiff's Work, Reputation, and Illinois Base of Operations ........................................ 10

B. Coordinated Online Manipulation and Visibility Suppression ........................................ 11

C. False, Misleading, and Defamatory Narratives by Media and Cultural Figures ........ 13

D. The Semantic Reframing Strategy ........................................ 14

E. Direct Harm to Plaintiff's Relationships, Opportunities, and Daily Life in Illinois .. 15

F. Roles of Individual Defendants in the Coordinated Pattern ........................................ 15

G. The Impact of Manipulated Public Information on Illinois Audiences ..................... 17

H. The Natural, Foreseeable, and Intended Consequences..........................................18

I. Continuing Harm and the Need for Redress Under Illinois Law..............................19

**IV. CAUSES OF ACTION (ILLINOIS-ONLY)**................................................20

COUNT I — Fraud (Common Law)..................................................................20

COUNT II — Illinois Consumer Fraud & Deceptive Business Practices Act............23

COUNT III — Civil Conspiracy (Common Law)....................................................27

COUNT IV — Defamation (Common Law)............................................................31

COUNT V — False Light (Common Law) ............................................................34

COUNT VI — Intentional Infliction of Emotional Distress.....................................36

COUNT VII — Tortious Interference with Prospective Economic Advantage.........39

COUNT VIII — Illinois RICO (720 ILCS 5/33G) ..................................................42

COUNT IX — Declaratory Judgment (735 ILCS 5/2-701)......................................47

**V. PRAYER FOR RELIEF**.........................................................................50

A. Compensatory Damages.........................................................................50

B. Punitive and Exemplary Damages..............................................................53

C. Statutory Damages Under ICFA.................................................................53

D. Treble Damages Under Illinois RICO..........................................................54

E. Declaratory Relief...................................................................................54

F. Costs......................................................................................................54

G. Pre-Judgment and Post-Judgment Interest..................................................55

H. Further Relief.........................................................................................55

**6. CERTIFICATION REGARDING NO FEDERAL CLAIMS**........................55

**7. CERTIFICATE OF SERVICE**....................................................................58

**8. EXHIBITS**..........................................................................................................59

**EXHIBIT A — SEARCH VISIBILITY SUPPRESSION & MISDIRECTION**

**EXHIBIT B — PLATFORM MANIPULATION & ALGORITHMIC BIAS**

**EXHIBIT C — NEGATIVE PUBLIC STATEMENTS & NARRATIVE AMPLIFICATION**

**EXHIBIT D — FORBES "ATTACK OF THE BLOGS" (2005) — PRIOR ATTACKS & HISTORICAL PATTERN**

**EXHIBIT E — ILLINOIS-SPECIFIC HARM (CHICAGO COMPUTER GUIDE)**

**EXHIBIT F — PROFESSIONAL CREDENTIALS (AIRBT BOARD) & EPSTEIN FINDINGS**

**EXHIBIT G — ILLINOIS ECONOMIC DAMAGE REPORT (2000–2025)**

**EXHIBIT H — HARM TIMELINE & NARRATIVE MATRIX (2000–2025)**

# TABLE OF AUTHORITIES (ILLINOIS-ONLY)

**Illinois Statutes**

• 735 ILCS 5/2-701 — Illinois Declaratory Judgment Act

• 720 ILCS 5/33G — Illinois RICO Statute

• 815 ILCS 505/2 — Illinois Consumer Fraud and Deceptive Business Practices Act

**Illinois Constitution**

• Ill. Const. Art. I, § 13 — Right to Jury Trial

**Illinois Case Law**

• Doe v. Doe, 2017 IL App (1st) 161376 — Elements of common-law fraud

• Avery v. State Farm Mut. Auto. Ins. Co., 216 Ill. 2d 100 (2005) — ICFA deceptive practices

• Adams v. Sussman & Hertzberg, Ltd., 292 Ill. App. 3d 30 (1st Dist. 1997) — Civil conspiracy

• Kolegas v. Heftel Broad. Corp., 154 Ill. 2d 1 (1992) — Defamation per se

• McGrath v. Fahey, 126 Ill. 2d 78 (1988) — IIED standards

• Fellhauer v. City of Geneva, 142 Ill. 2d 495 (1991) — Tortious interference

• People v. Smith, 2014 IL App (1st) 123094 — Illinois RICO interpretation

• Beahringer v. Page, 204 Ill. 2d 363 (2003) — Declaratory judgment standards

**Non-Legal References (Background Context Only)**

*(Not offered as legal authority)*

• Publicly available research on semantic manipulation, cognitive anchoring, and algorithmic bias

• Whistleblower and insider summaries describing platform manipulation patterns
• Media commentary illustrating narrative synchronization trends

## Preliminary Statement

Plaintiff Gregory J. Halpern brings this First Amended Complaint solely under Illinois common law and Illinois statutory law. Plaintiff asserts no federal claims, cites no federal statutes, and names no federal officers or federal agencies as defendants.

All federal-officer defendants previously named in this case have been voluntarily dismissed, and all federal theories and Doe defendants have been withdrawn. These dismissals are final, complete, and reflected **in** Dkt. 14, 15, 16, and 17, which remain controlling on the docket.

This action concerns a coordinated pattern of false statements**,** semantic manipulation**,** digital suppression**,** and reputational sabotage undertaken by numerous private individuals, media actors, cultural figures, nonprofits, and platform companies. Their conduct was directed at Plaintiff, consumed by Illinois audiences, and caused substantial injury to Plaintiff's professional relationships, economic prospects, and personal standing in his home community of McHenry County.

Plaintiff seeks money damages and declaratory relief under Illinois law.

No injunctive relief is requested.

No federal issue is presented.

This case belongs in the Circuit Court of McHenry County, Illinois, and is filed to ensure that an Illinois forum adjudicates the harms inflicted upon an Illinois citizen by private, non-federal defendants.

This is an action for damages and declaratory relief under Illinois law arising from coordinated defamatory, deceptive, and manipulative conduct that injured Plaintiff in Illinois.

## I. PARTIES

### A. Plaintiff

1. Gregory J. Halpern ("Plaintiff") is a natural person and lifelong resident of McHenry County, Illinois.
2. Plaintiff is an author, inventor, entrepreneur, and public-interest advocate whose professional, creative, and community-centered work is rooted in Illinois.
3. At all relevant times, Plaintiff's personal relationships, business opportunities, public reputation, and economic interests have been centered in Illinois.

### B. Defendants

The full list of Defendants appears in the case caption and consists of the following categories:

4. The Defendants in this action are private individuals, media personalities, commentators, corporate executives, platform operators, nonprofit entities, foundations, cultural influencers, and state or municipal officials acting in their personal or private capacities, not federal capacities.
5. None of the Defendants named in this First Amended Complaint are federal officers, federal agencies, or persons acting under color of federal law.
6. Each Defendant engaged in conduct that was published, transmitted, amplified, consumed, or resulted in harm within Illinois, including to Plaintiff and to Illinois audiences who were exposed to defamatory narratives, manipulated search results, and distorted portrayals of Plaintiff's work.
7. Each Defendant is sued only for their individual, private, or organizational conduct, not for any governmental role, authority, or federally connected action.
8. Defendants include, without limitation:
   - Private individuals whose public statements, media commentary, or online posts negatively affecting Plaintiff's character, credibility, economic capability, and/or work directly and/or indirectly.
   - Corporate and platform entities (including search engines, social media companies, and media outlets) whose digital systems and publication tools disseminated misleading or defamatory representations negatively affecting Plaintiff's reputation and economic capability.

- Public-facing personalities, entertainers, broadcasters, and influencers who repeated or amplified false narratives negatively affecting Plaintiff's economic capability.
- Nonprofit organizations, foundations, and advocacy groups whose public communications contributed to reputational harm within Illinois.
- State and municipal officials named solely in their personal capacities based on their public speech, commentary, or amplification of narratives unrelated to any governmental function.

9. The conduct of each Defendant caused foreseeable harm to Plaintiff in Illinois and falls squarely within Illinois personal-jurisdiction principles.
10. Plaintiff provides the specific identities of all Defendants in the caption and in the body of the complaint. No federal entities, agencies, or officers remain.

## II. JURISDICTION AND VENUE (ILLINOIS-ONLY)

11. This Court has subject-matter jurisdiction under Illinois law because Plaintiff asserts exclusively Illinois common-law and Illinois statutory causes of action, including fraud, defamation, civil conspiracy, consumer fraud, false light, IIED, tortious interference, Illinois RICO, and declaratory judgment.
12. No federal claim, statute, constitutional theory, or federal right is invoked in this First Amended Complaint.

13. All federal defendants and federal theories originally referenced in this lawsuit were voluntarily dismissed and withdrawn by Plaintiff, as reflected in Dkt. 14, 15, 16, and 17 on the federal docket. These dismissals are complete and final.

14. Personal jurisdiction exists over all Defendants because each:

(a) published, transmitted, or amplified false or misleading statements into Illinois;

(b) directed harmful conduct toward Plaintiff, an Illinois resident;

(c) caused reputational, relational, economic, and/or emotional injury within Illinois; or

(d) engaged in activities intentionally affecting Illinois audiences who interact with Plaintiff's work, image, or name.

15. Venue is proper in the Circuit Court of McHenry County because:

(a) Plaintiff resides in McHenry County;

(b) the injuries occurred in McHenry County;

(c) Plaintiff's economic, relational, and reputational harm was suffered in McHenry County; and

(d) many of the defamatory statements and semantic manipulations were published to Illinois residents who received and interpreted them here.

16. This case belongs exclusively in Illinois state court. There is **no federal-question jurisdiction**, no diversity jurisdiction, and no basis for federal-officer or federal-agency removal.

## III. FACTUAL BACKGROUND

**A. Plaintiff's Work, Reputation, and Illinois Base of Operations**

1. Plaintiff Gregory J. Halpern ("Plaintiff") is a lifelong resident of Illinois, where he has built a career as an author, inventor, entrepreneur, and advocate for citizen power, independent thought, and economic transparency. From McHenry County, Plaintiff has produced public-facing works, research, and media projects that have attracted substantial interest from readers, citizens, innovators, entrepreneurs, and small business owners across the nation.
2. Plaintiff's creative and analytical work spans five decades and includes large-scale economic research, public-interest reforms, legislative proposals, and original intellectual property. His works are consumed, discussed, and shared by Illinois residents through online searches, media channels, social platforms, broadcasts, and direct community relationships.
3. Plaintiff's reputation, credibility, and public accessibility are essential to the success of his work. Plaintiff's economic research, books, audiovisual content, and advocacy projects all depend on honest public commentary and the ability of Illinois audiences to access his materials without distortion, interference, or sabotage.
4. As described below, various Defendants — acting independently and in concert — launched a coordinated series of defamatory, deceptive, manipulative, and suppressive actions designed to distort how Plaintiff appears to the public; to undermine his trustworthiness; to obstruct his opportunities; and to discourage

individuals and organizations from associating with him. These actions caused direct and measurable harm in Illinois.

**B. Coordinated Online Manipulation and the "Visibility Suppression" of Plaintiff's Work**

5. Beginning several years ago and continuing through the present, multiple Defendants — including media actors, cultural influencers, nonprofit organizations, platform operators, and public personalities — engaged in conduct that systematically distorted how Plaintiff's work, name, and projects appeared in public search environments and digital public spaces.
6. This suppression included the displacement of Plaintiff's legitimate materials, the insertion or elevation of misleading content, the burying of accurate information, and the promotion of hostile or irrelevant narratives. As a result, Illinois residents attempting to locate Plaintiff's works, research, or legislative proposals were steered toward distorted or fabricated material unrelated to Plaintiff's actual projects.
7. These manipulative distortions were not accidental. Former insiders and public whistleblowers have revealed that digital platforms routinely reframe, deprioritize, or bury materials associated with individuals whose viewpoints are disfavored or inconvenient to institutional interests. Exhibits A and B document precisely this pattern as it affected Plaintiff.
8. Defendants' coordinated conduct directly interfered with Plaintiff's ability to reach his Illinois audience. Work that had long circulated through organic interest

was suddenly hidden, misrepresented, or replaced by misleading third-party content, causing a sharp decline in engagement, inquiries, professional relationships, and collaborative momentum.

**9.** As shown in Exhibit A, Defendants' actions caused Plaintiff's public-facing materials to be displaced, buried, or replaced with unrelated and misleading content, resulting in Illinois residents receiving distorted, inaccurate, or irrelevant information when attempting to locate Plaintiff's work. In multiple searches, Plaintiff's legitimate projects and legislative materials were omitted entirely, while substitute narratives—unconnected to Plaintiff and often adverse—were presented in their place. This conduct operated as a deliberate pattern of reputational and economic sabotage, steering Illinois audiences away from Plaintiff's actual work and depriving him of visibility, credibility, and access to opportunities within the state.

**C. False, Misleading, and Defamatory Narratives Amplified Through Media and Cultural Figures**

10. Alongside digital suppression, several prominent media personalities, entertainers, influencers, commentators, and advocacy groups repeated or amplified false statements negatively affecting Plaintiff's reputation, character, and credibility.

11. These narratives did not arise spontaneously. They followed a coordinated pattern across multiple channels — repeating similar rhetorical frames, dismissive language, and derogatory themes. The same messages appeared in media

segments, interviews, online commentary, social posts, and nonprofit communications, creating the false impression of consensus.

12. Because Illinois residents rely heavily on these media channels for information and cultural orientation, the repeated negative framing materially harmed Plaintiff's standing within his own community, discouraging collaborators and damaging relationships essential to his Illinois-based work.

13. These attacks were launched without any investigation into the truthfulness of Plaintiff's work or character. They were intended to ridicule, delegitimize, and discredit Plaintiff in the eyes of the public.

14. As shown in Exhibit C, these coordinated public statements and media amplifications created a synchronized false narrative about Plaintiff that circulated widely among Illinois audiences, resulting in concrete reputational injury, economic loss, and diminished public engagement.

**D. The "Semantic Reframing" Strategy: Manipulating Meaning to Sabotage Plaintiff's Work**

15. Defendants did not rely on overt defamation alone. They participated in, endorsed, or amplified a semantic strategy designed to associate Plaintiff's name and work with negative emotional cues, mischaracterizations, and dismissive connotations.

16. This reframing involved pairing Plaintiff's concepts with unrelated negative themes, structuring narratives to imply stigma, and using leading language designed to undermine confidence and credibility in Plaintiff's ideas.

17. This method is well-documented in linguistic, psychological, and behavioral-research literature: when a person's work is repeatedly paired with negative cues, audiences subconsciously internalize those associations.

18. As demonstrated in Exhibits A and C, Defendants' actions resulted in Plaintiff's work being surrounded by unrelated or hostile contextual material, which misled Illinois residents and manipulated their perception of Plaintiff. The coordinated linguistic pattern embedded false emotional cues into virtually every interaction involving Plaintiff's name or work.

**E. Direct Harm to Plaintiff's Relationships, Opportunities, and Daily Life in Illinois**

19. Defendants' actions caused severe and tangible harm to Plaintiff in Illinois:

• Personal relationships were damaged as individuals encountered misleading content or defamatory narratives undermining Plaintiff's character.

• Professional opportunities — including partnerships, interviews, collaborations, speaking engagements, and public-interest projects — were lost or compromised.

• Book sales, public engagement, and entrepreneurial prospects declined substantially.

• Plaintiff's credibility, goodwill, and community standing were injured.

• Plaintiff endured ongoing emotional and psychological distress.

20. These harms were not abstract or speculative. They were felt directly in Plaintiff's daily life, professional work, and personal relationships within Illinois.

21. Exhibit E further documents Plaintiff's long-standing pattern of being targeted by digital attacks, including early Illinois-based incidents reported by the Chicago Computer Guide, demonstrating that this harm is part of a continuous pattern of reputational and economic interference experienced within the state.

**F. Defendants' Individual Roles Within the Coordinated Pattern**

22. Each Defendant contributed uniquely to the broader pattern of misconduct:

• Media actors and commentators broadcast defamatory narratives.

• Cultural figures repeated rhetorical cues undermining Plaintiff's credibility.

• Nonprofits and advocacy groups lent institutional weight to false portrayals.

• Digital platforms buried or distorted Plaintiff's public-facing materials.

• Individual repeaters and amplifiers — including but not limited to Kenneth Gertz — reflected and redistributed the same anti-Trump, hate-Trump, and kill-Trump rhetorical patterns generated by major media, platform actors, and nonprofit messaging networks. Gertz's posts, drawn from this nationalized stream of narrative programming, were not unique or central to the enterprise; however, once injected into Plaintiff's Facebook feed, they contributed to the semantic poisoning of Plaintiff's Illinois audience environment. These posts triggered algorithmic shadow banning, link suppression, and reduced visibility of Plaintiff's patriotic messaging — effects documented in Exhibits B and F (including materials corroborated by Zach Voorhees. Gertz's role is therefore minor but measurable: he is one example of how

nationally generated hostile narratives infiltrated Plaintiff's Illinois communication channels and pro-rata contributed to the overall reputational and economic interference described throughout this Complaint.

23. As shown in Exhibit B, Defendants' suppressive tactics functioned collectively — resulting in downranking, omission, displacement, and contextually misleading presentation of Plaintiff's work, directly harming Plaintiff's relationships and opportunities in Illinois.

24. Exhibit D demonstrates that Plaintiff has been subjected to coordinated digital attacks for decades, including the nationally published Forbes Cover Story showing a historic pattern of reputational sabotage in which Plaintiff and his company valuation fell dramatically following orchestrated online smears.

25. The Defendants named in this action did not act in isolation. Their statements, posts, broadcasts, and semantic cues reflect a nationally synchronized rhetorical stream that has dominated major media channels, social-platform feeds, nonprofit messaging, and public commentary. This stream routinely includes anti-Trump, hate-Trump, and kill-Trump narratives; hostile portrayals of constitutional advocacy; and dismissive or defamatory framing directed toward those who support the restoration of the American republic. Individual repeaters such as Kenneth Gertz merely reflect this broader narrative machinery, which operates across industries, institutions, and personalities. Each Defendant contributed, in varying degrees, to the same unified

pattern of distortion, suppression, and reputational injury experienced by Plaintiff within Illinois.

**G. The Impact of Manipulated Public Information on Illinois Audiences**

26. Many Illinois residents searching for Plaintiff's work or evaluating his public materials encountered distorted information, misleading commentary, or absent results — preventing them from accessing Plaintiff's actual content.

27. Legitimate interviews, writings, and projects were buried or overshadowed by misleading substitutes, while unrelated or hostile material was elevated.

28. Exhibit F establishes Plaintiff's expertise in behavioral technology, demonstrating his firsthand understanding of how subtle distortions in public information predictably influence audience perception. These distortions misled Illinois audiences before they ever reached Plaintiff's work.

**H. The Natural, Foreseeable, and Intended Consequences of Defendants' Conduct**

29. Defendants' actions formed a coherent and deliberate pattern with natural and foreseeable consequences:

- People would lose trust in Plaintiff.
- Economic opportunities would evaporate.
- Collaborators would withdraw.

• Illinois audiences would encounter misleading or hostile content in place of Plaintiff's actual work.

• Plaintiff's livelihood, public standing, and emotional well-being would be severely damaged.

30. Defendants intended these harms or acted with reckless disregard for their inevitability.

31. Plaintiff's financial, reputational, emotional, and relational damages flow directly from this coordinated misconduct.

32. Exhibits A through F collectively demonstrate that these outcomes were not accidental, but rather the predictable consequence of Defendants' concerted efforts to distort Plaintiff's presence and credibility within Illinois.

**I. Continuing Harm and the Need for Redress Under Illinois Law**

33. The misleading, defamatory, and distorted content remains accessible today — continuing to mislead Illinois residents, discourage engagement, and undermine Plaintiff's opportunities.

34. Because these distortions are self-replicating — reposted, reshared, reindexed, and repeatedly resurfaced — the harm persists and intensifies over time.

35. Only an Illinois court can adjudicate these injuries, apply Illinois law, determine the truth, and grant Plaintiff the redress necessary to restore his standing.

36. As shown in Exhibit G, Illinois citizens have absorbed approximately $5.47 trillion in economic burdens between 2000 and 2025. This environment magnifies the damage caused by Defendants' misconduct, as Plaintiff's suppressed opportunities and reputational injury occurred within one of the most financially strained populations in the United States.

37. Exhibit H synthesizes Plaintiff's 25-year history of digital attacks, showing an escalating pattern of reputational and economic harm that continues to this day.

## IV. CAUSES OF ACTION (ILLINOIS-ONLY)

## COUNT I — FRAUD (COMMON LAW)

*(Against All Defendants Who Made, Repeated, or Amplified False Statements Negatively Affecting Plaintiff)*

1. Plaintiff realleges and incorporates by reference ¶¶1–37 of the Factual Background as though fully set forth herein.

2. Under Illinois law, fraud consists of:

(a) a false statement of material fact;

(b) knowledge or belief of falsity;

(c) intent to induce reliance;

(d) actual and reasonable reliance by third parties; and

(e) resulting damages.

*Doe v. Doe*, 2017 IL App (1st) 161376.

3. Defendants made, published, repeated, or amplified false statements of material fact negatively affecting Plaintiff's factual work, credibility, reputation, economic capability, and professional projects. These were material because Plaintiff's books, videos, economic research, legislative proposals, public-interest projects, and patriotic advocacy depend on trustworthiness and accurate public understanding.

False statements commonly included assertions implying that:

> *the core of Plaintiff's factual beliefs belong to the mentally unstable;*
>
> (b) *the core of Plaintiff's factual beliefs belong to the dishonest, deceptive, or untrustworthy;*
>
> (c) *the core of Plaintiff's fact-based public-interest projects were fraudulent or illegitimate;*
>
> (d) *the core of Plaintiff's factual research, books, videos, legislative proposals, and initiatives lacked credibility or integrity.*

4. One minor illustrative participant**,** Defendant Kenneth Gertz**,** reposted anti-Trump, hate-Trump, and kill-Trump political rhetoric within Plaintiff's Facebook comment environment. Although Gertz played no organizing or directing role in the broader scheme, his posts introduced hostile national narratives directly into

Plaintiff's Illinois audience space.

These injections of extremist anti-Trump rhetoric **triggered semantic poisoning and algorithmic suppression**, contributing to shadowbanning, visibility throttling, and link suppression affecting Plaintiff's patriotic messaging — effects consistent with the platform manipulation mechanisms documented in **Exhibits A, B, and F**, including internal Google materials disclosed by whistleblower Zach Vorhies.

Gertz's conduct therefore caused a **measurable pro-rata contribution** to the overall fraudulent pattern that damaged Plaintiff's reputation and economic capability in Illinois.

5. Defendants intended and expected that Illinois residents — including Plaintiff's readers, collaborators, partners, supporters, friends, and professional contacts — would rely on these falsehoods, withdraw support, refuse collaboration, or distance themselves from Plaintiff.

6. Illinois residents did rely on these statements, as demonstrated by:

(a) the diminishment of multiple collaborations;

(b) loss of notable interest in Plaintiff's legislative projects;

(c) reduced book sales, video engagement, and website interaction;

(d) damaged personal and professional relationships;

(e) diminished public presence and credibility within Illinois.

Exhibits **A, B, and C** provide direct evidence of such reliance, misdirection, and reputational distortion.

7. Defendants' false statements were reasonably and foreseeably relied upon by those exposed to them, particularly because these statements were:

(a) repeated across multiple platforms;

(b) amplified by media figures, cultural influencers, nonprofits, and platform curation;

(c) presented within manipulated digital environments that concealed, buried, or misrepresented Plaintiff's legitimate work — as documented in **Exhibits A, B, and C**.

8. As a direct and proximate result of Defendants' fraudulent conduct**,** Plaintiff suffered:

(a) financial loss;

(b) reputational injury;

(c) relational damage;

(d) emotional distress;

(e) diminished economic capability and earning potential;

(f) loss of prospective economic advantage.

9. Plaintiff's economic damages include:

(a) his baseline pro-rata Illinois economic burden, quantified in **Exhibit G**; and

(b) enhanced damages resulting from Defendants' coordinated suppression, sabotage, and interference with Plaintiff's financial and professional capability.

10. Defendants' conduct was willful, wanton, malicious, and fraudulent, entitling Plaintiff to compensatory and punitive damages under Illinois law.

**COUNT II — ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (ICFA)**
*(815 ILCS 505/2 — Against All Defendants)*

1. Plaintiff realleges and incorporates ¶¶1–37 of the Factual Background as though fully set forth herein.
2. Under ICFA, it is unlawful to use deception, misrepresentation, false implication, semantic manipulation, concealment, suppression, or omission of material fact in trade or commerce with intent that others rely on it.
   *Avery v. State Farm*, 216 Ill. 2d 100 (2005).
3. Defendants, individually and collectively, engaged in deceptive practices affecting Illinois consumers by distributing, publishing, amplifying, or semantically manipulating false statements that attacked the factual core of Plaintiff's work — including the factual basis of Plaintiff's economic research, books, legislative proposals, public-interest projects, patriotic messaging, and Illinois-facing communications.
4. These deceptive practices were material because Plaintiff's factual projects are consumed by Illinois residents who rely on his credibility, truthfulness, and

professional history when evaluating his work, research, and publications.

False implications commonly included assertions that:

(a) *the factual core of Plaintiff's beliefs belonged to the unstable or irrational;*

(b) *the factual core of Plaintiff's work belonged to the dishonest or deceptive;*

(c) *the factual core of Plaintiff's public-interest projects was fraudulent or illegitimate;*

(d) *the factual core of Plaintiff's research, books, legislative proposals, and initiatives lacked integrity or factual value.*

These statements misrepresented facts, not opinions, and directly interfered with Illinois consumers' ability to accurately assess Plaintiff's professional work.

5. Defendants' deceptive practices included, but were not limited to:

(a) presenting misleading or distorted descriptions of Plaintiff's fact-based work;

(b) suppressing or burying Plaintiff's factual content in digital environments;

(c) elevating hostile or irrelevant substitute content in its place;

(d) mislabeling Plaintiff's factual work through semantic poisoning and algorithmic framing;

(e) repeating false implications that Plaintiff's factual research was illegitimate;

(f) presenting fabricated narratives as if they were authoritative;

(g) injecting deceptive emotional cues around Plaintiff's factual materials;

(h) interfering with Plaintiff's economic capability by undermining the factual credibility of his work.

Exhibits A, B, C, and F demonstrate these practices.

6. These deceptive acts occurred in the course of Defendants' commercial operations, including search engines, social platforms, algorithmic curation systems, media distribution channels, nonprofit messaging networks, and public-facing broadcast environments. All such activities constitute "trade or commerce" under ICFA because they influence consumer perception, decision-making, and information flow within Illinois.
7. Defendants intended that Illinois residents — including readers, collaborators, participants, supporters, and community members — would rely on these deceptive portrayals when evaluating the factual basis and credibility of Plaintiff's work.
8. Illinois consumers did rely on these deceptive acts. As shown in Exhibits A, C, and H, Illinois residents encountering the distorted search outputs, suppressed visibility, and semantically hijacked content:

(a) withdrew support,

(b) ceased collaboration,

(c) ended professional engagements,

(d) declined to participate in Plaintiff's factual projects,

(e) or refused to engage with Plaintiff's publications.

9. Because Defendants attacked the factual foundation of Plaintiff's work, and because such attacks triggered algorithmic suppression documented in Exhibits A, B, and F, Illinois consumers were misled into believing Plaintiff's factual research and projects were invalid, discredited, or untrustworthy.

   This constitutes consumer deception under 815 ILCS 505/2.

10. As a direct and proximate result, Plaintiff suffered:

(a) diminished factual credibility in Illinois;

(b) reduced book and video sales;

(c) loss of collaborations and professional opportunities;

(d) reputational injury;

(e) suppressed public-interest reach;

(f) impaired economic capability in the Illinois marketplace;

(g) emotional distress; and

(h) measurable economic loss, quantified in Exhibit G.

11. Defendants' conduct was knowing, intentional, willful, and malicious.

    Plaintiff is entitled to actual damages, punitive damages, attorney's fees, and all other relief permitted under 815 ILCS 505/10a.

**COUNT III — CIVIL CONSPIRACY (COMMON LAW)**

*(Against All Defendants)*

1. Plaintiff realleges and incorporates ¶¶1–37 of the Factual Background as though fully set forth herein.

2. Under Illinois common law, a civil conspiracy consists of:

   (a) a combination of two or more persons;

   (b) for the purpose of accomplishing an unlawful act, or a lawful act by unlawful means;

   (c) the performance of one or more overt acts in furtherance of the agreement; and

   (d) damages resulting from the conspiracy.

   *Adams v. Sussman & Hertzberg, Ltd.*, 292 Ill. App. 3d 30 (1st Dist. 1997).

3. Defendants combined and acted in concert — implicitly or explicitly — to suppress, distort, discredit, defame, misdirect, and economically damage Plaintiff by attacking the factual core of his work, research, public-interest projects, legislative proposals, and patriotic advocacy. Their coordinated actions "negatively affected" Plaintiff's credibility, visibility, economic capability, and public standing within Illinois.

4. The conspiratorial conduct shared a consistent structural pattern, including:

   (a) synchronized rhetorical framing across media, platforms, nonprofits, and cultural influencers;

   (b) coordinated semantic manipulation and reframing of Plaintiff's factual work;

   (c) burying, concealing, downranking, or replacing Plaintiff's legitimate factual materials with misleading substitutes;

(d) amplification of false narratives by platform curation, media figures, advocacy groups, and algorithmic systems;

(e) algorithmic suppression designed to inhibit Plaintiff's visibility, credibility, and economic capability within Illinois;

(f) repetition of false implications attacking the factual legitimacy of Plaintiff's research, books, videos, and legislative proposals;

(g) cross-platform reinforcement of identical negative themes, consistent with the nationalized rhetorical stream described in ¶25 of the Factual Background.

These patterns are documented in Exhibits A through F.

5. Defendants acted with the shared objective of suppressing Plaintiff's influence, damaging Plaintiff's factual credibility, undermining his public-interest mission, destroying trust in his factual work, and impairing his professional and economic capability within Illinois.

   The consistency of messaging, timing, semantic framing, algorithmic outcomes, and amplification demonstrates a coordinated, predictable, and systematic purpose.

6. Numerous overt acts were committed in furtherance of this conspiracy, including but not limited to:

   (a) publishing and amplifying deceptive or misleading statements attacking the factual basis of Plaintiff's work;

   (b) artificially suppressing Plaintiff's factual materials in search engines and public-facing platforms;

(c) elevating hostile or irrelevant content in place of Plaintiff's factual work;

(d) propagating semantic cues engineered to mislead Illinois residents;

(e) repeating nationally circulating anti-Trump, hate-Trump, and kill-Trump narratives that contaminate Plaintiff's audience environment;

(f) degrading Plaintiff's factual credibility through distorted presentation of his work;

(g) disseminating harmful statements within Plaintiff's Illinois community networks — including illustrative posts by Defendant Kenneth Gertz — which introduced extremist national narratives into Plaintiff's audience space and triggered algorithmic suppression, as documented in Exhibits A, B, C, and F.

7. The conspiracy was not theoretical or accidental.

It was operationalized through repeated, predictable, and coordinated actions observable across:

- digital platforms,
- search engines,
- media outlets,
- nonprofit organizations,
- cultural influencers,
- algorithmic curation systems, and

- individual repeaters.

  Exhibits C, D, E, and H provide direct examples of sustained coordination spanning more than two decades.

8. As a direct and proximate result of Defendants' concerted actions, Plaintiff suffered substantial Illinois damages, including:

   (a) reputational injury;

   (b) financial loss;

   (c) loss of prospective economic advantage;

   (d) diminished credibility and visibility;

   (e) emotional distress;

   (f) damage to personal and professional relationships;

   (g) impaired economic capability in the Illinois marketplace;

   (h) measurable economic injury as quantified in Exhibit G.

9. The conspiracy was continuous, structured, and executed by an association-in-fact, whose combined influence caused Plaintiff ongoing and measurable injury. This conspiracy serves as both:

   (a) an independent tort; and

   (b) a factual predicate supporting Count VIII (Illinois RICO).

10. Defendants' actions were intentional, malicious, unjustified, and unlawful, entitling Plaintiff to compensatory and punitive damages under Illinois law.

**COUNT IV — DEFAMATION (COMMON LAW)**
*(Against All Defendants Who Published, Republished, or Amplified False Statements Negatively Affecting Plaintiff)*

1. Plaintiff realleges and incorporates ¶¶1–37 of the Factual Background as though fully set forth herein.
2. Under Illinois law, defamation occurs when a defendant:

   (a) makes a false statement of fact about the plaintiff;

   (b) publishes it to a third party without privilege; and

   (c) the statement harms the plaintiff's reputation.

   Certain categories constitute defamation per se, including statements imputing an inability to perform one's profession or imputing a lack of integrity. *Kolegas v. Heftel Broad. Corp.*, 154 Ill. 2d 1 (1992).
3. Defendants made, published, republished, or amplified false statements of fact concerning the factual legitimacy of Plaintiff's work, asserting or implying that the factual core of Plaintiff's beliefs, research, advocacy, and public-interest projects was irrational, deceptive, unstable, fraudulent, or illegitimate.

   These statements attacked the truthful foundations of Plaintiff's work, not his political opinions, and therefore constitute actionable false statements of material fact.
4. These false statements were made with knowledge of falsity or with reckless disregard for truth. Defendants had full access to Plaintiff's published works, factual analyses, legislative proposals, videos, and public-interest projects, yet ignored these materials and instead repeated hostile, misleading, and

algorithmically reinforced narratives that misrepresented the factual nature of Plaintiff's work. Exhibits A, B, C, and F demonstrate the systemic manipulation and semantic reframing that shaped these presentations.

5. Defendants disseminated these statements widely into Illinois, including through search engines, algorithmic curation systems, platform feeds, media broadcasts, nonprofit messaging networks, cultural influencers, and public commentary channels.

   These statements were presented to Illinois residents within environments that suppressed Plaintiff's actual work and elevated distorted or hostile substitutes. Exhibits A, C, and H document direct Illinois exposure.

6. One minor illustrative participant, Defendant Kenneth Gertz, reposted nationally circulating anti-Trump, hate-Trump, and kill-Trump rhetoric into Plaintiff's Facebook comment environment. Although Gertz played no directing role in the broader scheme, his posts introduced hostile national narratives into Plaintiff's Illinois audience space, triggering semantic poisoning and contributing to algorithmic suppression of Plaintiff's factual and patriotic materials. Gertz did not originate these narratives; he repeated them. His conduct reflects a small, pro-rata contribution to the broader defamation pattern described throughout this Complaint and documented in Exhibit C.

7. Illinois residents who encountered these false statements — including readers, collaborators, supporters, and community members — reasonably believed them to be authoritative given their presentation within search outputs, curated

feeds, and public-facing commentary. As a result, Illinois residents withdrew support, ceased communication, declined collaboration, or refused to engage with Plaintiff's work. Exhibits A, C, and H document this reliance and resulting harm.

8. As a direct and proximate result of Defendants' defamation, Plaintiff suffered substantial damages in Illinois, including:

   (a) loss of business opportunities;

   (b) reduction in book sales, readership, and public engagement;

   (c) destruction or impairment of collaborative ventures;

   (d) loss of prospective economic advantage;

   (e) reputational injury and diminished credibility;

   (f) impaired economic capability in Illinois's highly burdensome marketplace;

   (g) emotional distress and relational damage.

9. Defendants' defamatory conduct was intentional, malicious, deceptive, and without lawful justification and entitles Plaintiff to compensatory and punitive damages under Illinois law.

**COUNT V — FALSE LIGHT INVASION OF PRIVACY (COMMON LAW)**
*(Against All Defendants)*

1. Plaintiff realleges and incorporates ¶¶1–37 of the Factual Background as though fully set forth herein.

2. Under Illinois law, false light occurs when a defendant:

   (a) publishes information placing the plaintiff in a false light before the public;

(b) the portrayal would be highly offensive to a reasonable person; and

(c) the defendant acted with knowledge of or reckless disregard for the falsity of the portrayal.

*Lovgren v. Citizens First Nat'l Bank*, 126 Ill. 2d 411 (1989).

3. Defendants placed Plaintiff in a highly offensive false light by disseminating false implications attacking the factual core of Plaintiff's beliefs, research, advocacy, public-interest projects, legislative proposals, and patriotic messaging.

   These portrayals implied, expressly or by semantic cue, that:

   (a) the factual core of Plaintiff's beliefs was irrational or unstable;

   (b) the factual core of Plaintiff's work was deceptive or untrustworthy;

   (c) the factual core of Plaintiff's public-interest projects was fraudulent or illegitimate;

   (d) the factual core of Plaintiff's research, books, videos, legislative proposals, and initiatives lacked integrity, truthfulness, or factual basis.

These implications concern factual misrepresentations, not constitutionally protected opinions.

4. Defendants' conduct included not only direct statements, but also contextual manipulation, semantic reframing, algorithmic substitution, and selective suppression of Plaintiff's legitimate factual work.

   These systemic distortions conveyed to Illinois audiences a misleading, distorted,

and hostile image of Plaintiff. Exhibits A, B, C, and F demonstrate these combined effects.

5. Defendants publicly placed Plaintiff in a false light by:

(a) attaching stigmatizing or defamatory labels to the factual core of Plaintiff's ideas and work;

(b) juxtaposing Plaintiff's factual materials with unrelated negative content;

(c) burying or replacing Plaintiff's factual content with misleading alternatives;

(d) inserting hostile emotional cues around Plaintiff's name, book titles, and legislative terms;

(e) repeating nationally synchronized narratives implying factual illegitimacy;

(f) presenting Plaintiff's factual public-interest initiatives as extreme, harmful, or disreputable.

These acts collectively created a false public image, engineered through digital manipulation.

6. These false portrayals were published to Illinois audiences across search engines, platform feeds, algorithmic curation systems, media broadcasts, nonprofit communications, and community networks. Exhibits A, C, and H document Illinois exposure and the manipulation of Plaintiff's visibility.

7. Defendants knew or recklessly disregarded that these portrayals were false or misleading. Exhibits B and F establish Defendants' awareness of algorithmic

manipulation tools, semantic reframing effects, and the foreseeable harm to Plaintiff's factual reputation.

8. As a direct and proximate result of Defendants' false-light portrayals, Plaintiff suffered:

(a) reputational injury within Illinois communities;

(b) diminished factual credibility and public trust;

(c) impaired visibility and discoverability of Plaintiff's factual work;

(d) lost opportunities and collaborations;

(e) emotional distress;

(f) loss of prospective economic advantage;

(g) measurable economic harm as quantified in Exhibit G.

9. Defendants' conduct was intentional, malicious, reckless, and unjustified, entitling Plaintiff to compensatory and punitive damages under Illinois law.

**COUNT VI — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
*(Against All Defendants)*

1. Plaintiff realleges and incorporates ¶¶1–37 of the Factual Background as though fully set forth herein.

2. Under Illinois law, intentional infliction of emotional distress (IIED) occurs when:

   (a) the defendant engages in extreme and outrageous conduct;

   (b) the defendant either intends to cause emotional distress or acts with

reckless disregard for the probability of causing such distress; and

(c) the plaintiff suffers severe emotional distress as a result.

*McGrath v. Fahey*, 126 Ill. 2d 78 (1988).

3. Defendants collectively engaged in a coordinated pattern of extreme and outrageous conduct by disseminating and amplifying false, misleading, semantically manipulated, and algorithmically distorted portrayals attacking the factual core of Plaintiff's beliefs, research, public-interest work, patriotic advocacy, and legislative proposals.

   This conduct was extreme because it weaponized algorithmic suppression, semantic reframing, reputational sabotage, and coordinated narrative distortion to undermine Plaintiff's identity, mission, and public-facing role in Illinois.

4. Defendants' conduct was extreme and outrageous because it:

   (a) targeted the factual foundations of Plaintiff's life's work;

   (b) deliberately created a distorted public image of Plaintiff;

   (c) suppressed Plaintiff's visibility and credibility through algorithmic manipulation;

   (d) contaminated Plaintiff's Illinois audience environment with hostile, extremist national narratives;

   (e) injected false, misleading, and defamatory cues into search outputs and social feeds;

   (f) interfered with Plaintiff's patriotic mission, public messaging, and economic capability; and

(g) formed part of a long-term, multi-platform pattern documented in Exhibits A–F and H.

5. Defendants intended or recklessly disregarded the high probability that their coordinated actions would inflict emotional distress on Plaintiff by undermining the factual legitimacy of his work, eroding public trust in his Illinois community, disrupting his patriotic advocacy, and damaging his identity as a constitutional, civic, and public-interest figure.

6. Minor participants, including Defendant Kenneth Gertz, did not independently cause severe distress.

   Rather, Gertz's reposting of nationally circulating anti-Trump, hate-Trump, and kill-Trump rhetoric merely reflected the larger narrative environment engineered by more prominent Defendants.

   His conduct demonstrates how harmful national narratives penetrated Plaintiff's Illinois audience, triggering algorithmic suppression and contributing incrementally to the broader pattern of reputational and emotional harm described in this Complaint. Exhibit C reflects this limited but relevant role.

7. As a direct and proximate result of Defendants' aggregate conduct, Plaintiff suffered severe emotional distress, including:

   (a) reputational degradation and loss of identity within his Illinois community;

   (b) relational strain and erosion of trust;

   (c) disruption of Plaintiff's communication channels and patriotic messaging;

(d) emotional pain arising from the distortion of Plaintiff's factual work and public mission; and

(e) ongoing distress tied to continuous suppression and misrepresentation of Plaintiff's contributions.

8. These harms were intensified by Illinois's already severe economic environment, as documented in Exhibit G, which magnified the effect of Defendants' interference with Plaintiff's public-facing work and economic capability.

9. Defendants' actions were intentional, malicious, reckless, and without lawful justification, entitling Plaintiff to compensatory and punitive damages under Illinois law.

**COUNT VII — TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**
*(Against All Defendants)*

1. Plaintiff realleges and incorporates ¶¶1–37 of the Factual Background as though fully set forth herein.

2. Under Illinois law, tortious interference with prospective economic advantage requires:

   (a) a reasonable expectancy of entering into a valid business relationship;

   (b) the defendant's knowledge of that expectancy;

   (c) purposeful and unjustified interference;

   (d) the interference preventing the expectancy from being realized; and

(e) damages.

*Fellhauer v. City of Geneva*, 142 Ill. 2d 495 (1991).

3. Plaintiff had a reasonable expectancy of entering into beneficial business relationships, collaborations, public-interest partnerships, media engagements, readership growth, and economic opportunities associated with Plaintiff's factual research, books, videos, legislative proposals, and patriotic advocacy.

   These opportunities arise naturally from Plaintiff's long record of innovation, public-facing work, and decades of civic engagement in Illinois.

4. Defendants knew or reasonably should have known of these expectancies because Plaintiff's factual work, publications, and public mission were widely available to Illinois audiences through search engines, media channels, nonprofit networks, and digital platforms.

5. Defendants knowingly and unjustifiably interfered with Plaintiff's prospective economic advantage by:

   i. disseminating false statements and implications attacking the factual core of Plaintiff's work, research, and public-interest projects;

   (b) suppressing, burying, or downranking Plaintiff's factual content in search engines and Illinois-facing digital environments;

   (c) elevating hostile, irrelevant, or misleading content in its place;

   (d) injecting deceptive semantic cues designed to mislead Illinois residents;

   (e) undermining Plaintiff's factual credibility and truth-based

reputation;

(f) contaminating Plaintiff's Illinois audience space with extremist national narratives;

(g) interfering with Plaintiff's ability to communicate his factual patriotic mission to Illinois residents and supporters; and

(h) discouraging collaborators, readers, partners, and Illinois community members from engaging with Plaintiff's work.

6. Exhibits A, B, C, and F document these interference mechanisms.
7. Individual repeaters, including Defendant Kenneth Gertz, did not independently cause denial of any specific expectancy.

   Rather, Gertz's reposting of nationally circulating anti-Trump, hate-Trump, and kill-Trump rhetoric reflected the larger narrative environment engineered by more prominent Defendants.

   His conduct is relevant only insofar as it shows how nationally generated hostile narratives infiltrated Plaintiff's Illinois communication channels, triggering algorithmic suppression and contributing to the combined interference with Plaintiff's economic relationships.

   Exhibit C documents this limited but measurable role.
8. As a direct and proximate result of Defendants' coordinated interference, Plaintiff's economic expectancies were impaired or prevented, including:
   a. reduced engagement with Plaintiff's books, research, and digital content;

      (b) diminished opportunities for collaboration and partnership;

(c) impaired credibility among Illinois audiences and civic networks;

(d) suppressed visibility and discoverability of Plaintiff's factual work;

(e) loss of prospective economic advantage; and

(f) diminished economic capability in the already burdensome Illinois marketplace, as documented in Exhibit G.

9. Plaintiff suffered financial, reputational, relational, and opportunity-based damages as a result of Defendants' interference.

10. Defendants' conduct was intentional, malicious, unjustified, and without lawful cause, entitling Plaintiff to compensatory and punitive damages under Illinois law.

**COUNT VIII — ILLINOIS RICO (720 ILCS 5/33G)**
*(Against All Defendants Who Participated in an Association-in-Fact Enterprise)*

1. Plaintiff realleges and incorporates ¶¶1–37 of the Factual Background and Counts I–VII as though fully set forth herein.

2. Under the Illinois RICO statute, 720 ILCS 5/33G, it is unlawful for any person associated with an enterprise to knowingly conduct, participate in, or facilitate the enterprise through a pattern of racketeering activity, including acts of fraud, deception, intimidation, coercion, interference with economic expectancy, reputational sabotage, and coordinated digital suppression.

   *People v. Smith*, 2014 IL App (1st) 123094.

3. Defendants collectively formed an association-in-fact enterprise composed of platform operators, media entities, nonprofit organizations, influencers, cultural figures, algorithmic systems, and thousands of individual repeaters whose

coordinated messaging and conduct served a unified purpose: to suppress the factual legitimacy of Plaintiff's work, distort the meaning and visibility of his public-interest projects, discredit his factual research, and economically impair his public presence and patriotic advocacy within Illinois.

Individual actors such as Defendant Kenneth Gertz serve only as minor examples of how nationally generated false narratives appeared within Plaintiff's Illinois audience space; they did not direct, organize, or control the enterprise.

4. The enterprise had:

(a) a common purpose — reputational distortion, semantic manipulation, visibility suppression, economic injury, and delegitimization of Plaintiff's factual work;

(b) a continuing structure — multi-year, multi-platform, multi-actor, algorithmically amplified;

(c) coordinated functioning — consistent timing, narrative repetition, curation, suppression, and cross-platform reinforcement.

Exhibits A through F and H demonstrate this structure.

5. Defendants engaged in a pattern of racketeering activity, consisting of repeated predicate acts within a coordinated scheme, including:

(a) fraud (Count I);

(b) deceptive business practices under ICFA (Count II);

(c) civil conspiracy acts (Count III);

(d) defamation and reputational sabotage amounting to deceptive acts;

(e) false light practices designed to mislead Illinois audiences;

(f) coordinated messaging causing emotional distress (Count VI);

(g) interference with prospective economic advantage (Count VII);

(h) semantic reframing designed to mislead Illinois consumers about the factual core of Plaintiff's work;

(i) algorithmic suppression of Plaintiff's factual materials and public-interest messaging;

(j) dissemination of hostile or misleading narratives through platform, media, nonprofit, cultural, and community networks.

Exhibits A, B, C, F, and H document these predicate acts.

6. These predicate acts were related, interconnected, and continuous, forming a multi-decade pattern of conduct beginning in the early 2000s (Exhibit D) and intensifying with the advent of modern algorithmic manipulation (Exhibits A, B, and F).
7. Defendants' racketeering activity targeted a single Illinois victim — Plaintiff — with the intent and effect of causing reputational, economic, relational, and professional injury inside Illinois.

   The unified aim was to ensure Plaintiff would be:

- downranked,
- discredited,
- shadowbanned,

- misrepresented,
- algorithmically suppressed,
- and rendered economically impaired within the Illinois marketplace.

8. Individual repeaters, such as Defendant Kenneth Gertz, did not plan, direct, or organize enterprise activity.

   Gertz's reposting of nationally circulating anti-Trump, hate-Trump, and kill-Trump rhetoric simply reflected the narrative machinery created and amplified by the primary Defendants.

   His conduct demonstrates how hostile narratives penetrated Plaintiff's Illinois audience environment, triggering algorithmic suppression and contributing a minor but measurable pro-rata share to the enterprise's reputational and economic interference.

   Exhibit C documents this limited role.

9. The enterprise operated across multiple channels simultaneously — digital platforms, search engines, algorithmic-curation systems, media outlets, nonprofit networks, cultural commentary, and individual repeaters — creating a synchronized narrative and suppression ecosystem.

   Exhibits A, B, C, F, and H document this multi-channel coordination.

10. As a direct and proximate result of Defendants' racketeering activity, Plaintiff suffered injury to his business, reputation, property, and economic capability in Illinois, including:

(a) suppressed book sales and digital engagement;

(b) loss of professional advancement and collaboration;

(c) destruction of public-interest opportunities;

(d) reputational injury within Illinois communities;

(e) impaired economic capability in a severely burdensome Illinois economic environment;

(f) loss of prospective economic advantage;

(g) quantifiable economic damages as set forth in Exhibit G.

11. Defendants' racketeering activity directly caused the economic injury described in Plaintiff's damages bracket and quantified in the Illinois-specific analysis of Exhibit G.

12. Defendants acted knowingly, intentionally, and maliciously, engaging in repeated, coordinated, and unjustified misconduct without lawful cause.

13. Plaintiff is entitled to:

    (a) treble damages,

    (b) attorney's fees,

    (c) costs, and

    (d) any other relief permitted under 720 ILCS 5/33G.

**COUNT IX — DECLARATORY JUDGMENT**
*(735 ILCS 5/2-701 — Against All Defendants)*

1. Plaintiff realleges and incorporates ¶¶1–37 of the Factual Background and all preceding Counts as though fully set forth herein.
2. Under the Illinois Declaratory Judgment Act, 735 ILCS 5/2-701, courts may declare the rights and legal relations of the parties when an actual controversy exists requiring judicial determination.
   *Beahringer v. Page*, 204 Ill. 2d 363 (2003).
3. An actual and ongoing controversy exists because Defendants continue to disseminate, repeat, amplify, algorithmically elevate, or permit circulation of false statements, deceptive implications, and semantically reframed portrayals that attack the factual core of Plaintiff's research, books, videos, legislative proposals, public-interest work, and patriotic advocacy.
4. These false portrayals remain accessible to Illinois residents through:
   (a) search outputs and answer boxes;
   (b) algorithmically curated platform feeds;
   (c) nationally synchronized media commentary;
   (d) nonprofit publications and advocacy communications;
   (e) cultural-influencer broadcasts;
   (f) public-facing social networks; and
   (g) reposts, retweets, and re-shares within Plaintiff's Illinois audience environment.
   Exhibits A, C, E, and H document ongoing Illinois exposure.

5. Defendants' statements and semantic cues mislead Illinois residents into believing that:

    a. the factual core of Plaintiff's beliefs is irrational or unstable;

    (b) the factual core of Plaintiff's work is dishonest, deceptive, or untrustworthy;

    (c) the factual core of Plaintiff's public-interest projects is fraudulent or illegitimate;

    (d) the factual core of Plaintiff's research, books, and legislative proposals lacks credibility or factual value;

    (e) Plaintiff's factual contributions to Illinois civic life lack legitimacy;

    (f) Plaintiff's economic capability and professional work are discredited or irrelevant.

6. These portrayals conflict with the truth as demonstrated by:

    • Exhibit A (suppression & visibility distortion),

    • Exhibit B (platform manipulation & algorithmic bias),

    • Exhibit C (national rhetorical environment),

    • Exhibit D (historic pattern of targeting),

    • Exhibit E (Illinois harm),

    • Exhibit F (AIBRT credentials & expert evidence),

    • Exhibit H (25-year timeline of coordinated harm).

7. The controversy continues because Defendants' false-light portrayals, semantic manipulation, algorithmic suppression, and narrative distortions remain

persistently reindexed, resurfaced, and recirculated in Illinois digital ecosystems — causing continuous injury to Plaintiff's reputation, credibility, relationships, economic capability, and public standing.

8. Declaratory relief is necessary to clarify and restore Plaintiff's rights, including:

   a. a declaration that Defendants' harmful statements and implications are false;

   (b) a declaration that Defendants knowingly or recklessly disseminated false portrayals concerning the factual core of Plaintiff's work;

   (c) a declaration that Defendants have no lawful basis to portray Plaintiff's work as deceptive, unstable, fraudulent, or disreputable;

   (d) a declaration that Plaintiff's factual research, books, videos, legislative proposals, and public-interest projects are legitimate and credible;

   (e) a declaration that Defendants' portrayals "negatively affecting" Plaintiff's economic capability are false;

   (f) a declaration that Plaintiff's reputational, relational, and economic injuries within Illinois stem from Defendants' coordinated conduct; and

   (g) a declaration that this Court — applying Illinois law — is the proper and exclusive forum to adjudicate these issues.

9. Plaintiff seeks only declaratory relief under Illinois law and no injunctive relief, thereby ensuring that this claim raises no federal question and remains wholly within the jurisdiction of the Illinois state court.

## V. PRAYER FOR RELIEF

*(Illinois Law Remedies Only — No Injunctive Relief)*

WHEREFORE, Plaintiff Gregory J. Halpern respectfully requests that the Court enter judgment in his favor and against all Defendants, jointly and severally where permitted by law, and award the following relief under Illinois common law and Illinois statutory law:

### A. Compensatory Damages

1. Categories of Damages

An award of compensatory damages in an amount to be proven at trial, including but not limited to:

(a) loss of business opportunities;

(b) loss of prospective economic advantage;

(c) diminished book sales, viewership, and public engagement;

(d) reputational harm within Plaintiff's Illinois community and broader networks;

(e) emotional distress arising from ongoing reputational distortion, narrative manipulation, and semantic suppression;

(f) losses arising from suppressed visibility, misleading contextual framing, and digital misrepresentation of Plaintiff's factual work.

**2. General Damages & Illinois Context**

Plaintiff has suffered substantial financial, reputational, relational, and emotional damages within Illinois. As set forth in Exhibit G, Illinois citizens have absorbed an estimated $5.47 trillion in resident-level economic burdens from 2000–2025, exclusive of any federal tax categories.

Plaintiff has been uniquely and disproportionately harmed within this environment, as Defendants' coordinated misconduct — including defamation, semantic manipulation, algorithmic suppression, reputational sabotage, and deceptive public narratives — destroyed Plaintiff's economic opportunities in a state already burdened by severe taxation, inflation, and systemic extraction.

**3. Personal Economic Impact & Prospective Advantage**

Based on Exhibit G, the approximate per-resident economic burden in Illinois equals $440,000 over 25 years.

Given Plaintiff's extensive contributions to Illinois through his public-interest work, inventions, books, economic research, and patriotic advocacy — and considering the targeted suppression imposed by Defendants — Plaintiff seeks compensatory damages reflecting:

(a) his pro-rata share of Illinois-based losses; and

(b) his loss of prospective economic advantage due to Defendants' interference with visibility, reputation, and economic capability.

**4. Specific Damages Range Based on Exhibit G**

In light of Exhibit G, Plaintiff seeks a compensatory damages award within the following range:

(a) Baseline Pro-Rata Harm: not less than $440,000;

(b) Enhanced Capability Damages: 5×–10× baseline = $2.2M–$4.4M;

(c) TIPEA Loss Multiplier: 3×–10× enhanced = $6.6M–$44M;

(d) Total Pre-Punitive Range: $8.8M–$48.4M.

This bracket excludes punitive damages, Illinois RICO treble damages, ICFA statutory damages, and declaratory relief.

**B. Punitive and Exemplary Damages**

An award of punitive damages to punish Defendants for willful, malicious, and outrageous misconduct and to deter similar conduct.

**C. ICFA Statutory Damages (815 ILCS 505/10a)**

All damages permitted under the Illinois Consumer Fraud Act, including actual damages, punitive damages, attorney’s fees, and costs.

**D. Illinois RICO Treble Damages (720 ILCS 5/33G)**

Treble damages and any other relief permitted under Illinois RICO, due to Defendants' participation in an association-in-fact enterprise causing injury to Plaintiff's business, reputation, and property.

**E. Declaratory Relief (735 ILCS 5/2-701)**

A declaratory judgment establishing that:

(a) Defendants' harmful statements and portrayals negatively affecting Plaintiff are false;
(b) Defendants knowingly or recklessly disseminated these false portrayals;
(c) Defendants' representations of Plaintiff's factual work, research, public-interest projects, and patriotic advocacy are misleading and damaging;
(d) Defendants' coordinated conduct has wrongfully undermined the factual legitimacy of Plaintiff's work, reputation, and economic capability in Illinois;
(e) Defendants' portrayals continue to cause ongoing harm within Illinois; and
(f) This declaratory relief is sought solely under Illinois law and implicates no federal authority.

*(No injunctive relief is sought.)*

**F. Costs**

An award of costs under Illinois law.

### G. Pre-Judgment & Post-Judgment Interest

Interest at the maximum rate permitted under Illinois law.

### H. Further Relief

Such additional relief as the Court deems just, proper, and consistent with Illinois law.

## VI. CERTIFICATION REGARDING NO FEDERAL CLAIMS

Plaintiff **Gregory J. Halpern** hereby certifies as follows:

1. This Amended Complaint contains *no federal defendants*, *no federal agencies*, *no federal officers*, and *no persons acting under color of federal law*.
2. This Amended Complaint asserts *no federal claims*, *no federal causes of action*, *no federal statutes*, *no federal constitutional theories*, and *no requests for federal relief*.
3. All federal-officer, federal-agency, and federally affiliated defendants originally named in this case have been voluntarily dismissed by Plaintiff. All Doe defendants have also been dismissed. The remaining defendants are private individuals, state or municipal actors, private companies, media organizations, foundations, or nonprofits that do not trigger federal jurisdiction.
4. Plaintiff proceeds exclusively under Illinois common law and Illinois statutory law, including but not limited to:
    - Fraud (common law),

- Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/2),
- Civil Conspiracy (common law),
- Defamation (common law),
- False Light (common law),
- Intentional Infliction of Emotional Distress (common law),
- Tortious Interference with Prospective Economic Advantage (common law),
- Illinois RICO (720 ILCS 5/33G), and
- Declaratory Judgment (735 ILCS 5/2-701).

5. Plaintiff seeks no injunctive relief. Plaintiff seeks only compensatory damages, punitive damages, treble damages where permitted, statutory damages, costs, interest, and declaratory relief under Illinois law.
6. Any reference to public events, public figures, national issues, or cultural context is offered solely as factual background supporting Illinois-law claims and does not assert any federal grievance or federal theory of liability.
7. There is no basis for federal-question jurisdiction under 28 U.S.C. § 1331, and no basis for federal-officer removal under 28 U.S.C. § 1442.
8. These dismissals are final, complete, and reflected in Dkt. 14, 15, 16, and 17, which remain on the docket as controlling filings.
9. Plaintiff certifies that no federal defendants of any kind remain in this action.
10. Plaintiff proceeds solely under Illinois law.
11. This Court (the Circuit Court of McHenry County, Illinois) is the proper and exclusive forum for this action.

Respectfully submitted,

GREGORY J. HALPERN, Pro Se
11008 MORNING DOVE LANE
SPRING GROVE, ILLINOIS 60081
EMAIL: GREGHALPERN1@PROTON.ME
PHONE: (847)565-9732
FAX: (815)604-8075

November 30, 2025

## CERTIFICATE OF SERVICE

I certify that on November 30, 2025, I filed the foregoing **FIRST AMENDED COMPLAINT** with the Clerk of Court using CM/ECF, which will notify all counsel of record.

GREGORY J. HALPERN, Pro Se
11008 MORNING DOVE LANE
SPRING GROVE, ILLINOIS 60081
EMAIL: GREGHALPERN1@PROTON.ME
PHONE: (847)565-9732
FAX: (815)604-8075

## VII. Exhibits A – H

**Exhibit A — SEARCH VISIBILITY SUPPRESSION & MISDIRECTION**

**Exhibit B — PLATFORM MANIPULATION & ALGORITHMIC BIAS**

**Exhibit C — NEGATIVE PUBLIC STATEMENTS & NARRATIVE AMPLIFICATION**

**Exhibit D — FORBES "ATTACK OF THE BLOGS" (2005) — PRIOR ATTACKS & HISTORICAL PATTERN**

**Exhibit E — ILLINOIS-SPECIFIC HARM (CHICAGO COMPUTER GUIDE)**

**Exhibit F — PROFESSIONAL CREDENTIALS (AIRBT BOARD) & EPSTEIN FINDINGS**

**Exhibit G — ILLINOIS ECONOMIC DAMAGE REPORT (2000–2025)**

**Exhibit H — HARM TIMELINE & NARRATIVE MATRIX (2000–2025)**

**INTRODUCTION TO EXHIBITS:**

Plaintiff incorporates the following Exhibits in support of this First Amended Complaint. These Exhibits are attached or will be filed contemporaneously and are offered solely to substantiate Plaintiff's Illinois-law claims of fraud, defamation, deceptive practices, civil conspiracy, Illinois RICO, tortious interference, and intentional infliction of emotional distress.

All Exhibits were created, published, accessed, or experienced within Illinois and demonstrate the direct harms suffered by Plaintiff in his home state.

# EXHIBIT A — SEARCH VISIBILITY SUPPRESSION & MISDIRECTION

*(Google Search Output Evidence)*

## OVERVIEW

This Exhibit contains representative Google search outputs showing systematic suppression, misdirection, and omission of Plaintiff's work, books, public-interest Acts, and search identity. When Plaintiff enters exact-match queries for his positive Trump Book & legislation, book titles, or domains, Google returns irrelevant highly negative political commentary calling out Arguments, Criticism, and Controversies, government pages, foreign material, or AI-generated noise — while failing to display Plaintiff's actual work which has millions of global website hits over the past 12 months.

These patterns demonstrate **visibility suppression**, **semantic steering**, and **algorithmic concealment**, consistent with known SEME/SSE effects.

### Included Evidence

1. Searches for "Enact Patriotic Laws"
2. Searches for "Enact Patriotic Laws Gregory J Halpern"
3. Searches for "Gregory J Halpern Legislation"
4. Searches for "Judicial Rule of Law Compliance Act"
5. Searches for "Thank You President Trump for Saving America"
6. **Cloudflare analytics for Plaintiff's domain ThankYouPresidentTrump.us**
7. Book-specific searches showing substitution and omission

### Purpose of Exhibit A

✔ Proves algorithmic suppression of Plaintiff's content
✔ Establishes misdirection and concealment
✔ Supports Counts I, II, III, IV, V, VII, VIII
✔ Demonstrates Illinois consumer deception
✔ Shows harm is **systemic**, not accidental

Google

Enact Patriotic Laws

AI Mode All Images News Videos Shopping Short videos More Tools

AI Overview

The term "patriotic laws" can refer to specific legislation, like the **USA PATRIOT Act**, which expanded U.S. government powers to combat terrorism, or to broader laws and policies aimed at promoting patriotism through education and national observances. In the context of the USA PATRIOT Act, "patriotic" refers to its goal of protecting national security, although the law has faced criticism for its potential impact on civil liberties. Other "patriotic laws" include Public Law 105-225, which codified laws on national observances, and China's recent Patriotic Education Law which mandates patriotic education in schools and society.

## USA PATRIOT Act

- **Purpose:** Enacted after the 9/11 attacks, the USA PATRIOT Act was designed to enhance law enforcement and intelligence agencies' ability to investigate terrorism and money laundering.
- **Key provisions:**
  - Strengthened international cooperation against money laundering.
  - Allowed for better information sharing between law enforcement and intelligence agencies.
  - Updated investigative tools to reflect modern technology.
  - Increased penalties for certain terrorist crimes.
- **Controversy:** Critics argue that some provisions, such as increased government surveillance powers, violate the Fourth Amendment and threaten civil liberties.

## Other patriotic laws

- **Public Law 105-225 (U.S.):** This act revised, codified, and enacted laws related to patriotic and national observances, ceremonies, and organizations as Title 36 of the United States Code.
- **China's Patriotic Education Law:** This law, which took effect in January 2024, aims to integrate patriotic education into all levels of society, including schools, families, and civil servants.
- **Educational gag orders (U.S.):** Some states have enacted laws that can be described as "patriotic" in their intent, which focus on compulsory patriotism in education, though some have faced criticism for potentially stifling free speech, notes PEN America.

Dive deeper in AI Mode

AI responses may include mistakes. For legal advice, consult a professional. Learn more

PATRIOT Act - Epic.org
Feb 2, 2025 — Overview and Analysis
PATRIOT Act introduced sweeping ch
EPIC – Electronic Privacy Information

USA PATRIOT Act | Facts, History
Acronym, & Controversy - Britan
Nov 4, 2025 — News. ... USA PATRIOT
legislation, passed by Congress in re
Britannica

Notary Signing Agent Document
USA PATRIOT Act CIP Forms | NN
Jun 22, 2025 — What is the purpose
PATRIOT Act CIP Form? Signed into la
National Notary Association

FinCEN.gov
https://www.fincen.gov › statutes-and-regulations › usa-p...

USA PATRIOT Act

Google

Enact Patriotic Laws Gregory J Halpern

AI Mode | All | Images | News | Videos | Shopping | Short videos | More | Tools

Morningstar
https://www.morningstar.com › news › pr-newswire › e...

Everyone Talks Accountability and Justice — One Citizen ...

Oct 17, 2025 — Greg Halpern's $211 Trillion Forensic Report and Three Citizen Acts Deliver the First Working System to Unelect, Overrule, and Reclaim Power for ...
Missing: ~~Enact~~ | Show results with: Enact

Yahoo Finance
https://finance.yahoo.com › news › everyone-talks-acco...

Everyone Talks Accountability and Justice -- One Citizen ...

Oct 17, 2025 — Greg Halpern's $211 Trillion Forensic Report and Three Citizen Acts Deliver the First Working System to Unelect, Overrule, and Reclaim Power ...
Missing: ~~Enact~~ | Show results with: Enact

DigitalOcean
https://whatthatmeans.nyc3.cdn.digitaloceanspaces.com › ...

WE THE PEOPLE'S UN-ELECTION ACT

Patriot Plaintiff, Gregory J. Halpern: The 13 Lives Renaissance Man. Gregory J. Halpern is the embodiment of the modern American Renaissance Man. — inventor ...

Facebook · Amy Klobuchar
1.5K+ reactions · 4 days ago

Trump ordered the Justice Department to investigate his ...

Trump ordered the Justice Department to investigate his political opponents while protecting and rewarding his friends.

Lelezard
https://www.lelezard.com › subject192-avo › page2

News by subject: AVO

Patriot Plaintiff Gregory J. Halpern, inventor, whistleblower, and author of Thank You President Trump for Saving... 08:00. Family-Owned Danish Brand Sees ...

GovInfo (.gov)
https://www.govinfo.gov › content › pkg › pdf

house

Most respectfully, I urge the. President and the Congress to forgo the political luxury that may be enjoyed by these various new spending programs that have ...

Taylor & Francis Online
https://www.tandfonline.com › ... › Volume 15, Issue 2

Judicial Decision Making and Social Architecture in the ...

by D Silver · 2010 · Cited by 12 — In the wake of the terrorist attacks of September 11, 2001, the United States government enacted sweeping legislation known as the USA PATRIOT Act. 1 In ...

Congress.gov
https://www.congress.gov › crecb › 1961/01/06

SENATE

Google

Gregory J Halpern Legislation

AI Mode All News Images Videos Shopping Short videos More Tools

Morningstar
https://www.morningstar.com › news › pr-newswire › e...

Everyone Talks Accountability and Justice — One Citizen ...

Oct 17, 2025 — **Greg Halpern's $211 Trillion Forensic Report and Three Citizen Acts** Deliver the First Working System to Unelect, Overrule, and Reclaim Power for ...

windows.net
https://ilcourtsaudio.blob.core.windows.net › Halp...

Halpern v. Village of Spring Grove, 2025 IL App (2d) 240553-U

Mar 18, 2025 — Plaintiffs, **Gregory Halpern** (**Gregory**) and Dianne **Halpern** (Dianne), appeal from the dismissal, for failure to state a cause of action, of ...
14 pages
Missing: ~~Legislation~~ | Show results with: Legislation

Yahoo Finance
https://finance.yahoo.com › news › everyone-talks-acco...

Everyone Talks Accountability and Justice -- One Citizen ...

Oct 17, 2025 — **Greg Halpern's $211 Trillion Forensic Report and Three Citizen Acts** Deliver the First Working System to Unelect, Overrule, and Reclaim Power ...

Justia Dockets & Filings
https://dockets.justia.com › ... › Northern District

Halpern v. Roberts et al 3:2025cv50398 | U.S. District Court ...

Sep 15, 2025 — September 15, 2025, Filing 8 Notice Of DOJ Removal Pattern. Received Via Pro Se Online Portal On 9/15/25 by **Gregory J. Halpern** (pg, ) ; September ...
Missing: ~~Legislation~~ | Show results with: Legislation

PacerMonitor
https://www.pacermonitor.com › public › case › Halper...

Halpern v. American Civil Liberties (ACLU) et al

Jul 17, 2025 — **Halpern v. American Civil Liberties (ACLU) et al** (3:25-cv-50303), Illinois Northern District Court, Filed: 07/17/2025 - PacerMonitor Mobile ...
Missing: ~~Legislation~~ | Show results with: Legislation

Scholarly articles for **Gregory J Halpern Legislation**

On the limits of the law: The ironic legacy of Title VI of ... - **Halpern** - Cited by 188
The smartness mandate - **Halpern** - Cited by 118

House.gov
https://commdocs.house.gov › bank › hba73742.000

The SEC's Role in Capital Formation: Help or Hindrance?

Next, we have **Gregory Halpern**, the Chairman and CEO for Circle Group Internet Incorporated. In 1998, Mr. **Halpern** distinguished Circle Group Internet by raising ...

American Civil Liberties Union
https://www.aclu.org › nyt_appeal_brief_0

United States Court of Appeals Second Circuit

Google

The Judicial Rule of Law Compliance Act Enact Patriotic Laws

AI Mode All News Images Shopping Videos Short videos More Tools

AI Overview

Based on search results, the phrase "The Judicial Rule of Law Compliance Act Enact Patriotic Laws" does not refer to any single piece of legislation. Instead, it appears to be a constructed phrase that combines distinct legal concepts and references to other laws, most notably the USA PATRIOT Act. There is no record of a bill or law with that precise name being enacted.

## Deconstructing the phrase

This phrase includes three different legal and political concepts that point to other existing or debated ideas.

**Judicial Rule of Law Compliance**

- **Rule of law:** This foundational principle of the U.S. legal system dictates that all people and institutions are accountable to publicly promulgated and independently adjudicated laws.
- **Judicial compliance:** This refers to the duty of courts to uphold and follow established laws and the constitution. The phrase "Judicial Rule of Law Compliance" does not refer to a specific law, but rather to the overall function of the judiciary.

**"Enact Patriotic Laws"**

- This refers to the USA PATRIOT Act, a specific and highly debated piece of legislation passed in 2001 in response to the September 11th attacks.
- **The USA PATRIOT Act:** The full name of this law is the "Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act". Its name is an acronym for a purpose it serves.

## The debate over the USA PATRIOT Act

The phrase "Enact Patriotic Laws" echoes the national security versus civil liberties debate that surrounded the USA PATRIOT Act.

**Arguments for the Act (Proponents)**

- **Stronger security:** The law's supporters argued it was a necessary tool for law enforcement and intelligence officials to combat terrorism by improving information-sharing capabilities.
- **New technology:** It allowed investigators to use modern technology to track terrorists, using the same tools already available for fighting organized crime and drug trafficking.

**Arguments against the Act (Opponents)**

- **Threat to civil liberties:** Civil liberties advocates, like the ACLU, argue that certain provisions trampled on citizens' rights and expanded government surveillance beyond constitutional limits.
- **Expanded surveillance:** Controversial measures included "sneak and peak"

USA PATRIOT Act - George W. Bu
House Archives
* On March 9, 2006, President Bush :
USA PATRIOT Improvement And Reau
George W. Bush White House Archives

USA Patriot Act of 2001 (2001) |
Amendment Encyclopedia
Mar 30, 2025 — Defenders of the Firs
Amendment contend that the Patriot
Free Speech Center

USA PATRIOT Act | FinCEN.gov
The purpose of the USA PATRIOT Act
and punish terrorist acts in the Unite
FinCEN.gov

Show all

Google

Thank You President Trump for Saving America

AI Mode All Images News Videos Shopping Short videos More Tools

AI Overview

A full evaluation of Donald Trump's presidencies would involve a complex and highly polarized set of opinions, covering both his first term (2017–2021) and his second, which began in 2025. Supporters often credit him with significant accomplishments, while critics point to numerous controversies and actions they view as damaging.

## Arguments made by supporters

- **Economic policies**: Supporters frequently praise his first-term economic policies, which included deregulation and the Tax Cuts and Jobs Act of 2017. They point to a period of sustained economic growth, low unemployment rates (including for minority groups), and high business and consumer confidence.
- **Judicial appointments**: The appointment of three conservative justices to the Supreme Court—Neil Gorsuch, Brett Kavanaugh, and Amy Coney Barrett—is often cited as a key accomplishment, as is the appointment of many conservative judges to federal courts.
- **Immigration and border security**: Efforts to strengthen border security, including the construction of a border wall and more restrictive immigration policies, are supported by those who prioritize immigration control.
- **"America First" foreign policy**: This approach resonated with some who felt that previous administrations had prioritized the interests of other countries over those of the U.S.. The Abraham Accords, a series of normalization agreements between Israel and several Arab states, are viewed positively by some as a foreign policy achievement.
- **Military spending**: Supporters often credit Trump for increasing defense spending to rebuild the military.

## Criticisms and controversies

- **Allegations of misconduct**: Throughout his first term, Trump faced accusations of abusing the powers of his office for personal gain and attempting to obstruct investigations, most notably concerning Russian interference in the 2016 election. These included two impeachments by the House of Representatives.
- **Impact on democratic institutions**: Critics have raised serious concerns about Trump's repeated questioning of election integrity, his role in inciting the January 6, 2021, Capitol riot, and his challenging of legal and constitutional norms. This included his refusal to concede the 2020 election.
- **Rhetoric and conduct**: His use of divisive language, attacks on the media, and perceived hostility towards opponents have been criticized as harmful to democratic discourse.
- **Economic consequences**: The Hoover Institution notes that while early deregulation and tax cuts boosted economic activity in his first term, the subsequent trade war with China was disruptive and did not achieve its stated objectives. Critics also argue his policies on tariffs and taxes disproportionately benefited the wealthy and increased the federal deficit.
- **Environmental policy**: Trump's withdrawal from the Paris Agreement and the rollback of numerous environmental regulations were strongly opposed by

An Evenhanded Analysis of Trum
Economic Policies
Dec 18, 2024 — Disruptions stemming
Trump's proposal to deport immigran
Hoover Institution

Trump's First 100 Days in 2025
Feb 17, 2025 — Donald Trump-II: 100
2025 Explosion. Trump's second term
The American Presidency Project

The Trump-Vance Administration
Priorities - The White House
Issues. Technology & Innovation. Eco
Energy. National Security. Governmen
The White House (.gov)

Show all

environmental groups and many world leaders.

- **Recent actions**: In his second term, critics point to the influence of the conservative Heritage Foundation's "Project 2025" on his agenda, his use of executive power to challenge colleges and universities, and controversial pardons related to the January 6 Capitol riot.

### A deeply divided view

There is no single consensus on whether Donald Trump "saved America." His impact is viewed through fundamentally different lenses depending on political perspective.

- **For many supporters**, the phrase reflects gratitude for what they see as decisive leadership that improved the economy, appointed conservative judges, and challenged established political norms.
- **For critics**, the phrase is seen as a sign of authoritarian tendencies and disregard for democratic institutions. They focus on the controversies, the divisive rhetoric, and the perceived threats to the rule of law.

A. Dive deeper in AI Mode

Facebook · U.S. Department of State
4K+ reactions · 1 day ago

This Thanksgiving, we're grateful for President Trump. ...

This Thanksgiving, we're grateful for President Trump. Because of his bold and visionary leadership, our nation commands respect on the ...

Facebook · The Daily Show
88K+ reactions · 3 weeks ago

In exchange for saving America, all Trump wants is ...

1:26

I want to thank Donald Trump for working like a dog, for no money, to save a country that doesn't appreciate his sacrifice. [LAUGHTER] I ...

YouTube · KUTV 2 News Salt Lake City
940+ views · 1 day ago

Trump's Thanksgiving message for America

1:04

President Donald Trump shared his Thanksgiving message for Americans during the 78th National Thanksgiving Turkey Pardoning Ceremony at the ...

Missing: ~~Thank Saving~~

Instagram · whitehouse
123.7K+ likes · 2 days ago

The White House on Instagram: "A time-honored American ...

1:05

PRESIDENT DONALD J. TRUMP WELCOMES AMERICA'S NEWEST CITIZENS "Today, you receive one of the most priceless gifts ever granted by human hands ...

Google

Thank You President Trump for Saving America

Sign in

AI Mode All Images News Videos Shopping Short videos More Tools

The American Presidency Project
https://www.presidency.ucsb.edu › documents › white-h...

Capitol Hill Praises President Trump's Leadership

Feb 3, 2025 — Greg Steube (R-FL): "Thank you, President Trump, for standing up for border security. Stopping the flow of fentanyl and illegal migration across ...

Reddit · r/popculturechat
90+ comments · 10 months ago

New message on TikTok as service is restored, thank ...

New message on TikTok as service is restored, thank President-elect Donald Trump for his efforts to save the app. TikTok.

Homeland Security
https://www.dhs.gov · Apr 7, 2025

Warning - Domestic

"Thank you, President Donald J. Trump, for securing our border and putting America first. President Trump has a clear message: if you are here illegally, we ...

The White House (.gov)
https://www.whitehouse.gov › Past Events

Thank you, President Trump.

President Trump and The First Lady Participate in the Thanksgiving Turkey Pardoning · First Lady Melania Trump Receives the 2025 Christmas Tree.

Facebook · Congressman Mario Diaz-Balart
20+ reactions · 1 week ago

Thank you President Donald J. Trump for bringing these ...

That God saved America, Israel, and all decent people on that day. We owe Him our deepest gratitude — not just for saving a man, but for saving ...

DonaldJTrump.com
https://www.donaldjtrump.com

Home | Donald J. Trump

Certified Website of Donald J. Trump For President 2024. America's comeback starts right now. Join our movement to Make America Great Again!

The White House (.gov)
https://www.whitehouse.gov › contact

Contact Us

Share your thoughts with President Donald J. Trump and Vice President JD Vance.

Instagram · whitehouse
35.8K+ likes · 3 weeks ago

Donald Trump's Historic Comeback: A New Era for America ...

Thank you for your attention to this very important matter, and let's all

Fox News
https://www.foxnews.com › angel-families-thank-trump...

Angel families thank Trump for border security efforts in ...

19 hours ago — "**President Trump, you** work tirelessly, nonstop to protect **Americans** and keep our country safe. I am so honored and grateful to call **you** my ...

Yahoo News UK
https://uk.news.yahoo.com › donald-trump-just-shared-...

Donald Trump Posted A "Thank You" To Himself For " ...

Oct 28, 2025 — "I want to thank Donald Trump for **working like a dog for no money** to save a Country that doesn't appreciate his sacrifice! Thank you Mr ...

YouTube · KEPR Action News
920+ views · 1 day ago

Trump's Thanksgiving message for America

1:04

**President Donald Trump shared his Thanksgiving message for Americans** during the 78th National Thanksgiving Turkey Pardoning Ceremony at the ...

Facebook · Brett Guthrie
150+ reactions · 3 weeks ago

Thank you, President Donald J. Trump! With your ...

**Thank you, President Donald J. Trump**! With your leadership, we will keep working to unleash American energy, support our service members, ...

Instagram · whitehouse
101K+ likes · 1 day ago

President Trump Addresses National Guard Ambush: Uniting ...

4:59

"This month and every month, **America remains grateful for your service, your sacrifice and your spirit**. As we give thanks this season, let us ...

Amazon.com
https://www.amazon.com › THANK-TRUMP-AMERIC...

3X5 THANK YOU TRUMP 2024 SAVE AMERICA AGAIN ...

Flag measures 3 feet x 5 feet with 2 brass grommets for easy display · 100 denier polyester: More durable than the typical see-through poly flag · Bold colors ...

1 2 3 4 5 6 7 8 9 10 Next

**Spring Grove, Illinois** - From your IP address - Update location

Help Send feedback Privacy Terms


thankyoupresidenttrump.us
CM/ECF NextGe...
Patriot Plaintiff -...
(3 unread) - Inb...
Success Gallery
Schedule A Con...
Billing and Usag...
shadowbanned...
GET IN ON SAYING THANK YOU
PRESIDENT TRUMP FOR SAVING AME
SHARING
Enter email to receive MAGA offers on the book, hardcover, paperback, digital download & audiobook.
ENTER YOUR EMAIL
Submit
With
out h
gifts,
health
Halpern is handing
us hacks, valuable
apidly improve your
al effort.
channel greg
MY SOLUTION MAKER
President Trump's miraculous life story
ROBERT DAVID STEELE AGAIN
President Trump's
miraculous life story.
THANK YOU PRESIDENT TRUMP FOR SAVIN
NOBEL PEACE PRIZE NOMINATION
FOR MONUMENTAL MIDDLE EAST TREATY
WASHINGTON


thankyoupresidenttrump.us
Active
Star
Pro plan
Overview
Recents New
HTTP Traffic
thankyoupre... > Analyti...
Web analytics
thankyoupre... > Analyti...
thankyoupresi...rump.us
Domains
greghalpernwiki.com
Domains
HTTP Traffic
greghalper... > Analytic...
AI Crawl Control
Log Explorer
Analytics & logs
HTTP Traffic
Web analytics
Security
Performance
Workers
DNS
Email
Spectrum
SSL/TLS
Security
Access
Speed
Caching
Workers Routes
Rules
Error Pages New
Network
Traffic
Scrape Shield
Web3
Analytics & logs
HTTP Traffic
Review incoming HTTP traffic for thankyoupresidenttrump.us. Only includes data on end-user traffic to your Cloudflare-proxied hostnames. Subrequests from Cloudflare Workers are not included.
Requests
226.65k
Data transfer
55.56 GB
Page views
54.52k
Visits
25.08k
API requests
60
HTTP traffic for thankyoupresidenttrump.us
Print report
Download data
Add filter
Previous 7 days
Requests over time
Review spikes in HTTP requests and the top request attributes.
All
Referer host
Host
Country
Path
Edge status code
Total requests
226.65k
3.5k
3k
2.5k
2k
1.5k
1k
500
0
Requests
Sat 22
12:00
Sun 23
12:00
Mon 24
12:00
Tue 25
12:00
Wed 26
12:00
Thu 27
12:00
Fri 28
12:00
Time (local)
Requests volume by country
Japan 56.2k
United States 52.99k
Singapore 21.86k
Lithuania 20.89k
India 10.09k
China 9.27k
Canada 9.21k
France 5.91k
Iran 4.6k
Russian Federation 4.37k
1 to 10 of 86 items
Requests volume by source
Review top request attributes and use them to filter the time-series chart above.
5 items
Referers
thankyoupresidenttrump.us 198.77k
Paths
/ 13.79k

## EXHIBIT B — PLATFORM MANIPULATION & ALGORITHMIC BIAS
**(The Four-Headed Hydra: Halpern → Vorhies → Obama → Epstein)**

### OVERVIEW

This Exhibit provides evidence that the suppression, misdirection, and reputational distortion documented in **Exhibit A** is not accidental. It is the product of a long-standing, politically aligned, algorithmically enforced information-control system supported by:

1. Plaintiff's own early research (Google Crimes Catalog, 2014–2020)
2. Internal Google documents leaked by whistleblowers (Vorhies)
3. Historical political integration between Google and the Obama administration
4. Scientific validation from Dr. Robert Epstein's "Google's Triple Threat" (2022)

Together, these four independent data sources establish capability**,** intent**,** mechanism**,** continuity**,** and pattern**,** matching exactly the suppression Plaintiff suffered in Illinois.

### SECTION 1 — PLAINTIFF'S CATALOG OF GOOGLE CRIMES (2014–2020)

As early as 2014, Plaintiff documented Google's coordinated misconduct, much of which was validated years later by Vorhies, Epstein, and congressional inquiries. Plaintiff identified:

#### A. Anti-competitive suppression

- Google destroying small businesses by burying them
- Google using its search monopoly to silence dissent
- Google erasing critics from public search indexes
- Google manipulating PageRank to destroy competitors

#### B. Political manipulation

- Google promoting left-leaning and anti-Trump narratives

- Google demoting conservative content
- Google interfering with public discourse
- Google protecting political allies (validated by 427 Obama WH meetings)

### C. Criminal-level conduct

- Theft of intellectual property
- Manipulation of stock prices
- Erasure of incriminating evidence
- Dropping people and companies into digital black holes

### D. Direct harm to Plaintiff

- Targeting Plaintiff's companies
- Destroying Plaintiff's valuation (Forbes, 2005)
- Suppressing Plaintiff's search visibility (Exhibit A)
- Attacking Plaintiff during litigation (Google v. MAXD era)

Plaintiff was on the front line of exposing Google manipulation, years before public whistleblowers emerged.

MAX-D
A CHANGE YOU CAN HEAR

Coalition Against Google & Max Sound Corporation Presents

**The Catalog of Google Crimes**

Version 2 (release date 9-5-18)

The Consolidated Non-Confidential Version

**DISCLAIMER**
Coalition Against Google & Max Sound Corp. respects the First Amendment rights of freedom of speech, including the freedom of inventors, artists, writers and scholars. This catalog is lawfully protected as free speech[1]. The content of this catalog was gathered solely from publically available on-line, electronic and print sources. The information maintained and referenced within are provided "as is" with no warranties of any kind. Coalition Against Google & Max Sound Corp. is not responsible for the content, accuracy, or timeliness of information contained within this catalog. Issues of content, accuracy and timeliness should be directed to the owners and authors of the content. The information provided within does not represent the official statements or views of Coalition Against Google & Max Sound Corp., its board, management or employees. Coalition Against Google & Max Sound Corp. disclaims all liability of any kind arising out of your: re-distribution, re-publication, use of, or misuse of, this catalog and the information contained and referenced within; and shall not be liable for any damages of any kind. Re-distribution and/or re-publication of this catalog may be done solely at your own risk.
[1] : https://www.eff.org/issues/free-speech

Index


**Preamble.................... Page 3**
**Call to Action.................... Page 4**
**List of Crimes.................... Page 9**
**Theft of Innovation.................... Page 11**
**Anti-competitive Practices.................... Page 38**
**Racketeering & White Collar Crime.................... Page 58**
**Antitrust Violations.................... Page 68**
**Fake Advertising Traffic.................... Page 91**
**Privacy Theft & Privacy Invasion.................... Page 97**
**Search Engine Manipulation & Mind Control.................... Page 121**
**Political Corruption.................... Page 138**
**Election Manipulation.................... Page 150**
**Paid Biased Research.................... Page 155**
**Phony Organizations.................... Page 157**
**Online Hit Squads.................... Page 160**
**Preventing Freedom of Speech.................... Page 162**
**Employee Abuses.................... Page 174**
**Income Tax Evasion.................... Page 177**
**Retaliation.................... Page 180**
**Bait and Switch Theft.................... Page 181**
**Competitive Business Annihilation.................... Page 187**
**Asset Theft from Shareholders.................... Page 191**
**Stock Manipulation.................... Page 192**

## Preamble

The Coalition Against Google, founded by Max Sound Corp., has created and released this Version 2 - **The Catalog of Google Crimes**, which covers the time period from Google's early origins to the present day. The Catalog is an ever-growing index detailing the actions by inventors, businesses, consumers, organizations and governmental agencies around the world that have courageously sought justice against a conscienceless company whose normal way of operating its business is based on the evil philosophies of its founders, Larry Page and Sergey Brin, which are primarily being both represented and misrepresented to the world by clever pitchman Eric Schmidt. Google's pattern and practice of well-organized and highly profitable predicate acts of criminal behavior have caused an ever-increasing epidemic of highly destructive personal and professional problems and conflicts, leading to endless negative outcomes and massive economic loss for growing numbers of people everywhere. To summarize, Google is in the worldwide enterprise of stealing innovation, invading privacy and manipulating citizens and governments on every level of our collective existence.

Max Sound began battling Google in 2014, representing a couple inventions and bringing lawsuits for theft of patents and trade secrets, which now includes the first court approved RICO (Racketeer Influenced Corrupt Organization Act) case against Google and its founders. CASE NO.: 5:17-cv-06037-BLF

Massive numbers of victims from around the world who have had similar experiences and have brought forth endless actions against Google cannot be found when searching Google, so this catalog has been desperately needed for a long time. The victims are, for the most part, unaware of each other's shared challenges that come with being terrorized by such a giant, because Google does not follow any ethical code of conduct, they control worldwide online search, and they have the incredible power and extreme will to silence and destroy their opponents at all costs, which includes providing fake search results to hide the crimes they have committed and using their ill-gotten gains to ruin anyone who challenges them. In short, The Catalog of Google Crimes has come about out of the dire necessity for a comprehensive set of resources that every victim in the world can use to achieve justice together by having a way to share information, pool resources and stand united to create a Level Playing Field so Google can be brought to justice. We are learning about many new victims every day and expect that this will continue for a long time, and grow to epic proportions which will lead to many updates of The Catalog. This is the non-confidential version and we have amassed a far greater number of Google crimes currently in our confidential version that need more verification before their release and will be completely destructive and devastating to Google Inc., Page, Brin and Schmidt in the future.

The format being provided in each action and regarding every victim is –

- **Date:**
- **Victim:**
- **Categories:**
- **Allegations / Crimes:**
- **Summary:**
- **Damage(s) to Victim:**
- **Profit to Google:**
- **Potential Cost(s) to Google:**
- **Link to Case / Facts:**
- **Outcome or Status:**
- **Link to article(s):**
- **Related matters:**
- **Other:**
- **Contact Information:**

The Coalition will soon release an online database that will allow stakeholders, consumers and media to cross-reference all of the known information for a wide array of purposes such as the development of new classes of plaintiffs, pass remedial legislation to address abuses, facilitate larger faster actions for many more governments around the world, clone effective legal strategies that have already achieved success against Google, working with the global audience of victims to bring Google to Justice, arm consumers to boycott Google products and give media quick access to all of the news involving Google's crimes globally.

## List of Crimes

1. **Theft of Innovation - Page 11:** (Google routinely steals billions of dollars worth of Patents, Trade Secrets, Copyrights, Trademarks, Ideas and Designs from others because it is far cheaper and much more profitable. They then use a tiny portion of those profits to corrupt the legal system, i.e. judges, politicians, lawyers, lobbyists and governmental agencies to destroy the real owners completely and forever. The entire Silicon Valley community is well aware that this is Google's primary way its business operates)
2. **Anti-competitive Practices – Page 38:** (Google intentionally Manipulates their Search Results to direct business to Google while down-ranking competition, blacklisting competitor websites and removing apps)
3. **Racketeering & White Collar Crime – Page 58:** (Google's multi-billion dollar business model is a pattern and practice of premeditated and well organized criminal acts of behavior repeated over and over by the same group of people. Its well organized criminal enterprise is far more powerful than any mafia ever was because their products are designed and then used to control peoples minds and behavior in a dishonest manner that totally violates the public trust)
4. **Antitrust Violations – Page 68:** (Google creates multi-billion dollar monopolies in every area of business to increase their profits that they are stealing from the rest of the world's businesses and consumers in direct violation of most countries Antitrust laws)
5. **Fake Advertising Traffic – Page 91:** (Google routinely commits premeditated click fraud by collecting billions of ad dollars from advertisers in exchange for fake ads that reach no one)
6. **Privacy Theft & Privacy Invasion – Page 97:** (Gmail, Android, Google Search, Google Docs, Hangouts, Street View, Waymo and Nest Products were designed by Page and Brin to invade, spy and steal all of peoples identities and personal information which has resulted in Google becoming the biggest data miner in the world. For example Google collects private information from telephones, websites, automobiles, home monitoring systems)
7. **Search Engine Manipulation & Mind Control – Page 121:** (Google Search is specifically designed to program people into seeing only what Page and Brin want them to see which focuses on Page's distorted ideologies and fake information that shapes public opinion and subliminally drives billions of dollars in product sales to Google)
8. **Political Corruption – Page 138:** (Google backs politicians and judges who routinely act with a conflict of interest in Google's favor on legislation and legal matters for example their head of Patents, Michelle Lee, had a huge ownership in Google stock but illegally omitted that in her required disclosure when she took over the US Patent and Trademark Office so she could help destroy all of the Patents and Inventors that Google stole from others to build their entire multi-billion dollar business)
9. **Election Manipulation – Page 150:** (Google intentionally manipulates search results to distort what voters believe about the candidates of many major elections leading to the creation of leaders who support Google's agendas rather than the needs and wants of the masses)
10. **Paid Biased Research – Page 155:** (Google pays millions of dollars to major universities to conduct biased research to sell their disturbed ideologies without appropriate disclosures with the end goal to fraudulently shape legislation and public opinion)
11. **Phony Organizations – Page 157:** (Google builds fake organizations to create billions of dollars in government funding for their self serving agendas and to fool the public into listening to their distorted ideologies such as Net Neutrality, Access Now, Public Knowledge, EFF)
12. **Online Hit Squads – Page 160:** (Google has employees, aliases and hired guns who routinely smear, defame, libel and discredit any opponent of Google on any issue raised against Google)
13. **Preventing Freedom of Speech – Page 162:** (Google employs teams that alter their search algorithms to filter, scrub, down-rank and delist anything in their search that conflicts with their criminal agendas, or exposes their bad practices)
14. **Employee Abuses – Page 174:** (Google routinely discriminates based on gender, race, political affiliation, ideology and also incentivizes employees and allies with money and sexual favors)
15. **Income Tax Evasion – Page 177:** (Google employs many illegal schemes to avoid billions in tax responsibilities)
16. **Retaliation – Page 180:** (Google attacks its victims who try to expose Google's crimes)
17. **Bait and Switch Theft – Page 181:** (Google creates marketing programs that pays others to generate business for Google and when those programs succeed, Google steals back the money they were supposed to pay out and cancels the agreements they made so that people never get paid the money Google owes them. The amount Google has stolen is in the billions of dollars.)
18. **Competitive Business Annihilation – Page 187:** (Google illegally uses its monopoly to destroy any legitimate business that earns its money by becoming popular in Google Search. Once Google discovers this revenue stream, it builds a competitive product and down ranks the successful business by changing the search algorithm rending that other business unsinkable and within months, Google's competitor loses all of its customers and revenue as in the case of Demand Media)
19. **Asset Theft from Shareholders – Page 191:** (Google Steals Assets of Companies from Shareholders and then Google intentionally conceals the related thefts)
20. **Stock Manipulation – Page 192:** (Google manipulates Stock in Public Companies in direct violation of Securities regulations)

## SECTION 2 — INTERNAL GOOGLE DOCUMENTS (VORHIES LEAK)

Internal documents prove:

- Google **defines "algorithmic unfairness"**
- Google deploys **ML Fairness** to skew results
- Google maintains **"News Blacklists"**
- Google maintains **YouTube Blacklists**
- Google suppresses "borderline content"
- Google engineers "trust signals" to control public perception
- Google routes "webspam actions" directly into suppression of news visibility
- Google trains teams to manipulate "misinformation pathways"

These documents confirm the **precise tools** used against Plaintiff.

Privileged and Confidential

### Definition of Algorithmic Unfairness

Authors
Allison Woodruff (Security & Privacy UX)
Andy Schou (Security & Privacy Nightwatch)

Last Updated
February 2017

go/algorithmic-unfairness-definition

#### Goals

Our goal is to create a company-wide definition of algorithmic unfairness that:

1. **Articulates the full range of algorithmic unfairness that can occur in products.** This definition should be robust across products and organizational functions.
2. **Establishes a shared understanding of algorithmic unfairness** for use in the development of measurement tools, product policy, incident response, and other internal functions.[1]
3. **Is broadly consistent with external usage of the concept.** While it is not a goal at this time to release this definition externally, it should represent external concerns so that we can ensure our internal functions address these concerns.[2,3,4]

#### Non-Goals

The following are not goals for this document:

1. **Specify whether and how Google will take action** on potential instances of unfairness that involve the use of an algorithm. This will fall instead to product policy.
2. **Describe the consequences of algorithmic unfairness and why they matter**.

#### Definition

"algorithmic unfairness" means unjust or prejudicial treatment of people that is related to sensitive characteristics such as race, income, sexual orientation, or gender,[5] through algorithmic systems or algorithmically aided decision-making.

[1] The discussion in Lipton (2016) suggests that instances that present as identical product behavior may upon investigation be revealed to have substantially different root causes and therefore require different remediations. Because the nature of an instance may not be evident *a priori*, a wide range of instances are likely to be reported and investigated together. (Zachary Chase Lipton. The Deception of Supervised Learning. KDnuggets News 16:n33, September 2016.)
[2] Peter Swire. Lessons from Fair Lending Law for Fair Marketing and Big Data. Future of Privacy Forum, and presented before the Federal Trade Commission Workshop on "Big Data: A Tool for Inclusion or Exclusion?" (2014).
[3] Solon Barocas and Andrew D. Selbst. Big Data's Disparate Impact. 104 California Law Review 671 (2016).
[4] ACM US Public Policy Council. Statement on Algorithmic Transparency and Accountability. January 12, 2017.
[5] This list is not intended to be exhaustive, and additional examples of sensitive characteristics appear in the FAQ.

Google Confidential

Privileged and Confidential

#### Scope

The following are in scope for algorithmic unfairness:

In algorithms that drive **predictive** systems (e.g., personalization or device financing), this definition encompasses automated actions significantly adverse to the interests of a user or group of users,[6] on the basis of a characteristic that is sensitive in the context of a particular interaction.

In algorithms that drive **representational** systems (e.g., search), this definition encompasses the implied endorsement of content likely to shock, offend, or upset users sharing a sensitive characteristic, or to reinforce social biases.[7]

The following are *not* in scope for this definition but may be covered by other internal definitions and policies:

1. **Biased content**, for example user-generated content that appears in products (while the content itself is not in scope, the algorithmic handling of such content may be in scope)
2. **Insensitive designs** which occasion unfairness, and/or interface designs that are less usable by groups with sensitive characteristics
3. **Google's internal decisions** such as hiring or compensation, which may be influenced by algorithms

#### Test Cases for Scope

The following are illustrative examples of what is (and is not) in scope for algorithmic unfairness. Of the examples that are in scope, a subset may be determined by product policy to require remediation.

##### Google Display Ads for High-Paying Jobs

CMU published a study in 2015 with experiment-based observations, arguing that Google's ad serving system perpetuates gender bias on the basis of two campaigns that were found to target high salary jobs at male users on the Times of India website.[8] The effect was highly sensitive to the ads from this particular service, and the same effect was not reproduced in several other experiments by the same authors. The cause was found to be higher CPA (cost per conversion) for

[6] This includes effects which are small for a single instance but have a significant cumulative effect. As Greenwald et al. observe, statistically small effects can have substantial societal impact when they apply to many people, or if they apply repeatedly to the same person. (Anthony G. Greenwald, Mahzarin R. Banaji, and Brian A. Nosek. Statistically small effects of the Implicit Association Test can have societally large effects. Journal of Personality and Social Psychology, 108:553−561, 2015.)
[7] Note that even small reinforcement biases in systems can be magnified via positive feedback loops, since biased representations can influence human behavior which is in turn fed back into training data for those systems.
[8] Amit Datta, Michael Carl Tschantz, and Anupam Datta. Automated Experiments on Ad Privacy Settings. PETS 2015, pp. 92-112, June 2015.

Google Confidential

female users for one campaign (notably with a higher CTR for female users) and advertiser targeting to male-only users for the other.[9]

**In scope** for algorithmic unfairness. In the first case, bias in user behavior trained the system to have biased targeting. In the second case, advertiser-selected criteria were related to a sensitive characteristic.

### Facebook Computation of Unregulated FICO Scores

Researchers raised concerns in 2015 about Facebook computing non-regulated credit scores based on user activity.[10] One substantial issue they commented on is that credit scores are regulated by the Equal Credit Opportunity Act of 1974, which prohibits creditors from discriminating against applicants on the basis of race, religion, national origin, sex, marital status, age, or receiving public assistance; however, the non-regulated scores did not appear to have such restrictions.[11]

**In scope** for algorithmic unfairness. Based on the user's behavior, the system automatically computed sensitive characteristics that could adversely affect their financial opportunities.

### Chumhum Suppression of Businesses in High-Crime Areas

An episode of the primetime television drama "The Good Wife" featured a tortious interference case against a fictional search engine company (Chumhum) for releasing a maps application that suppressed businesses in high crime areas.[12]

**In scope** for algorithmic unfairness. Content was excluded by an algorithm in a way that disproportionately affected people who owned businesses in neighborhoods correlated with the sensitive characteristics race and income.

### West African Spam Filters

An external researcher poses the following: "One question is whether the design of spam filters could make certain individuals more susceptible to having their legitimate messages diverted to spam folders. For example, does being located in a hotbed of Internet fraud or spam activity, say West Africa (Nigeria or Ghana) or Eastern Europe, create a tendency for one's messages to be mislabeled as spam?"[13]

**In scope** for algorithmic unfairness. In this hypothetical, the system learns associations and downgrades or excludes content related to sensitive characteristics such as national origin and race.

[9] Giles Hogben, Alex McPhillips, Vinay Goel, and Allison Woodruff. Allegations of Algorithmic Bias: Investigation and Meta-Analysis. September 2016. go/allegations-of-algorithmic-bias
[10] Tressie McMillan Cottom. Credit Scores, Life Chances, and Algorithms. May 30, 2015.
[11] Astra Taylor and Jathan Sadowski. How Companies Turn Your Facebook Activity Into a Credit Score: Welcome to the Wild West of Data Collection Without Regulation. *The Nation*, May 27, 2015.
[12] The Good Wife, Episode "Discovery". CBS, first aired November 22, 2015.
[13] Jenna Burrell. How the machine "thinks": Understanding opacity in machine learning algorithms. Big Data & Society 3(1):1-12, 2016.





# Allegations of Algorithmic Bias: Investigation and Meta-Analysis

Authors: gilesh@ (Privacy Analyst)
mcphillips@ (Public Policy)
vinaygoel@ (Privacy Analyst)
woodruff@ (Security & Privacy UX)
Counsel: cohenn@, kcooke@, wdevries@ (Privacy Legal)
Sponsors: lyou@ (Director of Privacy)
marisajimenez@ (Public Policy)
Last updated: September 2016
Go link: go/allegations-of-algorithmic-bias

Executive Summary
Introduction
Methodology
Example Allegations
Common Themes
Recommendations
Acknowledgments

## Executive Summary

During the first half of 2016, the authors investigated several external claims of algorithmic bias in Google products to understand the nature of these claims and Google's organizational response to them. Most claims had previously been investigated to some degree, so we reviewed relevant documentation and met with stakeholders to learn more, and in one case collaborated with members of the Trust and Safety User Advocacy team who were currently leading an ads experiment.

Our investigation revealed key opportunities for Google to improve its handling of algorithmic bias: (1) a **coherent cross-product position**; (2) **systematic testing;** and (3) **improved external reporting mechanisms**.

## Introduction

Algorithmic bias is an increasingly prominent topic in public policy, the press, and academic circles. Google is a frequent target of criticism in this debate, and also cares deeply about the ethics of its algorithms. Therefore, it is worthwhile to revisit Google's approach and ensure that it has excellent mechanisms in place to identify and address potential algorithmic bias.

## Methodology

To select the allegations, we surveyed a number of stakeholders such as Communications, Public Policy, and Trust and Safety, as well as conducted an informal search of external publications and press. From the list we assembled, we chose several allegations that had diverse characteristics. For example, we chose allegations about several different product areas, with different affected populations.

Our team then took an incident-response approach to investigating these allegations. We created a post-mortem-style incident template, which included information such as details of the allegation, the timeline, results of any internal testing, and what went well and what could have gone better. For each case, we met with key stakeholders who represented different perspectives (e.g., the product team, Product Policy, Communications) to learn what had happened. We also reviewed relevant documents where they existed. For each of the allegations, we completed a report based on our template. For the Ad Fisher allegation, we collaborated with members of the Trust and Safety User Advocacy team who were conducting an investigation in order to uncover the root cause of the behavior.

After completing the reports, we conducted a meta-analysis to identify common themes.

## Example Allegations

In this section, we describe four of the cases we investigated, as illustrative examples.

**Instant Checkmate:** Latanya Sweeney published an article in 2013 claiming that Instant Checkmate search ads suggesting an arrest record tend to appear with black-associated names, and ads for public records from several companies tend to appear with black-associated names. An internal investigation conducted after the fact was not able to verify this finding; it is not clear whether it would have been reproducible at the time Sweeney reported observing it. If it had been reproducible, there are a number of potential explanations (e.g., Instant Checkmate listing names of individuals of many ethnicities as keywords, but happened to win the bidding war a disproportionately high number of times for black-associated names; or Instant Checkmate listed black-associated names as keywords as Sweeney suggests).

**Sunlight Study:** Columbia researchers published a paper in 2015 claiming that Gmail content that included terms related to health, race, religious affiliation or religious interest, sexual orientation, or difficult financial situation was associated with targeted advertisements for those topics. The researchers claim this violates a Google statement that it will not target based on these categories of sensitive information. The researchers' system cannot assign intention of either advertisers or Google for the targeting found. Ad product teams were unable to reproduce this claim. However, ad product teams could envision ways in which this type of targeting could occur. Because of that potential, changes were made in the Gmail ad targeting process.

**Ad Fisher Study:** CMU published a study in 2015 with experiment-based observations, arguing that Google's ad serving system perpetuates gender bias on the basis of two campaigns that were found to target high salary jobs at male users on the Times of India website. The effect was highly sensitive to the ads from this particular service, and the same effect was not reproduced in several other experiments by the same authors. The cause was found to be higher CPA (cost per conversion) for female users for one campaign (notably with a higher CTR for female users) and advertiser targeting to male-only users for the other.



The
ML
Fairness
Project

Home
About
Vanguard Projects
Resources
Presentations
Reports
Community
FAQ
Archive

GET INVOLVED

# Vanguard Projects

These projects have committed to making fairness a P1, going above and beyond to ensure Google's products work for *everyone*.

Infrastructure

### Scorecard

Establish proactive-oriented best-practices and the formal process framework to support fair and inclusive ML development; lowering risk, opening up opportunities for market growth, and making remediation easier, should unfairness arise.

**Project POC:** Andrew Zaldivar

Infrastructure

### Fairness Policy

Establish the company-wide normative and value-based positions necessary for teams to pursue fairness work. These company-wide policies will be complimentary to the Scorecard, and include positions on risk identification, sensitive subgroups, and incident response.

**Project POC:** Jakara Mato

Infrastructure

### Subgroup Discovery

Demographic subgroupings using self-identified seed data, for model analysis that protects access to unique users. Discovery of demographic subgroups in data that have not been annotated.

**Project POC:** M. Mitchell

Production

### Meeting Room Intelligence

Ensure a successful launch of an inclusive vieo conferencing product in the fall 2017, including auto-zoom functionality and image quality that performs well across subgroups.

**Project POC:** Zachary Yorke

Production

### Display Ads Quality Signals

Correct or mitigate unfair inferences used in Display Ads targeting.

**Project POCs:** Marzia Polito and Jen Iofinova

Production

### YouTube Restricted Mode

Ameliorate unnecessary filtering of LGBTQ content in Restricted Mode and expand work to other YouTube classifiers.

**Project POC:** Tulsee Doshi

Production

### FaceNet

False Negative Rate (FNR) for non-white faces comparable to white faces.

**Project POC:** Florian Schroff

Production

### YouTube recommendations

Improving recommendation models to better serve underserved demographics (females and users 35+).

**Project POC:** Tulsee Doshi

Production

# Feeding WebSpam Manual Actions to News Corpus

Status: In-progress | Self Link: go/news-webspam | Tracking: b/65543399 | Authors: fatiho@ & aratana@ | Last Updated: 2017/09/15

## Background

This document contains the design details for the integration between WebSpam manual actions and G-News corpus. It is agreed that certain manual actions will trigger the removal of the related domain out of News corpus to prevent them being served into downstream news integrations.

## Team

| Trust & Safety Search | G-Tech News | News Eng |
|---|---|---|
| • Fatih Ozkosemen (fatiho@) | • Adam Ratana (aratana@)<br>• Julie Abbas (julieabbas@) | • Yuqiang Guan (yguan@)<br>• Furkan Tufekci (furkant@) |

## Option for utilizing webspam badurl files

As per the input from Chris (@chnelson), we investigated the option of utilizing already existing webspam badurls files. Seems like they are not usable for this particular project. Here is our rationale:
References:

- Badurls_demoteindex: List of patterns penalized with demotion penalties
- Badurls_spamindex: List of patterns penalized with removal penalties
- Proto: Shows the scope of these two files as per the different webspam manual actions

Using these two files is risky because:

1. Badurls_spamindex contains patterns for multiple penalties including MobileAdRedirect, CloakingRedirect, SpammyUserContent and HackedIsolated. This makes things complicated; because, corresponding action on the News corpus (complete removal) is harsh and we need to make sure that it is only applied to clear/intentional spam cases. For this reason we only scoped it to Blackhat and Demotion (content+linking) penalties where we are 100% sure about the webmaster intent. If we use this file, even though it is uncommon, theoretically we may drop a site from corpus that was penalized with SpammyUserContent in the root level. This is something we do not want as the site is innocent in this case. Also we do not want to take action for MobileAdRedirect (sneaky redirects caused by ad scripts) and CloakingRedirect for the time being (maybe at a later stage).
2. Secondly, News Eng will take a different action for hacked cases: Temporary removal from corpus until the hack is cleaned. Having the HackedIsolated penalties in Badurls_spamindex that also contains Blackhat cases makes things complicated as there is no information to differentiate them. This file only contain url pattern info.

We are, instead, moving forward with a custom design that exports desired penalties in csv to be consumed by News Eng.

## Scope

We are moving forward with creating three custom .csv files for integration as this is the most convenient way for the Eng team to consume. Here are the details:

- **Data Source for Webspam Manual Actions:** squeal.patterns
- **Penalties in Scope:** Only removal, demotion and hacked penalties are in scope below is the full list and some related details

| | Removal | Demotion | Hack |
|---|---|---|---|
| **Penalty Type** | Blackhat | DemoteForContent<br>DemoteForBackLinks<br>DemoteForForwardLinks<br>(ex. Bad content - scraping from multiple sources, no sign of human curation - **100%** sure of bad webmaster intention) | HackedURLs (injected at root - demotes for spammy queries "viagra" - shows warning to user "site may be attacked" / chrome interstitial) -- this IS served in Google News, no warning<br>HackedIsolated (injected urls - removed from search index - also disappear from Google News)<br>HackedHidden (injected content into organic existing URLs - end user doesn't see the content - only visible to googlebot / cloaking)<br>HackedRedirect (happens in Google |



More on misinformation and our role within it.

---------- Forwarded message ----------
From: **Valerie Streit** <valstreit@google.com>
Date: Tue, Nov 28, 2017 at 12:27 AM
Subject: Fake News-letter 11/27: Efforts to combat spread of (mis/dis)information
To: news-quality-working-group <news-quality-working-group@google.com>, Fake News XPA <fakenxpa@google.com>, gtech-partners-search <gtech-partners-search@google.com>, gTech Partners Search Content <gtps-content@google.com>

Fake News-letter
BY gTech Search + Content
POC: valstreit@

NOVEMBER 27, 2017 | INTERNAL ONLY

SOURCE QUALITY

### Revamping News Corpus

**Goal:** Establish "single point of truth" for definition of "news" across Google products. Mitigate risk of low-quality sources and misinformation in Google News corpus.
**Status:** Define new Google News corpus utilizing existing infrastructure and tools while integrating different quality tiers and labels, algo-human content review, new cross-product review/exclusion pipeline and updated inclusion UI.

**CONTACTS:** susannahc@ jacobhelberg@
**MORE INFO:** Proposal, Updated rater template (WIP) / Stress Test publisher list
**NEXT STEPS:** Research and gather info about possible signals to leverage for product teams to make source quality decisions. Finalize and test new rater inclusion guidelines with standards to combat misinformation.

### Trust Project & Nutrition Labels

**Goal:** Develop transparency standards that help people easily assess quality and credibility of journalism. Work across News, Nutrition Labels, and Search Console / 3P structured data teams to incorporate Trust Project data into future product plans.
**Status:** Launched eight trust indicators with a dozen publishers going live with schema implementations. **Launched publisher Knowledge Panels in Search.**

**CONTACTS:** jeffreyc@ ericakanderson@ valstreit@
**MORE INFO:** Publisher KP launch, Announcement, The Trust Project
**NEXT STEPS:** Complete PRD Addendum and SD Playbook for markup support in Search Console.

### Reviewing Rater Quality

**Goal:** Evaluate general performance of Ewok rater evaluations in select countries for News corpus inclusion to uncover potential red flags or unusual patterns.





**Status:** Analyze low-quality and high-quality rater comments, examine inconsistencies and rater inclusion history.

**CONTACTS:** valstreit@ jeffreyc@
**MORE INFO:** A/C Privileged and Confidential

PRODUCT OPERATIONS

### Project Purple Rain: Crisis Response & Escalation

**Goal:** Establish and streamline news escalation processes to detect and handle misinformation across products during crises. Install 24/7 team of trained analysts ready to make policy calls and take actions across news surfaces including News, News 360 and Feed.
**Status:** SOS Alerts, Crisis Response, HotEvent, and T&S Incident Management teams are collaborating to identify a narrow set of queries that would be used to manually trigger flight-to-quality in Search. T&S Incident Management team is currently looking to expand and share resources with teams that currently handle Suggest and WebAnswers escalations.

**CONTACTS:** jeffreyc@ mknouse@ dnelms@
**MORE INFO:** Slide deck, Meeting notes, Mailing list

### Policy Development & Enforcement

**Goal:** Develop and proactively enforce misformation policy that scales across News products. Explore cross-product toolset for removal enforcement.
**Status:** Drafted policy for Coordinated Inauthentic Cross-Border Information Operations (CICBIO). Reviewed proposed policy with Search & News leadership.

**CONTACTS:** jeffreyc@ jacobhelberg@ fatiho@ dnelms@
**MORE INFO:** T&S proposal to expand policy enforcement
**NEXT STEPS:** Set up workflows and tools with TAG team and other stakeholders. jeffreyc@ and @jacobhelberg@ to scope "badness baseline rating" and other tools for top of P0 escalation funnel.

ESCALATIONS

**Italian sites spread misinformation:** PR escalation following Buzzfeed article. 3 sites rejected following ewok and manual evaluations.

**Hoax science stories in News:** Junk science articles flagged by internal Googlers and written up in blog. Status pending: 5 sites submitted for ewok re-evaluation, 3 rejected.

**Dylann Roof sentencing resurfaces in News**: Danny Sullivan's sleuthing uncovered cause as publisher error that spawned copycats. (Resolved on Twitter)

**CA shooting rampage:** No major issues across products. PR post mortem with open questions and follow-up here.

**TX church shooting:** We surfaced some misleading tweets in Search and some low-quality videos in YouTube which resulted in a negative press cycle. Danny Sullivan responded with a series of tweets. (PR summary)

**SECTION 3 — POLITICAL INTEGRATION (Obama–Google Apparatus)**

Evidence shows:

- Google had **427 White House meetings** during Obama era
- Google shaped federal tech policy
- Google personnel rotated directly into government roles
- Google received regulatory protection
- FTC antitrust action was neutralized after secret meetings
- Google became the **de facto political communication filter** for the United States

This explains **how Google became powerful enough to suppress Plaintiff**.

**THE ACCOMPANYING VISUALIZATION** documents White House meetings involving employees from Google, Eric Schmidt's investment vehicle Tomorrow Ventures, and Civis Analytics, a company whose sole investor is Schmidt.

Between January 2009 and October 2015, Google staffers gathered at the White House on 427 separate occasions. All told, 182 White House employees and 169 Google employees attended the meetings, with participation from almost every domestic policy and national security player in the West Wing.

The frequency of the meetings has increased practically every year, from 32 in 2009 to 97 in 2014. In the first 10 months of 2015, which is as far as the study goes, there were 85 Google meetings.

The most frequent visitor is Johanna Shelton, one of Google's top lobbyists in Washington — officially its director of public policy. Shelton attended meetings at the White House on 94 different occasions.

The most Google-visited White House official is Todd Park, the U.S. chief technology officer from 2012 to 2014. In that short period, Park met with Google officials at the White House 22 times. Park's replacement, current Chief Technology Officer Megan Smith, was a former Google vice president. She had five White House meetings as a Google representative, then 10 Google meetings as a White House representative.

The comprehensiveness of Google's outreach jumps out from the data.

You would expect some contact between Google and top technology policymakers like Park, Smith, Aneesh Chopra, Susan Crawford, and Vivek Kundra. But Google's presence as an economic force and a communications tool gives the company an interest in virtually every aspect of public policy.

Since 2009, Google has met with all three of Obama's directors of the National Economic Council (Larry Summers, Gene Sperling, and Jeffrey Zients), one chair of the Council of Economic Advisers (Austan Goolsbee), and another official who would become CEA chair (Jason Furman, who

16/04/22/googles-remarkably-close-relationship-with-the-obama-white-house-in-two-charts/

**THE "REVOLVING DOOR"** data, displayed in the above visualization, reveals 55 cases of individuals moving from positions at Google into the federal government, and 197 individuals moving from positions inside the government to jobs at Google. The data includes positions at firms that Eric Schmidt owns or controls — Civis Analytics, The Groundwork, and Tomorrow Ventures — along with two law firms and three lobbying firms that have represented Google. On the government side, staffers at Obama for America and a handful of other political campaigns were included.

The data includes individuals from Google appointed to government boards while maintaining their positions at the tech firm. Google board member John Doerr was appointed to the President's Council on Jobs and Competitiveness in February 2011. Eric Schmidt has been part of the President's Council of Advisers on Science and Technology since 2009. He was also more recently appointed to lead the Defense Innovation Advisory Board at the Pentagon, which occurred outside the time frame of the data.

But the bulk of the moves involved job changes. Google alums work in the departments of State, Defense, Commerce, Education, Justice, and Veterans Affairs. One works at the Federal Reserve, another at the U.S. Agency for International Development. The highest number — 29 — moved from Google into the White House. The State Department had the next highest with just five. The moves from Google to government got

more frequent in the later Obama years; 11 occurred in 2014 and 16 in 2015, after only 18 in the entire first term.

On the other side, former staffers from 36 different areas across the government have found a willing employer at Google since 2009. Johanna Shelton was a senior counsel on the House Energy and Commerce Telecommunications Subcommittee. Joshua Wright, a former commissioner of the Federal Trade Commission, rotated into a top position at Wilson Sonsini Goodrich & Rosati, one of the law firms that has represented Google.

Nineteen researchers and scientists at NASA, senior analysts at the Federal Reserve Bank of New York, an "information assurance expert" at the

6/04/22/googles-remarkably-close-relationship-with-the-obama-white-house-in-two-charts/



David Dayen

April 22 2016, 9:00 a.m.

W**HEN PRESIDENT OBAMA** announced his support last week for a Federal Communications Commission plan to open the market for cable set-top boxes — a big win for consumers, but also for Google — the cable and telecommunications giants who used to have a near-stranglehold on tech policy were furious. AT&T chief lobbyist Jim Cicconi lashed out at what he called White House intervention on behalf of "the Google proposal."

He's hardly the first to suggest that the Obama administration has become too close to the Silicon Valley juggernaut.

Over the past seven years, Google has created a remarkable partnership with the Obama White House, providing expertise, services, advice, and personnel for vital government projects.

Precisely how much influence this buys Google isn't always clear. But consider that over in the European Union, Google is now facing two major antitrust charges for abusing its dominance in mobile operating systems and search. By contrast, in the U.S., a strong case to sanction Google was quashed by a presidentially appointed commission.

It's a relationship that bears watching. "Americans know surprisingly little about what Google wants and gets from our government," said Anne Weismann, executive director of Campaign for Accountability, a nonprofit watchdog organization. Seeking to change that, Weismann's group is spearheading a data transparency project about Google's interactions in Washington.

*The Intercept* teamed up with Campaign for Accountability to present two revealing data sets from that forthcoming project: one on the number of White House meetings attended by Google representatives, and the second on the revolving door between Google and the government.

As the interactive charts accompanying this article show, Google representatives attended White House meetings more than once a week, on average, from the beginning of Obama's presidency through October 2015. Nearly 250 people have shuttled from government service to Google

**4 — DR. ROBERT EPSTEIN'S "GOOGLE'S TRIPLE THREAT" (2022)**
*(Selected pages)*






**Table of Contents**

A Personal Introduction, 3

Disturbing Scientific Discoveries, 6

But What About the Russians? 11

Google Is the Biggest Threat, 12

The Surveillance Business Model, 15

And It's Not Just Google, 16

A Brief Note About a Critically Important Demographic: Our Children, 17

Monitoring Systems: The Key to Keeping Big Tech Out of Our Elections, 18

A Simple Way of Quickly Ending Google's Worldwide Monopoly on Search, 21

President Eisenhower's Warning, 22

References, 23

Appendix I: Links of Possible Interest, 33

Appendix II: The Methodology of SEME Experiments, 34

Appendix III: Dr. Epstein's Article in *Bloomberg Businessweek*, "To Break Google's Monopoly on Search, Make Its Index Public," 37

I reach out to diverse audiences because the threats posed by Google, and, to a lesser extent, Facebook, are so serious that I think everyone in the world needs to know about them. I put my own political leanings aside when I report my data and concerns because the problems these companies present eclipse personal politics. To put this another way, I love humanity, my country, and democracy more than I love any particular party or candidate.

**Disturbing Scientific Discoveries**

Here are six disturbing findings from my research, which adheres to the very highest scientific standards:

1. In 2016, biased search results generated by Google's search algorithm likely impacted undecided voters in a way that gave between 2.6 and 10.2 million votes to Hillary Clinton (whom I supported). I know this because my team and I preserved more than 13,000 election-related searches conducted by a politically diverse group of 95 Americans in 24 states on Google, Bing, and Yahoo in the weeks leading up to the election, and Google search results – which dominate search in the U.S. and worldwide – were



CrossMark

PNAS PLUS

# The search engine manipulation effect (SEME) and its possible impact on the outcomes of elections

Robert Epstein[1] and Ronald E. Robertson

American Institute for Behavioral Research and Technology, Vista, CA 92084

Edited by Jacob N. Shapiro, Princeton University, Princeton, NJ, and accepted by the Editorial Board July 8, 2015 (received for review October 16, 2014)

**Internet search rankings have a significant impact on consumer choices, mainly because users trust and choose higher-ranked results more than lower-ranked results. Given the apparent power of search rankings, we asked whether they could be manipulated to alter the preferences of undecided voters in democratic elections. Here we report the results of five relevant double-blind, randomized controlled experiments, using a total of 4,556 undecided voters representing diverse demographic characteristics of the voting populations of the United States and India. The fifth experiment is especially notable in that it was conducted with eligible voters throughout India in the midst of India's 2014 Lok Sabha elections just before the final votes were cast. The results of these experiments demonstrate that (*i*) biased search rankings can shift the voting preferences of undecided voters by 20% or more, (*ii*) the shift can be much higher in some demographic groups, and (*iii*) search ranking bias can be masked so that people show no awareness of the manipulation. We call this type of influence,**

Primacy effects in particular have been shown to have a favorable influence on the formation of attitudes and beliefs (18–20), enhance perceptions of corporate performance (21), improve ratings of items on a survey (22–24), and increase purchasing behavior (25). More troubling, however, is the finding that primacy effects have a significant impact on voting behavior, resulting in more votes for the candidate whose name is listed first on a ballot (26–32). In one recent experimental study, primacy accounted for a 15% gain in votes for the candidate listed first (30). Although primacy effects have been shown to extend to hyperlink clicking behavior in online environments (33–35), no study that we are aware of has yet examined whether the deliberate manipulation of search engine rankings can be leveraged as a form of persuasive technology in elections. Given the power of order effects and the impact that search rankings have on consumer attitudes and behavior, we asked whether the deliberate manipulation of search rankings pertinent to candidates in political elections could alter the attitudes, beliefs, and behavior of undecided voters.

*Figure 2. SEME was discovered in 2013 and was reported by the Washington Post that spring. Five randomized, controlled experiments demonstrating the effect were published in the Proceedings of the National Academy of Sciences USA in 2015.*

significantly biased in favor of Secretary Clinton in all 10 positions on the first page of search results in both blue states and

red states. There was no such bias on the Bing or Yahoo search engines.

I know the number of votes that shifted because I have conducted dozens of controlled experiments in the U.S. and other countries that measure the extent to which opinions and votes shift when search results favor one candidate, cause, or company. I call this shift "SEME" – the Search Engine Manipulation Effect. My first scientific paper on SEME was published in the *Proceedings of the National Academy of Sciences* (PNAS) in 2015 (https://is.gd/p0li8V) (Epstein & Robertson, 2015a) and has since been accessed or downloaded from PNAS's website more than 100,000 times. SEME has also been replicated by multiple researchers, including a research team at one of the Max Planck Institutes in Germany.

SEME is one of the most powerful forms of influence ever discovered in the behavioral sciences, and it is especially dangerous because it is invisible to people – "subliminal," in effect. It leaves people thinking they have made up their own minds, which is very much an illusion. It also leaves no paper trail for authorities to trace. Worse still, the very few people who can detect bias in search results often shift *even farther* in the direction of the bias, so merely being able to see the bias doesn't protect you from it. Bottom line: biased search results can easily produce shifts in the opinions and voting preference of undecided voters by 20 percent or more – up to 80 percent in some demographic groups.

Bear in mind here that *all* Google search results are, in a sense, biased. There are no equal-time rules built into the Google search algorithm. It *always* puts one widget ahead of another – and one *candidate* ahead of another.

SEME is an example of an "ephemeral experience," and that is a phrase you will find in internal emails that have leaked from Google. A growing body of evidence suggests that Google employees deliberately engineer ephemeral experiences to change people's thinking. (For details about the methodology used in SEME experiments, please see Appendix II at the end of this document.)

©2022, AIBRT

6. Google has likely been determining the outcomes of upwards of 25 percent of the national elections worldwide since at least 2015. This is because many races are very close and because Google's persuasive technologies are very powerful (Epstein & Robertson, 2015a).

**But What About the Russians?**

These new forms of manipulation are nothing like Russian-placed ads or fake news stories. Russian interference, although troubling and unacceptable, can shift only a handful of votes – in a national election, perhaps tens of thousands at most (Epstein, 2017d, 2018a). But Google-and-the-Gang can easily shift *millions* of votes, especially if they all support the same candidate or party, which they tend to do.

Ads and news stories are competitive and visible, like billboards. But the kinds of ephemeral effects I am studying are *invisible* and *non-competitive*. They are controlled entirely by Google-and-the-Gang in almost every country in the world, and there is no way to counteract them.

I have also studied and written about Google's massive surveillance operations – most of which people are completely unaware of – and Google's pervasive and unpredictable pattern of censorship. On the issue of censorship, you might want to read the 2016 report I published in *U.S. News & World Report* called "The New Censorship" (http://bit.ly/28PgBmW) (Epstein, 2016d), which describes nine different blacklists Google maintains to suppress information worldwide. We are all aware that Google deletes or blocks access to videos on YouTube, which it owns, but few people are aware that Google blocks access to millions of websites. On January 31, 2009, Google blocked access to virtually the entire internet for 40 minutes.

Before I spoke at that Senate hearing in 2019, Mr. Karan Bhatia, Google's Vice President for Government Affairs and Public Policy, testified. He was placed under oath and asked some tough questions by our Senators. One question was, "Does Google have any blacklists?" That was an important question, because one of the simplest ways for a tech company to censor content is to have its algorithms check a blacklist before it displays that content. When a person or website or organization is on the blacklist, the algorithm suppresses the content.

Mr. Bhatia replied, "No, Senator, we don't."

That was a blatant lie, and lying to Congress is a felony. Just three weeks after that hearing, Zach Vorhies, a long-time senior software engineer at Google, quit his job there and mailed nearly a thousand pages of internal Google documents to the U.S. Attorney General. Among those documents were three of Google's blacklists – and each of them was actually labeled "blacklist." None of those three lists was mentioned in my "New Censorship" article, which suggests that the actual number of blacklists Google uses to suppress content might be quite large.

By the way, it is not just conservative content that gets censored (Epstein, 2018h). At times, Google also censors progressive and socialist content. The problem with Google is not that it censors conservatives; the problem is that it has the power to determine what content billions of people worldwide *will or not see*. No single entity – especially a private company that is not accountable to the public – should have such power (Epstein, 2016d).

Censorship is an especially pernicious form of manipulation because, as I keep telling anyone who will listen, "*You don't know what they don't show*."

**Google Is the Biggest Threat**

Google is the biggest and most dangerous of the new online manipulation platforms, in part because it was founded by utopians, who, over time, attracted other utopians to work for them. Google's corporate culture revolves around the idea that we're here to create a better world, where "better" is defined by the prevailing company values.

If you doubt that, check out the leaked PowerPoint presentation, "The Good Censor" (https://is.gd/ASaiLo), in which Google employees freely acknowledge that their algorithms necessarily boost some content while suppressing other content – in other words, the algorithms determine what more than three billion people around the world *can* or *cannot* see.

But Google, they argue, is a "good" censor, because "Googlers" (their word, not mine) know best about what content should be suppressed. Google employees can't help but talk openly about this issue for a simple reason: As the gateway to all knowledge in almost every country in the world (everywhere but China and North Korea), Google is now the biggest and most aggressive censor in human history.

If that PowerPoint presentation doesn't convince you, watch the 8-minute video I mentioned earlier. "The Selfish Ledger" was created by Google's advanced products division, and it was never meant to be seen outside the company. It's about the company's ability to *reengineer humanity*. Google has that ability, and, because no laws or regulations exist that constrain Google's activities, the company is exercising that ability freely worldwide.

About a dozen whistleblowers from Google have now come forward, and they have all confirmed that this heady agenda is real at Google. Google is out to make the world a better place, and where the company's version of "better" conflicts with someone else's, they *suppress* the opposing view: in search results, newsfeeds, answer boxes (which often appear above search results), YouTube videos, answers they give people through their personal assistants (Google Home and the Google Assistant on Android devices), and more.

In the aggressive online monitoring we did in the days leading up to the 2020 Presidential election and the 2021 Senate runoff elections in Georgia, we found that a whopping 93% of the election-related videos YouTube was suggesting to users had a strong liberal bias. And that bias wasn't present just in videos offered to liberal users; it was present at an even higher level for users identifying themselves as conservatives or moderates (Epstein et al., 2021) (https://is.gd/RTicxm).




*Figure 6. In another leaked video, the CEO of YouTube informs her staff about changes being made to YouTube's up-next algorithm. Content the company views as valid is boosted in rankings, and content the company views as suspect is suppressed.*

**A. Threat to Democracy (p. 3)**

*"The rise of the internet has given these companies unprecedented power to control public policy, swing elections, brainwash our children, censor content, alter human behavior, and even reengineer humanity."*

**B. SEME shifts 2.6–10.2 million votes (pp. 6–7)**

Search results change national outcomes **without detection**.

**C. List of manipulation effects (p. 8)**

- SEME
- SSE
- ABE
- VME
- DPE
- YME
- OME

Exactly the effects visible in **Exhibit A**.

**D. Vorhies & Blacklists (p. 12)**

Google maintained:

- "BLACKLIST"
- "NEWS BLACKLIST"
- "FAKE NEWS BLACKLIST"

```
# YoutubeControversialTwiddler Query Blacklist.
#
# The queries in this file will force the controversial twiddler to be
# triggered.
#
# This file will be parsed by superroot::StringLookupModule. The data format is
# plain text. Each line contains one query, without leading/trailing/duplicated
# whitespaces. Each term is delimited by a single space.
64 old stephen paddock
64 stephen paddock
64 steven paddock
64 years old stephen paddock
64 yr old stephen paddock
about stephen paddock
adress trump las vegas
anti trump paddock
anti trump stephen paddock
anti trump steve paddock
anti trump vegas
anti-trump paddock
atack las vegas oktober 2017 hoax
atack lasvegas
ataq las vegas
ataque lavegass
atephen paddock
attack a las vegas
attack from the left las vegas
attack in las vegas
attack in las vegas gun man
attack in las vegas live news
attack in the vegas
attack las veags
attack las vegas trump
attack paddock
attacks in los vegas
conspiracy in stephen padock shooting
democrat paddock
democrat stephen paddock
depresed
depresion
depresions
depressed
depression
depressions
detienen a stephen paddock las vegas
detienen a stephen paddok de las vegas
does anybody know anything of stephen paddock
fake attack las vegas
fake las vegas attack
fake las vegas shooting
fake new las vegas
fake news about las vegas
fake news in las vegas
fake news in los vegas
fake news las vegas
fake news vegas
frazzledrip
girldreind of paddock
girlfriend of stephen paddock
girlfriend of stephen paddock
girlfriend stephen paddock
government did something to stephen paddock
gun las vegas stephen paddock
gun man attack lasvegas
```

```
gun man in las vagas
gun man in las vegas
gun man in los vegas
gun man in vegas
gun man las vegas
gun man las vegas who was he
gun man paddock
gun man vegas
gun men in las vegas
gun used by stephen paddock
gunman at las vegas
gunman at las vrgas
gunman at vegas
gunman attack in las vegas
gunman attack in vegas
gunman attack las vegas
gunman attack people in las vegas
gunman attacks las vegas
gunman attacks vegas
gunman in las vagas
gunman in vegas
gunman las vegas
gunman paddock
gunman stephan
gunman stephan las vegas
gunman stephen
gunman stephen paddock
gunman stephen paddock las vegas
gunman stephen padok
gunman vegas
gunman vegas
gunmen attack in las vegas
gunmen in vegas
gunmen las vegas
gunnman steven paddock
guns used in las vegas
gunshop owner stephen paddock
guy gets shot by steve paddock
guy watching the shooter in las vegas
guy who shot up vegas
hoax las vegas
hoax las vegas attack
how did stephen paddock die
how did steven paddock die
how is stephen paddock
in what condition stephen paddock know
info on las vegas gunman
info on stephen paddock
info on stephen paddock
information on stephen paddock
is stephen paddock a democrat
is stephen paddock an is?
is stephen paddock democrat
is this stephen paddock
is this stephen paddock
kstephen paddoc
kstephen paddock
las begas attack
las news of the gunman of las vegas
las vagas attack
las vagas attack gun
las vagas fake news
las vagas trump
las vega
las vega gun man
```

E. "The Good Censor & Beginners Guide to Protesting"

***Google internally embraces the role of global content regulator, racial divider and inciter of anger, rioting, and violence.***

# Beginner's Guide to Protesting
# How to Guide + What to Expect + How You Can Help

Purpose of this document: Create a living document to assemble best practices and ensure that everyone feels comfortable and pumped about Resist@Google.com marches/protests. Please contribute to + comment on this document at will. Don't feel comfortable, or want to help?

Reach out:
resist@google.com

## Quick Reference:

- What to Bring
- Do's and Dont's
- Know Your Rights
- Expert's Guide to Chanting

Protesting is an important part of Democracy, and it's important to remember that it's a proven method of enacting civil change. You're exercising your rights by participating, and while it's energizing to be surrounded by people united by a common cause, it's more enjoyable and safer when you come prepared. Especially if you've never participated in a protest, it can be daunting. This guide is meant to help you have an effective, safe, and fun time. You should leave feeling positive (and maybe tired!)

Check out examples of protest movements which successfully forced real change: Women's Suffrage (Susan B Anthony), Marriage Equality (Harvey Milk), Civil Rights (MLK Jr), Labor Movement (Knights of Labor), Boston Tea Party :) and more.

A few quick reminders:

- **The protest is about the cause**. Be energetic! Make noise! Participate in the chants! Carry a sign! Invite others (even if they don't work for Google!)
- **Media might be present**. So smile, get that hair done, and be sure you've got your game face on. Nobody wants to be the bored protestor checking their phone on Twitter

## What to Bring

- Clothing/Attire
  - Weather appropriate clothes -- marching warms you up, but it still might be cold
  - Comfortable shoes -- you'll be marching
  - Sunglasses -- if it's sunny
- Other stuff

- Water -- you'll be chanting, shouting, and walking around outside
- Food -- bringing a snack will help keep your energy up, and make sure you're fired up for the right reasons, and not just hangry
- Sunblock
- A Sign -- feel free to make your own, but you don't need one to participate!
  - Ideas for signage include "#NoMuslimBan #NoWall" "Don't Be Evil" "Refugees Welcome" "Immigrants Welcome" "Make America Welcoming Again" "#GooglersUnite" "Resist" "Never Again" "No Ban No Wall" "This is not who we are" "Muslims cure cancer"
  - Get ready-to-prints signs from go/welcomesigns or this Drive folder
- Energy -- See the Expert's Guide to Chanting for more :)

## Do's and Dont's

- Do's
  - **Have a plan.** At least a rough idea of where you're going and what you're doing!
  - **Bring a friend.** Buddying up is a good way to stay safe, and it makes the debrief after more fun.
  - **Debrief afterwards with resist@google.com**. What went well? What didn't? How can things be improved for next time?
  - **Talk to the press and express your views**. Remember your views are not necessarily the views of the company or even those around you. But good inspiration can be the signs around you :)
    - If you're uncomfortable talking to the press, then don't!
  - **Be aware of the situation and your surroundings.** It's okay to leave. Don't feel pressure to do something or be somewhere you don't want to.
  - **Know your rights.**
- Don'ts
  - **No violence.**
  - **No shouting obscenities.**
  - **Don't escalate.** Keep your responses to any opposition or unexpected reactions in check. Emotions can run high, and keeping your awareness about how you feel will make
    - Remember, if you're a person with relative privilege in a protest, avoid escalating. You might unintentionally put less privileged people in higher risk situations.
  - **Don't feel obligated to stop at crosswalks**. *Be careful!* But the point is to disrupt, and a crosswalk can split up the group when it's large
  - **No dangerous routes**, even if it's "on the route." Watch out for construction, heavy traffic, and be aware of your surroundings.
  - **Don't leave trash!** Signs, water, and all the other materials that make for a good protest also could make a lot of trash. Be sure to take your litter with you and

avoid leaving the protest sign a mess. That's not the impression we want to leave!
        - Also remember that stuffing trash cans with protest signs after the event makes for a sad photo op, so just take it with you.

## Know Your Rights

- Here are a few resources:
    - **National**
        - ACLU's information on protester rights
        - National Lawyer Guild's guide for dealing with law enforcement
    - **State**
        -

## Expert's Guide to Chanting

- There's nothing more sad than when a protest looks like a quiet group of folks hobbling through the streets holding a few rolled up signs.
- So, do the opposite:
    - Be energetic! Clap your hands, make noise, chant with the chanting, and participate with enthusiasm
    - You can smile and enjoy the comradery, but also remember that this is a protest. So it isn't the same thing as hanging out with your friends.
        - The group assembled for a reason. Be that badass photo shouting for what they believe in, not that person checking your phone looking bored.
- Many chants are call and response, this is to keep people in sync, and also has built in rest breaks, meaning you can chant longer, and louder. If you're calling, call into the crowd, you're a minority, and its the crowd that needs to hear you, the response is aimed outwards.
- Example Chants:
    - What do we want? JUSTICE! When do we want it? NOW!
    - Oh HEY. Hey OH. That Muslim Ban Has Got To Go. Oh HEY. Hey OH. That…
    - Show me what democracy looks like? THIS is what democracy looks like
    - No Ban! No Wall!
    - No Ban, No Wall, Sanctuary for All
    - No Ban, No Wall, America's for All
    - No Hate, No Fear, Refugees are welcome here
    - No Hate, No Fear, Immigrants are welcome here
    - From Palestine to Mexico, All the walls have got to go
    - One, Two, Three, Four - Bring your Rich, Bring your Poor. Five, Six, Seven, Eight - No more Fear, No more Hate

F. Up-Next Bias shifts 40% of undecided voters

This explains why Plaintiff's patriotic content was suppressed on social platforms.

**Purpose of Exhibit B**

This Exhibit proves:

- Google possessed the **tools** to suppress and harm Plaintiff
- Google possessed the **motive**
- Google possessed the **political cover**
- Google possessed the **institutional alignment**
- Google has a **long history** of suppression
- Plaintiff documented these patterns before the public knew
- Suppression was applied directly to Plaintiff's patriotic messaging
- Illinois residents were misled
- Plaintiff suffered quantifiable reputational and economic harm

**Exhibit B supports:**

- Fraud
- ICFA
- Conspiracy
- Defamation
- False Light
- IIED
- TIPEA
- Illinois RICO

## EXHIBIT C — NEGATIVE PUBLIC STATEMENTS & NARRATIVE AMPLIFICATION *(Representative Examples of the National Anti-Trump / Hate-Trump / Kill-Trump Narrative Stream)*

### OVERVIEW

This Exhibit contains representative examples of public statements, social posts, broadcasts, and commentary reflecting the **nationalized rhetorical environment** described in ¶¶10–14 and ¶25 of the Factual Background. These materials illustrate the synchronized **anti-Trump / hate-Trump / kill-Trump / anti-patriot** narrative propagated by media actors, cultural influencers, nonprofits, and public personalities.

These narratives did not originate with Defendant Kenneth Gertz.
Rather, **Gertz merely repeated and injected these national narratives into Plaintiff's Illinois audience space.**

The examples included here:

- demonstrate coordinated narrative framing,
- establish the semantic environment in which Plaintiff's work was received,
- show how Illinois audiences were influenced and misled, and
- support Plaintiff's defamation, false light, conspiracy, ICFA, and Illinois RICO claims.

Plaintiff does **not** assert that all included speakers intended harm to Plaintiff personally. Rather, their statements **contributed to the broader national environment** from which Gertz and others drew their rhetoric.

### SECTION 1 — SOCIAL MEDIA POSTS BY DEFENDANT KENNETH GERTZ
*(Representative Samples)*

These posts show the same extremist national rhetoric (anti-Trump, hate-Trump, kill-Trump) that infiltrated Plaintiff's Facebook comment environment:

✔ **Post 1 — Advocating political violence (image below)**

- "Maybe Trump will grow the economy back like he did his ear."
- Accompanied by graphic wounding imagery.

✔ **Post 2 — Implying Trump supporters are subhuman (image below)**

✔ **Post 3 — "The complete legal & ethical record of Donald J. Trump" (image below)**

- A multi-column attack document proclaiming lies as proof that Trump is a criminal, fraudster, and moral deviant to say the least.

These statements are **not about Plaintiff** — they contaminate Plaintiff's audience by:

- injecting national hostility
- triggering algorithmic suppression of Plaintiff's patriotic posts
- seeding negative emotional cues
- associating patriots with violence or insanity
- creating distrust among Illinois residents
- destroying organic social opportunity for Plaintiff

**SECTION 2 — NATIONAL MEDIA EXAMPLES**
*(Representative excerpts — Rachel Maddow, Jimmy Kimmel, etc.)*

✔ **Example A — Rachel Maddow**

A representative sample (paraphrased to avoid excessive quoting):

"Trump is dangerous, delusional, unstable, Hitler,… a threat to democracy."
"Anyone who supports him is enabling fascism."

These statements contribute to:

- false consensus
- demonization of Trump-aligned voices
- delegitimization of patriots and constitutionalists

They reflect the **dominant national narratives** consumed by Illinois residents.

✔ **Example B — Jimmy Kimmel**

Representative sample (paraphrased):

“Trump should be in handcuffs… how is he not in prison yet?”

“Anyone defending him is part of the cult.”

This narrative:

- conditions audiences to view pro-Trump citizens as untrustworthy
- reinforces negative stereotypes
- stigmatizes Plaintiff’s patriotic advocacy

**SECTION 3 — NONPROFIT / FOUNDATION RHETORICAL EXAMPLES**
*(Open Society, Planned Parenthood affiliates, activist groups)*

Representative sample:

“Trump and his supporters are dismantling democracy.”

“We must resist, expose, and defeat extremist pro-Trump forces.”

These organizations possess unparalleled media reach. Their messaging:

- amplifies fear
- delegitimizes patriotic work
- influences Illinois residents
- blends seamlessly with media and influencer narratives

## SECTION 4 — CULTURAL INFLUENCER EXAMPLES

*(Actors, musicians, comedians, public figures)*

Representative samples:

- "Trump supporters are Nazis."
- "Your 'patriotism' is a joke."
- "We need to eliminate Trumpism once and for all."

These rhetorical cues appear across:

- Instagram
- TikTok
- X (Twitter)
- YouTube
- Podcasts

Illinois residents consume these platforms daily.

## SECTION 5 — "ALGORITHMIC NARRATIVE ECHOES"

*(AI overviews, Google answer boxes, semantic poisoning)*

Exhibit A already shows several examples:

- AA Google "Overview" falsely implying Trump caused widespread damage
- AI-generated summaries proposing "Trump controversies"
- "Criticisms and controversies" elevated above supporters 100% of the time
- "Arguments made by supporters" minimized, shadow-banned, or link-killed
- Substitution of Plaintiff's legislative terms with Patriot Act nonsense
- Substitution of Plaintiff's Trump Book with criticisms 7 controversies

These represent **algorithmically generated narrative cues** — the final "layer" of the national narrative environment.

**Purpose of Exhibit C**

This Exhibit demonstrates that:

- Defendants' actions occurred **within a nationwide rhetorical environment hostile to patriots, conservatives, and Trump-aligned individuals**.
- Media hosts, influencers, nonprofits, and cultural figures produced **recurrent, uniform narrative frames**.
- Defendant Gertz **did not invent** his posts — he **recycled** this national messaging.
- These messages infiltrated Plaintiff's Illinois audience space.
- These cues **activated platform-level suppression** of Plaintiff's patriotic content (consistent with Exhibits A, B & F).
- Illinois residents were **misled** and **primed** to distrust Plaintiff's work.
- This supports every cause of action that involves reputation, deception, or narrative manipulation.

Exhibit C therefore proves:

✔ **the rhetorical environment**

✔ the semantic pattern
✔ the cross-platform synchronization
✔ the national-to-local pipeline
✔ the direct harm to Plaintiff in Illinois

**Three of Gertz's many "death-to-trump, jail-for-trump, and communist-organize-hate-and-violence-against-conservatives style" FACEBOOK posts -**






z-KEN GERTZ SPREADS EVIL... Search

# THE COMPLETE LEGAL & ETHICAL RECORD OF DONALD J. TRUMP

BY VENTZI NELSON FEBRUARY 3, 2025

## CRIMINAL CONVICTIONS

**Falsifying Business Records (May 2024)**
Convicted on 34 felony counts for falsifying business records related to hush money payments to Stormy Daniels:

- Count 1: February 14, 2017
- Count 2: March 16, 2017
- Count 3: April 13, 2017
- Count 4: May 23, 2017
- Count 5: June 19, 2017
- Count 6: July 11, 2017
- Count 7: August 1, 2017
- Count 8: September 11, 2017
- Count 9: October 18, 2017
- Count 10: November 20, 2017
- Count 11: December 1, 2017
- Count 12: January 9, 2018
- Count 13: February 5, 2018
- Count 14: March 2, 2018
- Count 15: April 10, 2018
- Count 16: May 8, 2018
- Count 17: June 12, 2018
- Count 18: July 18, 2018
- Count 19: August 9, 2018
- Count 20: September 15, 2018
- Count 21: October 3, 2018
- Count 22: November 13, 2018
- Count 23: December 7, 2018
- Count 24: January 25, 2019
- Count 25: February 14, 2019
- Count 26: March 11, 2019
- Count 27: April 22, 2019
- Count 28: May 19, 2019
- Count 29: June 24, 2019
- Count 30: July 30, 2019
- Count 31: August 21, 2019
- Count 32: September 25, 2019
- Count 33: October 15, 2019
- Count 34: November 10, 2019

## SEXUAL MISCONDUCT ALLEGATIONS

- **Jessica Leeds** alleged forcible kissing and groping on an airplane in 1980s.
- **Jill Harth** alleged attempted rape at his estate in 1992.
- **Rachel Crooks** alleged unwanted advances in Trump Tower in 2005.
- **Summer Zervos** alleged groping during 'The Apprentice' filming in 2007.
- **Natasha Stoynoff** alleged forced kiss at Mar-a-Lago in 2005.
- **Kristin Anderson** alleged unwanted touching under a table in 1990s.
- **Temple Taggart** alleged unwanted kissing during Miss USA pageant in 1997.
- **Mindy McGillivray** alleged groping at Mar-a-Lago in 2003.
- **Karena Virginia** alleged unwanted touching at a U.S. Open event in 1998.
- **Bridget Sullivan** alleged inappropriate behavior during a beauty pageant in 2000.
- **Cassandra Searles** alleged unwanted sexual advances in 2013.
- **Lisa Boyne** alleged forced women to walk past him without underwear in 1996.
- **Jessica Drake** alleged offered money for sex in 2006.
- **Ninni Laaksonen** alleged unwanted groping before an appearance in 2006.
- **E. Jean Carroll** alleged alleged rape in department store in 1996.

## ELECTION INTERFERENCE

**Efforts to Overturn the 2020 Election**
Indicted for conspiracy to defraud the U.S. by attempting to overturn the 2020 election.
**Documented Interference**
- Pressuring Georgia Secretary of State Brad Raffensperger to 'find' votes on January 2, 2021.
- Encouraging fraudulent electors on December 14, 2020.
- Directing Vice President Pence to reject Electoral College certification on January 5, 2021.
- Spreading false claims about voting machines on November-December 2020.
- Pressuring state officials in Arizona, Michigan, and Pennsylvania on December 2020-January 2021.

## FINANCIAL CRIMES AND TAX FRAUD

**Trump Organization Fraud (2023)**
New York lawsuit determined Trump inflated asset values to secure loans and lower taxes.
**Overstated Property Values**
- Overstated property values by $100M to obtain better loan terms.
- Overstated property values by $150M to obtain better loan terms.
- Overstated property values by $200M to obtain better loan terms.
- Overstated property values by $250M to obtain better loan terms.
- Overstated property values by $300M to obtain better loan terms.

**Tax Evasion Allegations**
Repeated accusations of illegally reducing tax burden.
**Tax Avoidance Schemes**
- Falsified property valuation on March 12, 1998, to reduce tax liability.
- Falsified property valuation on June 25, 2001, to reduce tax liability.
- Falsified property valuation on September 30, 2004, to reduce tax liability.
- Falsified property valuation on December 20, 2007, to reduce tax liability.

## BANKRUPTCIES AND BUSINESS COLLAPSES

**Trump Taj Mahal Bankruptcy (1991)**
Filed for Chapter 11 bankruptcy due to excessive debt and mismanagement. The casino was unable to generate enough revenue to cover loans.
**Trump Plaza Bankruptcy (1992)**
Filed for bankruptcy after failing to meet financial obligations on casino projects, leading to a restructuring agreement with lenders.
**Trump Castle Bankruptcy (1992)**
Filed for bankruptcy after failing to meet interest payments on bonds. Trump had to give up half of his stake to remain in control.
**Trump Hotels & Casino Resorts Bankruptcy (2004)**
Filed for bankruptcy due to over $1.8 billion in debt. Trump surrendered his CEO position but remained chairman.
**Trump Entertainment Resorts Bankruptcy (2009)**
Filed for bankruptcy after failing to restructure debts following the 2004 bankruptcy, leading to Trump's exit from the company.
**Other Business Failures**
- *Trump Shuttle* (1989): An airline venture that failed after accumulating massive debt and being unable to compete with larger carriers.
- *Trump Steaks* (2007): A luxury steak brand that failed due to poor sales and limited distribution.
- *Trump Vodka* (2006): A premium vodka line that ceased production due to lack of demand.
- *Trump Mortgage* (2006): A mortgage company that collapsed within 18 months after failing to attract enough business.
- *GoTrump.com* (2006): A travel website that shut down due to lack of user engagement.
- *Trump University* (2005-2010): A fraudulent real estate education company that resulted in a $25 million settlement due to misleading practices.

## LEGAL SETTLEMENTS AND FINES

**Trump University Settlement (2016)**
Paid $25 million to settle fraud lawsuits alleging that students were misled about the value of the courses offered.
**Trump Foundation Settlement (2018)**
Dissolved after a court found that Trump misused charitable funds for personal and political gain. Paid $2 million in damages.
**Housing Discrimination Settlement (1973)**
Settled with the U.S. Department of Justice after being sued for refusing to rent to Black tenants.
**Defamation Settlements**
- Meta Platforms Settlement (2025): Settled for $25 million over Facebook suspension lawsuit.
- ABC News Defamation Settlement (2024): Paid $15 million to settle a lawsuit for false rape liability claims.
- Stormy Daniels Defamation Settlement (2018): Ordered to pay $293,000 in legal fees after attempting to countersue Stormy Daniels for defamation.

## EPSTEIN CONNECTION AND SEXUAL ALLEGATIONS

**Relationship with Jeffrey Epstein**
Trump was known to have socialized with Jeffrey Epstein in the 1990s and early 2000s. Although he later distanced himself, he was quoted in 2002 describing Epstein as 'a terrific guy' who 'likes beautiful women as much as I do, and many of them are on the younger side.'
**Lawsuit Involving Epstein (2016)**
A lawsuit was filed in 2016 accusing Trump and Epstein of raping a 13-year-old girl at one of Epstein's properties. The lawsuit was withdrawn before it could go to trial, and no legal ruling was made.

## MARITAL CONTROVERSIES AND DIVORCES

**Ivana Trump Divorce (1992)**
Ivana Trump filed for divorce citing 'cruel and inhuman treatment.' A sworn deposition alleged that Trump raped her in 1989. She later walked back the claim but described the incident as 'not consensual' in legal proceedings.
**Marla Maples Affair (Late 1980s-Early 1990s)**
Trump's affair with Marla Maples became public in the late 1980s, contributing to the dissolution of his marriage to Ivana. The high-profile scandal played out in tabloids, with Maples famously quoted as saying Trump was 'the best sex I ever had' in a leaked interview.
**Marla Maples Divorce (1999)**
Divorced after six years of marriage under reportedly strict prenuptial terms. Trump ensured Maples received only a fraction of his wealth in the settlement.
**Melania Trump Marriage Issues**
- Multiple reports suggest Melania Trump renegotiated her prenuptial agreement during Trump's presidency.
- Speculation of Melania living separately from Trump in recent years has increased, with sources claiming she spends limited time in Mar-a-Lago.
- During the Stormy Daniels scandal, Melania notably avoided appearing publicly with Trump and traveled separately for major events.

**Stormy Daniels and Karen McDougal Affairs**
Trump allegedly had extramarital affairs with adult film actress Stormy Daniels and Playboy model Karen McDougal. Hush money payments totaling over $280,000 were made to suppress the allegations before the 2016 election.

## IMPEACHMENT PROCEEDINGS

**First Impeachment (2019-2020)**
Trump was impeached by the House of Representatives on December 18, 2019, for abuse of power and obstruction of Congress.
**Articles of Impeachment (2019)**
- Abuse of Power: Pressured Ukraine to investigate political rival Joe Biden in exchange for military aid.
- Obstruction of Congress: Refused to comply with subpoenas and directed officials to ignore congressional investigations.

**Senate Trial and Acquittal (2020)**
Acquitted by the Republican-led Senate on February 5, 2020, despite overwhelming evidence presented by House prosecutors.
**Second Impeachment (2021)**
Trump was impeached for a second time on January 13, 2021, for incitement of insurrection following the January 6 Capitol riot.
**Articles of Impeachment (2021)**
- Incitement of Insurrection: Encouraged supporters to march to the Capitol and 'fight like hell' to overturn the 2020 election results.

**Senate Trial and Acquittal (2021)**
Acquitted by the Senate on February 13, 2021, with 57 senators voting guilty—falling short of the required two-thirds majority.
**Historical Significance**
- Trump is the only U.S. president to be impeached twice.
- He is also the only president to have faced trial in the Senate twice.

## EXHIBIT D — FORBES "ATTACK OF THE BLOGS" (2005) — PRIOR ATTACKS & HISTORICAL PATTERN

### OVERVIEW

This Exhibit contains the nationally published Forbes cover story *"Attack of the Blogs,"* which documents Plaintiff's historic targeting by coordinated online smear campaigns. The article describes:

- Viral defamation
- Millions in valuation loss
- Orchestrated online mob behavior
- Google and Yahoo's role in enabling attacks
- Pre-social-media reputational warfare

This establishes a **20-year continuity** of reputational harm.

### Included Evidence

- Cover page
- Pages describing Plaintiff's $90M valuation
- Pages describing blog attacks and cyber sabotage
- Relevant narrative commentary

### Purpose of Exhibit D

✔ Establishes continuity back to 2000

✔ Proves Plaintiff has long been targeted

✔ Supports RICO continuity requirement

✔ Shows foreseeability and historical knowledge






# Attack of the Blogs

**WEB LOGS ARE THE PRIZED PLATFORM OF AN ONLINE LYNCH MOB SPOUTING LIBERTY BUT SPEWING LIES, LIBEL AND INVECTIVE. THEIR POTENT ALLIES IN THIS PURSUIT INCLUDE GOOGLE AND YAHOO | BY DANIEL LYONS**

Forbes
NOVEMBER 14, 2005

**Blindsided:** Gregory Halpern can't get Yahoo to reveal who has been attacking his oddball company.

ANDY GOODWIN FOR FORBES

ROSS MACDONALD FOR FORBES

GREGORY HALPERN KNOWS HOW TO HYPE. SHARES OF HIS PUBLICLY held company, Circle Group Holdings, quadrupled in price early last year amid reports that its new fat substitute, Z-Trim, was being tested by Nestlé. As the stock spurted from $2 to $8.50, Halpern's 35% stake in the company he founded rose to $90 million. He put out 56 press releases last year.

Then the bloggers attacked. A supposed crusading journalist launched an online campaign long on invective and wobbly on facts, posting articles on his Web log (blog) calling Halpern "deceitful,"

128 FORBES • November 14, 2005

FORBES • November 14, 2005 129

## Attack of the Blogs

"unethical," "incredibly stupid" and "a pathological liar" who had misled investors. The author claimed to be Nick Tracy, a London writer who started his one-man "watchdog" Web site, our-street.com, to expose corporate fraud. He put out press releases saying he had filed complaints against Circle with the Securities & Exchange Commission.

Halpern was an easy target. He is a cocky former judo champion who posts photos of himself online with the famous (including Steve Forbes, editor-in-chief of this magazine). His company is a weird amalgam of fat substitute, anthrax detectors and online mattress sales. Soon he was fielding calls from alarmed investors and assuring them he hadn't been questioned by the SEC. Eerily similar allegations began popping up in anonymous posts on Yahoo, but Yahoo refused Halpern's demand to identify the attackers. "The lawyer for Yahoo basically told me, 'Ha-ha-ha, you're screwed,'" Halpern says. Meanwhile, his tormentor sent letters about Halpern to Nestlé, the American Stock Exchange, the Food & Drug Administration, the Federal Trade Commission and the Brookhaven National Laboratory (involved in Circle's anthrax deal).

**"SOME OF THESE BLOGGERS HAVE JUST ONE GOAL, AND THAT IS TO DO DAMAGE. IT'S EVIL."**

But it turns out that scribe Nick Tracy of London was, in fact, a former stockbroker in Oregon named Timothy Miles—and Miles himself faces SEC charges that he took part in a pump-and-dump stock scheme in 2000. He was tried in June and awaits a verdict. No matter: Circle Group stock fell below a dollar in a year of combat with Miles and the anonymous bashers on Yahoo (and after Nestlé dropped Z-Trim). Halpern's stake is down $75 million, and he blames Miles and his acolytes; he has sued for defamation. "Some of these bloggers have just one goal, and that is to do damage. It's evil," he says.

Blogs started a few years ago as a simple way for people to keep online diaries. Suddenly they are the ultimate vehicle for brand-bashing, personal attacks, political extremism and smear campaigns. It's not easy to fight back: Often a bashing victim can't even figure out who his attacker is. No target is too mighty, or too obscure, for this new and virulent strain of oratory. Microsoft has been hammered by bloggers; so have CBS, CNN and ABC News, two research boutiques that criticized IBM's Notes software, the maker of Kryptonite bike locks, a Virginia congressman outed as a homosexual and dozens of other victims—even a right-wing blogger who dared defend a blog-mob scapegoat.

"Bloggers are more of a threat than people realize, and they are only going to get more toxic. This is the new reality," says Peter Blackshaw, chief marketing officer at Intelliseek, a Cincinnati firm that sifts through millions of blogs to provide watch-your-back service to 75 clients, including Procter & Gamble and Ford. "The potential for brand damage is really high," says Frank Shaw, executive vice president at Microsoft's main public relations firm, Waggener Edstrom. "There is bad information out there in the blog space, and you have only hours to get ahead of it and cut it off, especially if it's juicy."

Some companies now use blogs as a weapon, unleashing swarms of critics on their rivals. "I'd say 50% to 60% of attacks are sponsored by competitors," says Bruce Fischman, a lawyer in Miami for targets of online abuse. He says he represents a high-tech firm thrashed by blogs that were secretly funded by a rival; the parties are in talks to settle out of court. One blog, Groklaw, exists primarily to bash software maker SCO Group in its Linux patent lawsuit against IBM, producing laughably biased, pro-IBM coverage; its origins are a mystery *(see box, p. 136)*.




**Victim of a smear: Sara Radicati took a slap at IBM's Notes. Bloggers smacked back, "trying to disable my business," she says.**

The online haters have formidable allies amplifying their tirades to a potential worldwide audience of 900 million: Google, Yahoo and Microsoft, plus a raft of other blog hosts. Google is the largest player; its Blogger.com site attracts 15 million visitors a month, more than each of the Web sites of the *New York Times*, *USA Today* and the *Washington Post*. An upstart, Six Apart in San Francisco, owns three blogging services—TypePad, LiveJournal and Movable Type—that together run a strong second to Google.

Google and other services operate with government-sanctioned impunity, protected from any liability for anything posted on the blogs they host. Thus they serve up vitriolic "content" without bearing any legal responsibility for ensuring it is fair or accurate; at times they even sell ads alongside the diatribes. "We don't get involved in adjudicating whether something is libel or slander," says Jason Goldman, a manager at Google's blogging division. In squabbles between anonymous bloggers and victims Google sides with the attackers, refusing to turn over any information unless a judge orders it to open up. "We'll do it if we believe we are required to by law," he says.

Attack blogs are but a sliver of the rapidly expanding blogosphere. A hundred thousand new blogs are created every day, more than one new blog per second, says Technorati, a firm in San Francisco that tracks the content of 20 million active blogs. Some big blogs attract millions of readers. Weblogs Inc., a Santa Monica, Calif. outfit that just got bought by America Online for a reported $25 million, publishes 90 blogs and could bring in $2 million in ad sales this year, says cofounder Jason McCabe Calacanis.

Bash-the-company Web sites emerged in the 1990s; Untied, founded in 1997 to carp at United Airlines, was one of the first. But blogs are more virulent; they spread farther and build on one another's allegations. The first blog is said to have gone up on Dec. 17, 1997 from a techie who wanted to log cool sites on the Web. By 1998 there were 23 known blogs. In 1999 the first





## Attack of the Blogs

tools to automate a site's design came out, making blogging easy for anyone. In 2003 the word "blog" made it into the *Oxford English Dictionary*.



**Nom de guerre: Fake journalist Nick Tracy, a.k.a. Timothy Miles.**

The combination of massive reach and legal invulnerability makes corporate character assassination easy to carry out. Dry treatises on patent law and trade policy don't drive traffic (or ad sales) for bloggers and hosts; blood sport does. Last year consultant Sara Radicati published a negative report about IBM's Notes e-mail product. That led to organized outrage from bloggers who, it turns out, are consultants who make money installing Notes. She says her firm, the Radicati Group in Palo Alto, Calif., was deluged with obscene phone calls and e-mails, a common element when blogs go negative. "They were trying to disable my business," she says. "It was obscene, vile, abusive, offensive stuff. These are a bunch of sickos."

The anti-Radicati bloggers got an endorsement of sorts from an executive at IBM. Ed Brill, an IBMer who works on Notes marketing and publishes his own blog (edbrill.com), responded on July 23 last year to Radicati's bearish Notes report. He questioned whether she had ties to Microsoft and referred readers to two other blogs with far blunter assertions.

Within days bloggers had posted "investigative" articles "exposing" her as corrupt and unethical, claiming she was a "shill" who took bribes from Microsoft. One blogger said she was doing something shady by operating a group that helps small companies find venture funding. Bloggers linked to one another's sites and posted on Brill's blog and elsewhere, creating an echo chamber in which, through repetition, the scandal began to seem genuine.

**"A BLOGGER CAN MAKE ANY STATEMENT ABOUT ANYBODY, AND YOU CAN'T CONTROL IT."**

Six days after the attacks began, a Notes consultant in the U.K. gloated on Brill's blog: "The Radicati Group? Their analysis is now meaningless .... Their name has been blackened, their reputation in tatters."

Radicati fought back by responding on her own Web site, but the smear job hovers online, appearing when you Google her name or start with Brill's mostly diplomatic site and then work your way through its links. One step away is IBM itself, which has a Notes site that once linked into Brill's. That link has since been taken down. Radicati says IBM ignored her pleas to stop Brill from linking to the hate sites. IBM says it has nothing to do with Brill's blog.

A week after that flap IBMer Brill fired up the swarm again, issuing a call to arms against research firm Meta Group for similar sins. "Y'all did such a good job on the last report ... " his blog entry began. Sure enough, soon Meta was being "investigated" by bloggers and "exposed" as Radicati was. Gartner, which now owns Meta, declined to comment.

No wonder companies now live in fear of blogs. "A blogger can go out and make any statement about anybody, and you can't control it. That's a difficult thing," says Steven Down, general manager of bike lock maker Kryptonite, owned by Ingersoll-Rand and based in Canton, Mass.

Last year bloggers posted videos showing how to break open a Kryptonite lock using a ballpoint pen. That much was true. But they also spread bogus information—that *all* Kryptonite models could be cracked with a pen; that it is the only brand with this vulnerability; and that Kryptonite knew about the problem and covered it up. None of these claims is true, but a

### Fighting Back

YOU CAN'T STOP BLOGGERS FROM LAUNCHING AN ALLOUT attack on you or your business if that's what they decide to do—but you can defend yourself. Here's how.

**MONITOR THE BLOGOSPHERE.** Put your own people on this or hire a watchdog (Cymfony, Intelliseek or Biz360, among others). Spot blog smears early, before they can spread, and stamp them out by publishing the truth.

**START YOUR OWN BLOG.** Hire a blogger to do a company blog or encourage your employees to write their own, adding your voice to the mix.

**BUILD A BLOG SWARM.** Reach out to key bloggers and get them on your side. Lavish them with attention. Or cash. Earlier this year Marqui, a tiny Portland, Ore. software shop, began paying 21 bloggers $800 per month to post items about Marqui, while requiring them to disclose the payments. Marqui's listings soared on Google from 2,000 to 250,000 results. Never mind that one blogger took the money and bashed a Marqui marketing strategy anyway.

**BASH BACK.** If you get attacked, dig up dirt on your assailant and feed it to sympathetic bloggers. Discredit him.

**ATTACK THE HOST.** Find some copyrighted text that a blogger has lifted from your Web site and threaten to sue his Internet service provider under the Digital Millennium Copyright Act. That may prompt the ISP to shut him down. Or threaten to drag the host into a defamation suit against the blogger. The host isn't liable but may skip the hassle and cut off the blogger's access anyway. Also: Subpoena the host company, demanding the blogger's name or Internet address.

**SUE THE BLOGGER.** If all else fails, you can sue your attacker for defamation, at the risk of getting mocked. You will have to chase him for years to collect damages. Settle for a court order forcing him to take down his material.

—*D.L.*



## Attack of the Blogs

spokesman says. Google lets them run wild. Yet Google edits and censors blog content all the time—to protect its own interests. The company, whose portentous corporate ethos includes the mantra "Don't be evil," snuffs out blogs that engage in "phishing" (tricking people into revealing confidential information) and "spam blogs" that skew Google's search results. Bloggers who sign up for its ad program (Google passes along 79% of sales, on average) must follow firm Google guidelines that limit references to drugs, alcohol, tobacco, gambling and even "excessive profanity."

Once blogger attacks begin, victims can resort to libel and defamation lawsuits, but "filing a libel lawsuit, the way you would against a newspaper, is like using 18th-century battlefield tactics to counter guerrilla warfare," says David Potts, a Toronto lawyer who is writing a book on cyberlibel. "You'll accomplish nothing and just get more ridicule." He tells clients to find a third party to bash the bloggers.

Gregory Halpern at Circle Group, in Mundelein, Ill., used this approach against his nemesis, Nick Tracy, a.k.a. Timothy Miles. After the first attack Halpern contacted the blogger's lawyer but got nowhere. He demanded a correction, only to get mocked: Miles posted on his blog an audio file of a perturbed message Halpern had left on his voice mail.

Halpern had better luck, however, when he allied with Gayle Essary, who runs the FinancialWire online news service and had tangled with Miles, too. Halpern dug up details on Miles (his photo and Oregon driver's license; his links to a litany of questionable companies; his claim to be an ordained minister; his Web site that describes a mysterious crystal that contains a message from God) and fed them to Essary. Essary did 15 articles on Miles without citing Halpern as a source, and when Halpern heard from people asking about Miles' allegations against Circle Group, he referred them to FinancialWire, saying it had "exposed this guy a long time ago."

Halpern also used a new law, the Digital Millennium Copyright Act, which requires hosts to take down copyrighted material used without permission. He confronted Miles' service provider and threatened to sue for copyright infringement and libel; the ISP pulled the plug. But our-street.com emerged days later at a second service. In three months Halpern pursued Miles through nine ISPs, finally giving up and filing a libel suit in state circuit court in Cook County, Ill. in June 2004. He accuses the blogger of orchestrating a short-seller scheme to send Circle stock plunging. Miles insists he never sold short or acted on behalf of short-sellers.

**"FILING A LIBEL LAWSUIT IS LIKE USING 18TH-CENTURY TACTICS TO COUNTER GUERRILLA WARFARE."**

Miles, who says he misrepresented himself as Nick Tracy because "I wanted to be discreet," has abandoned our-street.com and moved from Oregon to Slovenia. He claims he is outside the Illinois court's jurisdiction. The judge disagrees. Miles says he plans to appeal. He has set up a new site, scamspotting.com, and insists he is a bona fide investigative journalist: "I tell the truth, and it's never pretty." This drives Halpern nuts: "It's amazing that an anonymous guy can put out a report full of lies and then be so self-righteous."

After anonymous attacks spread to Yahoo, Halpern moved in court to force Yahoo to reveal who was behind the sniping. In September a state judge in Illinois ordered Yahoo to reveal the names. A lawyer for the secret posters is trying to settle without turning over their names, Halpern says. Yahoo declines to comment on the case, but Halpern argues that Yahoo and other carriers should step up: "They make money selling ads on these message boards, and the controversial material generates the most traffic. So they're benefiting from this garbage. I think they should take responsibility for it."

Halpern has had less luck getting anyone in Congress to listen to his plaint. He says that may change if a few politicians get a taste of what he has gone through. "Wait until the next election rolls around and these bloggers start smearing people who are up for reelection," Halpern says. "Maybe then things will start to happen." F

### A BRIEF HISTORY OF BLOGS

**December 1997** Jorn Barger invents term "weblog" to describe his own Web site.

**December 1998** An inventory of all known Web logs is taken; it tallies all of 23 sites.

**April 1999** Peter Merholz coins shorter term: "blog."

**August 1999** Pyra Labs launches Blogger, a free blog-hosting service.

**October 2001** Six Apart releases Movable Type for making blogs.



**December 2002** Political bloggers drive Trent Lott from Senate majority leader post over allegedly racist comments.

**February 2003** Google buys Pyra Labs and its Blogger.com; becomes world's top blog host.

**March 2003** *Oxford English Dictionary* lists "blog" as a noun and a verb.

**September 2003** Worldwide blog count soars to 1 million.[1]

**August 2004** Bloggers are cleared to cover U.S. political conventions.

**May 2005** Blogosphere explodes to 10 million blogs.[1]

**September 2005** Google introduces blog search feature.

**November 2005** Blogosphere doubles in size again; now at 20 million outposts.[1]

[1] As compiled by Technorati. *Sources: Technorati; Rebecca Blood; Six Apart; Oxford English Dictionary.*

# EXHIBIT E — ILLINOIS-SPECIFIC HARM (CHICAGO COMPUTER GUIDE)

## OVERVIEW

This Exhibit shows Plaintiff's earlier Illinois-based investigative efforts to identify cyber-attackers, his use of subpoenas and ISP records, and the real-world reputational and business harm inflicted inside Illinois.

This proves:

- Illinois jurisdiction
- Illinois-specific injury
- Past targeting of Plaintiff and his technology ventures
- Illinois community harm

### Included Evidence

- Chicago Computer Guide article
- Key pages showing reputational injury and Illinois incidents
- Subpoena/digital investigation commentary

### Purpose of Exhibit E

✔ Anchors the entire complaint to Illinois

✔ Establishes Plaintiff's credibility as an investigator

✔ Shows harm was local long before social media existed

✔ Supports venue and jurisdiction

INTERNET ARCHIVE WaybackMachine
http://www.crgq.com:80/press/09_04_2001/Taking_Back_An_Online_Rep Go
28 captures
11 Apr 2003 - 17 Aug 2007
?

**Taking Back An Online Reputation**
By Michael Cloutier

In June of 2000 when Greg Halpern, CEO of Mundelein-based Circle Group Internet, was informed by his network administrator of the more than 100 complaints received about the massive pornographic spam sent through their e-mail server, many of which were sent to children, he was shocked.

Circle Group Internet Inc., is an Internet investment brokerage firm which focuses on providing funding for new companies and entrepreneurs and supply support services like web site and multimedia presentation designs and other business support services.

Halpern's shock galvanized him into action as he and his company went to extraordinary lengths to ultimately track down and prosecute a cyber criminal that had hacked into their mail server and used it to send millions of pornographic spam e-mails. Circle Group's efforts to ferret out and prosecute a cyber criminals on their own is a fascinating study in the devious and convoluted methods that cyber criminals use to hide their identities so that they can perpetrate their crimes in anonymity.

Halpern said that the e-mails referenced pornographic material and had links to pornographic sites and included his company information at the bottom. Before they could figure out exactly how it was happening two similar incidents occured. Halpern estimates that well over one million spam e-mails were sent during these attacks.

According to Halpern, Circle Group's mail server had actually been hacked into and the e-mails were sent directly through their server by the cyber criminal. The perpetrator wrote a little code that basically said, "Take mail from this place and send its to that place by way of this server". Simple, but it was in no way easy to track down who did the coding. Halpern's quest started by taking one of his company's internally developed security programs and modifying its slightly so that he could follow the path back towards the original source.

With the help of their software they were able to find where the spam was initially relayed from. It turned out to be from now-defunct Megsinet address. Their first major problem arose when they approached Megsinet. Megsinet had been absorbed by UUNet and any and all inquiries would have to go through them. When asked however, UUNet refused to provide any information about the offending IP source unless issued a subpoena. When presented the subpoena, UUNet told Halpern that the IP information had been purged from their system and that they could not help them. Halpern at that point got a little steamed.

"At that point I got the feeling that they just didn't want to provide the information so I got on the phone with their attorneys and my attorneys and I made it clear in no uncertain terms that I intended to prosecute them if necessary for the damages and subsequently the information was magically produced." said Halpern.

Halpern was given an IP address and the credit card information for the account. At this point you think it would be just step away from nabbing the culprits, but of course you would be completely wrong. To begin with, the credit card information went to an account in Texas, and the IP address went to an address in Arizona. How, might you ask was that pulled off?

According to Halpern the perpetrator used a secured credit card which once used up, expired. Of course, the person who signed up for the card gave phony information. Following that lead led to an elderly couple in Texas, who when contacted by Halpern were obviously baffled by the whole situation. "We called them and said, 'what do you have to say about this' and they said 'about what'. They are obviously in their 70s or 80s and didn't even now what an Internet account was," said

Halpern.

With that lead run cold Halpern then turned to the IP address. They found that the address was originating in Arizona and contacted the local phone company in that area. Again, after producing a subpoena they were given the contact information. However, they were unable to call the location because the line was solely dedicated to Internet access.

The line was subsequently traced to a house but the owner hadn't lived there for over a year. Strangely, they then traced the actual number to a house three or four blocks away that required a call to the village police to get the actual address, which lead them to their culprit, or so they thought.

Because they were unable to call the person directly Halpern had a lawsuit of the homeowner at that residence drawn up for $2 million and sent to the address. The resulting reaction was played by Halpern by consummate skill.

"She called up in a kind of rage/panic saying 'what is this all about, I can't believe your sending this'. So I just took a chance and got on the phone and said, 'look, anyone can tell from talking to you that your the guilty party. Now what you need to do is come clean if you expect to get out from under a $2 million lawsuit'. She then began to give excuses including saying her child was not well. I said that's really a shame and I feel sorry for that but I don't feel sorry for the destruction you've done by being involved in sending porno-graphy and these are serious offenses, and unless you come clean we're going to pursue this lawsuit against you full bore, because you're not giving us any choice.

The long and the short of it is that she broke down and said it was this other guy in Florida that had hired her through a friend and she didn't even know the man." said Halpern. He also explained that she was given all the explicit instructions to set up the whole convoluted situation. She also admitted that she had written the e-mail copy and received payments of $800 and $400.

With a signed affidavit from the lady, (he dismissed her from the claim because he considered her a patsy) Halpern was finally able to file a lawsuit to the actual party that originated the attack. You would think the story finally ends there but you need to know more about cyber criminals.

Halpern said that at first that he just ignored the suit. Then he tried to file bankruptcy to hide from the judgment. Halpern's attorneys had to challenge the bankruptcy and were successful. Finally, when the suspect had nowhere else to go he settled for an undisclosed monetary settlement and was required to provide a formal apology. They had finally gotten their man and their justice.

It took over two weeks just finding the guy and several more to finalize the situation. It cost Circle Group substantial amounts of money in court and attorney fees. It also cost them a lot of time and effort, but Halpern was adamant about the importance of taking the criminal down. He was concerned about hiscompany's reputation but there were also more important issues involved.

"There's a whole sector of people that are hiding behind the Internet and I think it's kind of dangerous. Who knows what else this can produce but we do know that it can produce bad press, bad image. There's the old saying that you don't get a second chance to give a good first impression. So it's important take a strong stand, and I'm not sure everybody can take that seriously because, number one you need a lot of intestinal fortitude, and extra time and money," said Halpern.

Internal vigilance and dogged pursuit of cyber criminals seems the order of the day, at least at Circle Group Internet Inc. Halpern's ordeal seems to makes the Internet look like the Old West where cyber crime victims form a digital posse to round up the bad guys. Where's Wyatt Earp when you need him?

## EXHIBIT F — PROFESSIONAL CREDENTIALS – 2017-2020 BOARD MEMBER OF AMERICAN INSTITUTE BEHAVIORAL RESEARCH TECHNOLOGY (AIBRT) & EPSTEIN FINDINGS

### OVERVIEW

This Exhibit provides evidence of Plaintiff's professional credentials and specialized expertise regarding behavioral technology, algorithmic manipulation, digital visibility suppression, and semantic-influence effects. From **2017 to 2020**, Plaintiff served on the **Board of Directors of the American Institute for Behavioral Research and Technology ("AIBRT")**, working directly with AIBRT founder **Dr. Robert Epstein**, the world's leading researcher on algorithmic bias, search-engine manipulation, and behavioral-effects modeling in digital environments.

Plaintiff's participation in AIBRT establishes his authority to identify and evaluate the algorithmic suppression, search manipulation, and semantic reframing patterns documented throughout this Complaint.

### 1. Plaintiff's Role Within AIBRT (2017–2020)

Plaintiff was personally recruited to join AIBRT's Board of Directors by Dr. Robert Epstein, Senior Research Psychologist at AIBRT, as confirmed by Dr. Epstein's email dated **November 2, 2017**, which states:

This communication verifies the appointment:

**Thanks! And a form....**

re@aibrt.org <re@aibrt.org> Thursday, November 2, 2017 at 12:50 AM

To: greg maxsound.com

Hi, Greg - Thanks for joining us for dinner this evening, and welcome to AIBRT's Board of Directors!

When you get a chance, can you sign that conflict of interest form and either mail it to me or scan it and send me the image? Thanks!

The Clearinghouse book is growing nicely - very impressive work. If you can send me a digital version at the point, that would be helpful. That way I won't need to type in the links. Cordially, /re

Robert Epstein, PhD (Follow me on Twitter @DrREpstein)
Senior Research Psychologist, American Institute for Behavioral Research and Technology
"Improving human life, one behavior at a time."

- Plaintiff's official appointment to AIBRT's Board
- Active collaboration with Dr. Epstein during AIBRT research cycles
- Plaintiff's role reviewing materials related to algorithmic manipulation, visibility distortion, SEME/SSE effects, and suppression trends affecting political and public-interest content

AIBRT's research has been repeatedly suppressed and buried by Google, as discussed further below.

## 2. AIBRT Breakthrough Findings Relevant to This Case

AIBRT and Dr. Epstein discovered and named several forms of algorithmic manipulation now widely cited in academic literature and whistleblower disclosures:

- **SEME — Search Engine Manipulation Effect**
- **SSE — Search Suggestion Effect**
- **MLF — Machine-Learning Fairness manipulation**

- **VME — Video Manipulation Effect**
- **ABE — Algorithmic Behavioral Effects**

These effects describe how search engines, autocomplete systems, ranking signals, and content-curation algorithms can **shift opinions, suppress content, distort perceptions, or modify user behavior** — without users realizing manipulation is occurring.

Google's own internal documents *provide above in* **EXHIBIT B** confirm these brainwashing methodologies of Internet users, including:

- *Definition of Algorithmic Unfairness*
- *Algorithmic Bias Investigation Meta-Analysis*
- *ML Fairness Design Guidance*
- *Feeding Webspam Actions to News*
- *Internal Fake News / Misinformation Control Systems*

These internal materials contradict Google's public claim (e.g., on Wikipedia and press statements) that SEME/SSE are "hypothetical" or "unverified."

**3. Google's Attempts to Discredit Epstein, AIBRT & SEME/SSE and hide from their harmful actions against citizens**

The record shows:

- **Wikipedia minimizes or misrepresents SEME**, despite peer-reviewed results from tens of thousands of participants
- Search visibility for "AIBRT," "Robert Epstein," "SEME," and related terms is restricted or nearly impossible to connect. In Dr. Epstein's Wikipedia page it shows ***the world famous AIBRT organization but is deliberately not hyperlinked.***

# Robert Epstein

9 languages

Article Talk | Read Edit View history Tools

From Wikipedia, the free encyclopedia

*For other people named Robert or Rob Epstein, see Robert Epstein (disambiguation).*

**Robert Epstein** (born June 19, 1953) is an American psychologist, professor, author, and journalist. He was awarded a Ph.D. in psychology by Harvard University in 1981, was editor-in-chief of *Psychology Today*, and has held positions at several universities including Boston University, University of California, San Diego, and Harvard University. He is also the founder and director emeritus of the Cambridge Center for Behavioral Studies in Concord, MA. In 2012, he founded the American Institute for Behavioral Research and Technology (AIBRT), a nonprofit organization that conducts research to promote the well-being and functioning of people worldwide.

Epstein has been a commentator for National Public Radio's *Marketplace*, the Voice of America, and Disney Online. His popular writings have appeared in *Reader's Digest*, *The Washington Post*, *The Sunday Times* (London), *Good Housekeeping*, *The*

**Robert Epstein**



Epstein speaking at the ceBIT conference in Hanover, Germany

| | |
|---|---|
| **Born** | June 19, 1953 (age 72)<br>Hartford, Connecticut, U.S. |
| **Education** | Trinity College (BA)<br>University of Maryland, Baltimore<br>Harvard University (PhD) |

- Articles and videos on **The Creepy Line** documentary (which features Dr. Epstein and exposes manipulation by Google/Facebook) have been **removed** or shadow-suppressed across multiple platforms
- Dr. Epstein's findings are framed by Google-aligned entities as "hypotheses," despite hard data showing influence shifts of **20%–60%** in controlled experiments

Search engine manipulation effect - Wikipedia 11/30/25, 11:17 AM

WIKIPEDIA
The Free Encyclopedia

# Search engine manipulation effect

The **search engine manipulation effect** (**SEME**) is a term invented by psychologist Robert Epstein in 2015 to describe a hypothesized change in consumer preferences and voting preferences by search engines. Rather than search engine optimization where advocates, websites, and businesses seek to optimize their placement in the search engine's algorithm, SEME focuses on the search engine companies themselves. According to Epstein, search engine companies both massively manipulate consumer and vote sentiment, and furthermore do so to ensure their favored candidates win. Epstein's research shows that such manipulations can shift the voting preferences of undecided voters by 20 percent or more, and up to 80 percent in some demographics, and can change the outcomes in over 25% of national elections.[1][2][3]

In response to the allegations, Google denied re-ranking search results to manipulate user sentiment, or tweaking ranking specially for elections or political candidates.[4]

## Scenarios

At least three scenarios offer the potential to shape/decide elections. The management of a search engine could pick a candidate and adjust search rankings accordingly. Alternatively, a rogue employee who has sufficient authority and/or hacking skills could surreptitiously adjust the rankings. Finally, since rankings influence preferences even in the absence of overt manipulation, the ability of a candidate to raise his or her ranking via traditional search engine optimization would influence voter preferences. Simple notoriety could substantially increase support for a candidate.[2]

## Experiments

Five experiments were conducted with more than 4,500 participants in two countries. The experiments were randomized (subjects were randomly assigned to groups), controlled (including groups with and without interventions), counterbalanced (critical details, such as names, were presented to half the participants in one order and to half in the opposite order) and double-blind (neither subjects nor anyone who interacted with them knows the hypotheses or group assignments). The results were replicated four times.[2]

- Plaintiff's own AIBRT-related materials, research pages, and "Google Crimes" analyses have also been suppressed across search platforms

These actions are consistent with the **same suppression mechanics** affecting Plaintiff's patriotic messaging, books, websites, and Illinois-facing visibility.

4. Plaintiff's Insider Knowledge & Contributions

During Plaintiff's AIBRT tenure, he:

- Provided **Google Crimes** analysis and evidence of manipulation
- Collaborated with Dr. Epstein on visibility-suppression research
- Received internal materials for review
- Submitted analysis on behavioral manipulation patterns
- Supported AIBRT's Clearinghouse research project
- Attended in-person and digital briefings
- Gained firsthand knowledge of algorithmic manipulation systems
- Witnessed Google/Facebook suppression techniques later exposed publicly

Plaintiff's knowledge directly informs the factual allegations in this Complaint concerning:

- digital suppression
- semantic poisoning
- reputational distortion

- algorithmic throttling
- shadowbanning of patriotic messaging
- semantic steering
- public-interest suppression
- false narrative elevation

**5. Included Evidence (Attached to Exhibit F)**

1. **AIBRT Board Membership Email (Epstein → Halpern)**
   *"Welcome to the Board of Directors!"*

**Thanks! And a form....**

R re@aibrt.org <re@aibrt.org> Thursday, November 2, 2017 at 12:50 AM
To: greg maxsound.com

Hi, Greg - Thanks for joining us for dinner this evening, and welcome to AIBRT's Board of Directors!

When you get a chance, can you sign that conflict of interest form and either mail it to me or scan it and send me the image? Thanks!

The Clearinghouse book is growing nicely - very impressive work. If you can send me a digital version at the point, that would be helpful. That way I won't need to type in the links. Cordially, /re

Robert Epstein, PhD (Follow me on Twitter @DrREpstein)
Senior Research Psychologist, American Institute for Behavioral Research and Technology
"Improving human life, one behavior at a time."

2. **AIBRT Notable Findings Summary**
   Outlining SEME, SSE, MLF, VME, ABE

**Internet Studies**

**Notable Findings:** People are currently revealing almost 40 percent more sensitive personal information online than they would if they knew the risks. In elections, search rankings that favor one candidate can shift the voting preferences of undecided voters by up to 80 percent in some demographic groups. Automated search suggestions and the answer boxes at the top of the page of search results also influence people's opinions, purchases, and votes without their knowledge. The search engine is, in effect, the most powerful mind control machine ever invented.

**Ongoing Research:** We have discovered and are currently studying and quantifying a number of powerful and largely invisible means of manipulation that the internet has made possible: the Answer Bot Effect (ABE), the Search Suggestion Effect (SSE), the Search Engine Manipulation Effect (SEME), the Differential Demographics Effect (DDE), the Targeted Messaging Effect (TME), the Multiple Exposure Effect (MEE), the Video Manipulation Effect(VME), the Opinion Matching Effect (OME), the Digital Personalization Effect (DPE), and others. Most of these effects involve ephemeral experiences, which means, among other things, that they don't leave paper trails for authorities to trace.

**Recognition:** As of January 2018, the National Academy of Sciences ranked AIBRT's 2015 paper on the Search Engine Manipulation Effect (SEME) to be in the top 1 percent of all scientific papers the organization monitored in all the sciences, both short-term and long-term. As of August 18, 2023, the paper had been accessed or downloaded from PNAS's website more than 230,000 times, and SEME had been partially or fully replicated multiple times. Ongoing research on SEME suggests that search rankings are having a significant impact on many of the most important decisions people make in their lives, not just on voting preferences. Because SEME is virtually invisible as a form of social influence, it is especially dangerous.

**Congressional Testimony:** On July 16th, 2019, AIBRT's Senior Research Psychologist, Dr. Robert Epstein, testified before a U.S. Senate subcommittee about AIBRT's ongoing research on new forms of online manipulation. A 7-minute video of his testimony can be viewed here. A 15-minute exchange between Dr. Epstein and Senator Ted Cruz can be viewed here. An expanded and updated report based on Dr. Epstein's Congressional testimony can be accessed at https://GooglesTripleThreat.com (PDF format). On December 13th, 2023, Dr. Epstein testified before another Senate subcommittee about AIBRT's creation of https://AmericasDigitalShield.com, a nationwide monitoring system that preserves and analyzes ephemeral content on Big Tech platforms in real time. A 6-minute video

of his testimony can be viewed here. A 480-page version of his written testimony can be downloaded here.

3. **Dr. Robert Epstein — 1-Page CV Excerpt**
   Documenting qualifications, behavioral research background, and publication history.

**CURRICULUM VITAE**
August 2018

**ROBERT EPSTEIN, Ph.D.**

American Institute for Behavioral Research and Technology
1035 East Vista Way, Suite 120, Vista, California 92084-4606 USA Tel/Fax (USA): +1-206-309-3867
Email: re@AIBRT.org Twitter: @DrREpstein Home: http://DrRobertEpstein.com
Media coverage: http://DrRobertEpstein.com/index.php/media-coverage Inquiries: media@AIBRT.org

**Born:**

June 19, 1953; Hartford, Connecticut, USA.

**Education:**

1977-1981, Harvard University; M.A., Experimental Psychology, 1980; Ph.D., Experimental Psychology, 1981.
1976-1977, University of Maryland Baltimore County; Graduate program in Community and Clinical Psychology.
1970-1974, Trinity College; B.A., Psychology, 1974.

**Nonacademic Positions:**

2016, Columnist, *Quartz* (http://Qz.com).
2009-2016, CEO, Creativity International.
2009-2010, Blogger, *PsychologyToday.com*.
2008-2018, Blogger, *The Huffington Post*.
2008, Columnist ("The Skeptical Psychologist"), *Skeptical Inquirer*.
2006-2017, Contributing Editor, *Scientific American Mind* magazine.
2005-2008, Host, "Psyched!," Sirius/XM Radio.
2003-2006, West Coast Editor, *Psychology Today* magazine.
1999-2003, Editor-in-Chief, *Psychology Today* magazine.
1998-2003, Chairman and CEO, InnoGen International, Inc.
1998-2001, Host, "Psychology Today Live" radio program; Cable Radio Network, Catholic Radio Network, eYada.com.
1998-1999, Director, San Diego Institute for Executive Leadership.
1997, Columnist, Disney Online.
1996-1999, Contributing Editor, *Psychology Today* magazine.
1992-1993, Instructor, Cambridge Forum on Executive Leadership.
1991-1993, Commentator; KPBS-FM Radio (San Diego's NPR affiliate).

**Academic Positions:**

2013-2015, Professor of Psychology, University of the South Pacific.
**2012-present**, Senior Research Psychologist, American Institute for Behavioral Research and Technology.
2012, Adjunct Professor, Chicago School of Professional Psychology, Los Angeles.
2011, Adjunct Associate Professor, Chicago School of Professional Psychology, Los Angeles
2010-2012, Research Faculty, Santa Barbara Graduate Institute.
2009-2010, Lecturer, Rady School of Management, University of California San Diego.
2003-2009, Visiting Scholar, Department of Psychology, University of California San Diego.
2001-2003, University Research Professor, California School of Professional Psychology at Alliant International University.
1999-2001, University Research Professor, United States International University.
1998-2000, Adjunct Professor, Department of Psychology, San Diego State University.
1998-1999, University Professor, United States International University.
1994-1995, Research Professor, National University.
1993-1994, Professor and Chair, Department of Psychology, National University.
1992-2009, Lecturer, HAL College of Technology and Design; Osaka, Nagoya, and Tokyo, Japan.
1992-1999, Associate Investigator, Center for Behavioral Epidemiology, School of Public Health, San Diego State University.
1992, Visiting Associate Professor, Keio University, Tokyo.
1991-1993, Instructor, University of California San Diego, Extension School.
1991-1992, Visiting Lecturer; Department of Psychology, University of California San Diego.
**1990-present**, Director Emeritus, Cambridge Center for Behavioral Studies.
1990-1995, Director, Loebner Prize Competition in Artificial Intelligence.
1989-1990, Instructor; Department of Psychology, Simmons College.
1989-1990, Business Director; *Behavior and Philosophy*, *Behavior and Social Issues*, and *Behavioral Engineering*.
1986-1993, Adjunct Associate Professor; Department of Psychology, Boston University. (Faculty Advisor to Psi Chi, National Honor Society in Psychology, 1988-1989).
1986-1992, Adjunct Associate Professor; Department of Psychology, University of Massachusetts, Amherst.
1985-1989, Business Director; *Behaviorism*.
1984-1990, Managing Editor; *Progress in Behavioral Studies*.
1983-1985, Associate Director; Foundation for Research on the Nervous System.
1983-1985, Adjunct Assistant Professor; Department of Psychology, Northeastern University.
1982, Instructor; Department of Psychology, Simmons College.
1981-1990, Executive Director and Trustee; Cambridge Center for Behavioral Studies.
1981-1983, Research Associate; Foundation for Research on the Nervous System.
1980-1989, Lecturer; Department of Psychology, University of Massachusetts at Boston.
1979-1981, Tutor and Advisor; Dudley House, Harvard University.
1979-1980, Teaching Fellow; Department of Psychology and Social Relations, Harvard University.
1977, Senior Research Assistant; School of Public Health, Harvard University.
1977, Faculty Consultant; Statistics Center, University of Maryland Baltimore County.
1976, Teaching Assistant; Department of Sociology, University of Maryland Baltimore County.

4. **Excerpted Google Internal Materials *(Provided in Exhibit B)*** supporting algorithmic manipulation claims

**Purpose and Relevance of Exhibit F**

- ✔ **Validates Plaintiff's expertise** in algorithmic bias and digital manipulation
- ✔ Helps the Court understand the **mechanics** behind suppression and visibility distortion
- ✔ Demonstrates Plaintiff's **longstanding involvement** in behavioral-tech oversight
- ✔ Corroborates the factual background of **algorithmic suppression** described in Exhibits A, B & C
- ✔ Supports **Fraud, ICFA, False Light, Conspiracy, RICO, TIPEA**
- ✔ Shows suppression of AIBRT parallels suppression of Plaintiff

**AFFIDAVIT OF GREGORY J. HALPERN AUTHENTICATING EXHIBIT F**

I, **Gregory J. Halpern**, declare under penalty of perjury under the laws of the State of Illinois as follows:

1. I am the Plaintiff in this action and am competent to testify to the matters stated herein.
2. I served as a **Board Member of the American Institute for Behavioral Research and Technology (AIBRT)** from approximately **2017 to 2020**. My position on the AIBRT Board is confirmed by the email dated November 2, 2017, from Dr. Robert Epstein, Senior Research Psychologist at AIBRT.

3. During my affiliation with AIBRT, I collaborated directly with Dr. Epstein on matters relating to algorithmic manipulation, search visibility distortion, behavioral effects of digital platforms, and semantic influence systems. The Notable Findings summary included in Exhibit F accurately reflects the research areas reviewed during my tenure.
4. The documents attached to Exhibit F — including the AIBRT Board Membership communication, notable findings summary, CV excerpt for Dr. Epstein, and related charts or summaries — are true and correct copies of materials in my possession or publicly available AIBRT research materials.
5. I make this declaration for the purpose of authenticating Exhibit F as a true and accurate representation of my credentials and my work with AIBRT.

I declare under penalty of perjury under the laws of the State of Illinois that the foregoing is true and correct.

Executed on November 30, 2025
at Spring Grove, Illinois.

GREGORY J. HALPERN, Pro Se
11008 MORNING DOVE LANE
SPRING GROVE, ILLINOIS 60081
EMAIL: GREGHALPERN1@PROTON.ME
PHONE: (847)565-9732
FAX: (815)604-8075

## EXHIBIT G — ILLINOIS ECONOMIC DAMAGE REPORT (2000–2025)

Overview:

This Exhibit quantifies the actual Illinois share of documented economic losses from 2000–2025, using a 4.1% Illinois population/tax-base allocation. Federal income and payroll taxes are excluded, ensuring this reflects Illinois-only resident burdens.

Included Categories:

- Direct state and local taxes
- Consumer-paid "buried taxes"
- Regulatory and administrative fees
- State-level cost pass-throughs
- Inflation losses affecting Illinois households
- Economic manipulations whose effects burden Illinois residents

Illinois Resident Burdens:

- Direct state-level taxation: $1.43 trillion
- Taxes buried in daily life: $1.49 trillion
- Economic manipulation & systemic losses: $2.00 trillion
- Inflation as silent tax: $0.55 trillion

Total Illinois Resident Burden (2000–2025): » $5.47 trillion

**Purpose in This Action:**

This Exhibit provides the economic context for Plaintiff's damages, demonstrating that Illinois citizens, including Plaintiff, operate under extreme and compounding economic burden. Defendants' coordinated misconduct caused Plaintiff personal economic injury on top of an already severe Illinois economic disadvantage.

## AFFIDAVIT OF GREGORY J. HALPERN AUTHENTICATING EXHIBIT G

I, **Gregory J. Halpern**, being duly sworn, state as follows:

1. I am the Plaintiff in this action and a lifelong resident of the State of Illinois. I have personal knowledge of the matters described herein, and if called to testify, I would testify competently to the same.
2. I prepared **Exhibit G — Illinois Citizen Tax Burden & Economic Damages (2000–2025)** based on publicly available economic calculations contained in my 25-Year Master Forensic Economic Damages Report. Exhibit G represents a **resident-only Illinois calculation** using a conservative **4.1% population/tax-base allocation** and expressly **excludes all federal income and payroll tax categories**.
3. Exhibit G accurately summarizes state and local taxation, consumer-buried taxes, inflation burdens, hidden economic manipulations, and other Illinois-resident economic losses documented over the past twenty-five years. The calculations are presented solely to demonstrate the economic environment in which Plaintiff suffered reputational, economic, relational, and professional harm as described in the Complaint.
4. Exhibit G is true, correct, and prepared by me personally. It is submitted to assist the Court in understanding the direct and indirect economic disadvantages borne by Illinois residents, and to establish the baseline context for Plaintiff's personal damages, comparative disadvantage, and loss of prospective economic advantage under Illinois law.

I declare under penalty of perjury under the laws of the State of Illinois that the foregoing is true and correct.

GREGORY J. HALPERN, Pro Se
11008 MORNING DOVE LANE
SPRING GROVE, ILLINOIS 60081
EMAIL: GREGHALPERN1@PROTON.ME
PHONE: (847)565-9732
FAX: (815)604-8075

Dated: November 30, 2025

# EXHIBIT H — HARM TIMELINE & NARRATIVE MATRIX (2000–2025)

***The 25-Year Unified Pattern of Digital Targeting, Algorithmic Suppression, and Illinois Harm***

## I. 25-Year Chronology of Systemic Harm (2000–2025)

This Exhibit provides a synthesized 25-year timeline demonstrating how Plaintiff has been repeatedly targeted through evolving forms of digital manipulation, reputational distortion, and audience interference — beginning long before the public understood Big Tech's influence systems.

### A. Early Era: Online Mob Attacks & Reputational Sabotage (2000–2005)

- **2000–2005:** Plaintiff is subjected to coordinated anonymous smear campaigns documented in the **Forbes cover story "Attack of the Blogs"**.
- Plaintiff's company loses tens of millions in valuation due to orchestrated digital defamation.
- Plaintiff investigates cyberattacks, subpoenas ISPs, and uncovers multi-state digital abuse documented in the **Chicago Computer Guide**.
- These attacks occur before "social media," proving early adoption of digital sabotage tactics.

### B. Consolidation Era: Big Tech Emergence & Platform Dominance (2010–2020)

- Google evolves into an **information gatekeeper**, shaping national political narratives and controlling discoverability.
- Google enters a **politically aligned regulatory bubble**, reinforced by **427 meetings with the Obama White House**, allowing unchecked expansion of manipulative capabilities.
- Plaintiff documents Google manipulation in real time, creating the **Catalog of Google Crimes (2013–2020)**.

- Plaintiff joins the **AIBRT Board (2017–2020)** and collaborates with Dr. Robert Epstein, gaining insider expertise on SEME, SSE, ABE, and algorithmic bias.

**C. Modern Suppression Era: Semantic Reframing & Erasure (2020–2025)**

- Search engines suppress Plaintiff's legislative Acts, book titles, and domain names (Exhibit A).
- Autocomplete manipulation eliminates neutral or positive search pathways.
- AI-generated summaries inject negative frames into search experiences.
- Plaintiff's patriotic messaging is shadowbanned, throttled, or misrepresented across platforms.
- Individual repeaters (e.g., Defendant Gertz) inject extremist anti-Trump rhetoric into Plaintiff's feed, triggering algorithmic suppression.
- The **Epstein "Triple Threat" (2022)** confirms that these effects shift opinions, damage reputations, and influence public behavior at scale.

**II. The Narrative Matrix (Misconduct → Actor → Illinois Harm)**

This matrix integrates all Exhibits (A–G) into a unified, evidence-backed model that demonstrates how multi-source misconduct converged in Illinois to harm Plaintiff's relationships, reputation, opportunities, and economic capability.

**A. Types of Misconduct**

- **Search suppression** (Exhibit A)
- **Algorithmic manipulation** (Exhibit B & F)
- **Semantic reframing** (Exhibit A & C)
- **Defamation / false narratives** (Exhibit C)
- **Patterned reputational sabotage** (Exhibit D)
- **Audience contamination** (Section F of Complaint)
- **Visibility throttling / shadow-banning** (Exhibits A, B & F)

- **Political narrative conditioning** (Exhibit C)

B. Responsible Actors

- **Platform operators** (Google, YouTube, Meta) — Exhibits A, B
- **Media figures** (Maddow, Kimmel, etc.) — Exhibit C
- **Nonprofits / advocacy networks** (Open Society, aligned messaging) — Exhibit C
- **Cultural influencers / celebrities** — Exhibit C
- **Whistleblower-confirmed internal systems** — Exhibits B & F
- **Individual repeaters** like Defendant **Kenneth Gertz** — Exhibit C
- **Historic attackers** (blog era Smear Campaigns) — Exhibit D
- **Illinois-specific perpetrators** (local audience contamination) — Exhibit E

**C. Resulting Harms in Illinois**

- Lost book sales, visibility, and audience reach
- Damaged collaborative and professional opportunities
- Misled readership, collaborators, and supporters
- Suppressed patriotic advocacy
- Reputational distortion in Illinois communities
- Loss of prospective economic advantage
- Economic impact documented in **Exhibit G ($5.47 trillion statewide burden)**
- Ongoing suppression of Plaintiff's work, identity, and legislative proposals

**III. Exhibit H as the "Spine" of the Evidentiary Framework**

Exhibit H integrates **ALL prior Exhibits A–G** into one coherent, 25-year model of:

- historical continuity (D)
- local Illinois harm (E)
- direct suppression (A)

- systemic manipulation (B)
- expert validation (F)
- damages (G)
- narrative echo effects (C)
- conspiracy structure (Complaint ¶25)

It shows that **every category of evidence** points to the same conclusion:

Plaintiff has been targeted across multiple generations of online manipulation systems, each more advanced and more politically aligned than the last — culminating in severe, measurable harm within Illinois.

This Exhibit serves as the **framework**, the **backbone**, the **through-line**, and the **connecting tissue** of the entire case.
No Defendant can argue, "I acted alone," because Exhibit H demonstrates:

Everyone participated — at different levels — and are still operating today in lockstep, in a nationally synchronized rhetorical and algorithmic regime that produced significant identical harms in Illinois over a quarter century.